# Exhibit 9

**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**REPLY EXPERT REPORT OF GRAHAM WADE**

**FEBRUARY 28, 2022**

# Table of Contents

I.    INTRODUCTION .................................................................................................. 1

II.   SUMMARY OF OPINIONS RELATED TO MR. HAYDEN AND DR. CARR'S
      REPORTS ............................................................................................................ 2

      A.   General Observations Common to Both Mr. Hayden and Dr. Carr's Reports .... 2

      B.   General Observations Specific to Mr. Hayden's Report ......................................... 8

      C.   General Observations Specific to Dr. Carr's Report .............................................. 11

      D.   Summary of Opinions Related to Mr. Hayden's Report ....................................... 12

      E.   Summary of Opinions Related to Dr. Carr's Report ............................................. 15

III.  BASES FOR OPINIONS RELATED TO MR. HAYDEN'S REPORT ........................... 15

A.    Opinion 1: If the IDBs Had Pre-Existing Rights to a Real Dividend, None of Them Would
      Have Entered into the Cum-Ex Transactions on the Terms They Employed ................... 15

      1.   Mr. Hayden Points to a de Minimis Price Difference Between Annex E
           Trades That ED&F Man Has Acknowledged as Improper and Non-Annex E
           Trades.  In Fact, His Explanation Merely Highlights the Slight Premium That
           Was Necessary for ED&F Man to Pay to Include External IDBs in the Non-
           Annex E Trades.  This Premium Was Demonstrably Not Incurred in the
           Annex E Trades Which Were Only Restricted to Internal Parties................. 18

      2.   Mr. Hayden's Suggestion That It Is Economically Rational to Sell a Dividend
           for Any Price Above 73% Is Wrong and Ignores Contemporaneous Evidence
           That a Tax-disadvantaged Owner Could Earn Around 90% .......................... 21

      3.   IDBs With Existing Long Positions May Have Been Able to Earn 85% or
           More of a Real Gross Dividend Payment by Simply Doing Nothing............. 23

      4.   Evidence in the Record and My Market Experience Suggest That the
           Availability of Danish Shares Was Subject to Constraints............................ 25

B.    Opinion 2: Mr. Hayden's Conclusion That the Payments ED&F Man Received Were
      Real Dividends Passed on Through Market Claims Is Wrong, Contradicted by the
      Contemporaneous Actions of the Custodians, and Unsupported by His Extensive
      Citations Which Simply Establish That OTC Transactions Can Be Executed on
      Whatever Terms the Parties Agree. ........................................................................ 28

      1.   Mr. Hayden and I Agree on the Definition of Market Claim but Not Its
           Application to the Transactions at Issue.  Except for One Cum-Dividend
           Transaction That Failed, the Industry Market Claim Guidance He Cites Is
           Irrelevant. ............................................................................................... 28

      2.   OTC Trades Are Not Subject to the Extensive Exchange Rules Cited by Mr.
           Hayden.  Therefore, His Citations to Support His Opinions on OTC Trades
           Are Irrelevant and Unpersuasive. ............................................................. 33

i

3.      The HMRC Guidance on Manufactured Overseas Dividends Cited by Mr. Hayden Highlights the Precise Point at Issue and Supports My Position, Not Mr. Hayden's ............................................................................................. 38

4.      The Contemporaneous and Irrefutable Evidence of the Actions of BNP Paribas and SEB in This Very Record Confirm That My Approach Is Correct ............................................................................................................... 41

C.   **Opinion 3: Mr. Hayden's Claims That Various Regulatory Restrictions Would Have Prevented the IDBs From Undertaking Transactions in the Same Way as MPT Dubai in the Annex E Cum-ex Transactions Is Demonstrably Wrong and There Are Multiple Examples Where Participation in the Transactions at Issue Would Have Been Unlawful if His Analysis Were Correct. ............................................................................... 50**

1.      ED&F Acted as Prime Broker in These Transactions and Mr. Hayden's Assertions to the Contrary are Incorrect ........................................................ 50

2.      The Short Selling Regulations Cited by Mr. Hayden Are a Complete Red Herring as Demonstrated by the Actions of Both MPT Dubai and ED&F Man ........................................................................................................... 54

3.      The Intermediation of Share Sales, Offsetting Futures, and the Facilitation of Financing Transactions Using Futures by the IDBs Were Not Prohibited Practices in and of Themselves (as Opposed to as Part of the Overall Scheme to Generate False Tax Vouchers in Support of Reclaim Applications), as Suggested by Mr. Hayden.  Instead, it was a Customary Activity for IDBs and There are Numerous Examples of Such Transactions in the Record. ...... 59

D.   **Opinion 4: Evidence in the Record Overwhelmingly Suggests That the Non-Annex E Cum-Ex Transactions Were Executed in a Very Similar Way to the Annex E Cum-Ex Transactions, and I Re-affirm the Opinions in the Wade Initial Report on Non-Annex E Transactions ............................................................................................................. 69**

1.      Mr. Hayden's Claims That the Timing of the Trades Indicates That They Could Not Be Linked Transactions Proves Precisely the Opposite. The Pricing and Timing of the Cum-Ex Purchases and Futures Demonstrates That the Trades Were Part of Co-Dependent Circles. ............................................. 70

2.      Mr. Hayden's Admission That the Recycling Unwind of the Acer TDC March 2014 Position was Inappropriate is Significant Because the Position Unwound was Created in Part by Acer Purchasing 6 million Non-Annex E Shares from Lutetia.  The Unwinds Provide an Unambiguous Roadmap to How ED&F Man and the Pension Plans Created a Misleading Impression of the Positions Owned by the Pension Plans. .................................................. 75

E.   **Opinion 5: The Pension Plans Made Tax Reclaims based on Tax Vouchers for Share Quantities that Substantially Overstated the Shares Actually Owned and Dividends Received.  ED&F Man's Corporate Representative Admitted that ED&F Man Facilitated This By Recycling Shares Through Intraday Settlement, Which Supported the Creation of False Tax Vouchers For The Pension Plans To Apply For a Double, Triple, and Quadruple Dip Refund ............................................................................................................ 81**

1. A Complete Reconciliation of the TDC Share Movements on March 12, 2014, Plus Corroborating Evidence from Various Contemporaneous Communications Demonstrate a Planned and Deliberate Process of Recycling Shares in Order to Justify Larger Tax Reclaims Than the Number of Shares Which ED&F Man Could Actually Source. The Share Counts Involved Appear to Amount to a Quadruple Dip of Shares Actually Held to Receive Four Times the Tax Reclaims. ........................................................................ 83

2. Mr. Hayden's Criticism on the Detail of the ADTV Calculations Ignores the Substantive Point That It Is Implausible That ED&F Man Really Acquired Such Large Positions and Would Have Been Unable to Risk Manage Them if It Could. In Any Event, ED&F Man Has Now Admitted That It Did Not Really Acquire the Shares It Claimed. ........................................................... 96

**IV. BASES FOR OPINIONS RELATED TO DR. CARR'S REPORT ................................... 98**

**A. Opinion 6: Dr. Carr Ignores the Comprehensive Evidentiary Record That No Shares Were Ever Held by the Parties in Connection with Tax Reclaims and That the Solo Trades Were Conducted with Contrived Circularity and No Economic Risk. Dr. Carr's Claim That the Solo Transactions Carried Normal Market Risk Ignores All Available Evidence and Is Incorrect. ....................................................................... 98**

1. Dr. Carr's Claim That the Pension Plans Could Have Reasonably Assumed That the Solo Transactions Were Real Ignores All Available Evidence and Is Incorrect .................................................................................... 100

2. Dr. Carr's Claim That IDBs' Participation in the Solo Transactions Is Evidence That They Were Not Fictitious Ignores All Available Evidence and Is Incorrect ................................................................................... 103

3. Dr. Carr's Claim That the Solo Transactions Were "Bespoke" and Therefore Legitimate Ignores All Available Evidence and Is Incorrect ..................... 106

4. Dr. Carr's Claim That the Securities Lending Transactions Were Real and Legitimate Ignores All Available Evidence and Is Incorrect ..................... 109

5. Dr. Carr's Claim That the Pension Plans Had Economic Exposure to the Shares and Therefore a Claim to Dividends Ignores All Available Evidence and Is Incorrect ........................................................................... 111

6. Dr. Carr's Claim That the Circularity of the Solo Transactions Does Not Imply They Are Fictitious Ignores All Available Evidence and Is Incorrect ................................................................................................. 112

7. Dr. Carr's Claim That Offsetting Trades in Solo's Accounts Could Somehow Legitimize the Solo Transactions Ignores All Available Evidence and Is Incorrect .................................................................................... 113

**Appendix A: Materials Considered ................................................................. 117**

iii

## I. INTRODUCTION

1.      I have been asked by Counsel for SKAT, the Customs and Tax Administration of the Kingdom of Denmark, to respond to the reports of Mr. Max Hayden ("Hayden Report") and Dr. Emre Carr ("The Carr Rebuttal Report"), dated February 1, 2022.  For purposes of this report, I incorporate the definitions, background, analyses, and opinions detailed in my reports dated December 31, 2021 ("Wade Initial Report")[1] and February 1, 2022 ("Wade Rebuttal Report").[2]  My qualifications were detailed in Section II of the Wade Initial Report and my curriculum vitae was also included in that report as Appendix A.

2.      I affirm that this report is my independent work product and contains my objective unbiased opinions in relation to matters within my expertise.  I believe that the facts and analyses stated in this expert report are true, and the opinions I have expressed represent my true and complete professional opinions.

3.      I have prepared this report to state my expert opinions; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data which I considered in reaching my opinions; and to make all other appropriate disclosures.  My opinions in this report are based on specialized knowledge arising from my education, training, study, and experience (which is set out in Section II of the Wade Initial Report).  I express no legal opinions in this report and the information in this report is based upon discovery to date and the information that is currently available.  I have considered and compiled materials as cited herein with the assistance of various CRAI personnel working under my direction and supervision.[3]  In addition to the materials considered in the Wade Initial

---

[1] See, Expert Report of Graham Wade In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.

[2] See, Rebuttal Expert Report of Graham Wade in re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, February 1, 2022.

[3] I confirm that all opinions which I express in this report are mine alone, and not necessarily reflective of the opinions of CRAI or any of its personnel.

Report and the Wade Rebuttal Report, a listing of additional materials that I have considered for this matter as of the date of this report is contained in Appendix A, as well as the citations in the footnotes to the text and tables presented in this report.

4.      Following this introductory Section I, the remainder of this report is organized as follows.  In Section II, I summarize my opinions in response to Mr. Hayden's and Dr. Carr's reports.  In Section III, I offer opinions specific to Mr. Hayden's Report.  In Section IV, I offer opinions specific to Dr. Carr's Report.

5.      Throughout this report capitalized terms which are not otherwise defined take their meaning from the Wade Initial Report and the Wade Rebuttal Report.

## II.      SUMMARY OF OPINIONS RELATED TO MR. HAYDEN AND DR. CARR'S REPORTS

### A.      General Observations Common to Both Mr. Hayden and Dr. Carr's Reports

6.      Plaintiff, SKAT, has alleged that certain reclaim applications supported by Tax Vouchers issued by ED&F Man and Solo to their respective Pension Plan clients were fraudulent.  The critical question bearing on this issue is whether the Defendant Pension Plans were entitled to receive tax reclaims resulting from the Tax Vouchers issued for dividend payments claimed to have been received by the Pension Plans on shares they claimed to own from Cum-Ex transactions for which they actually held no shares.

7.      Rather than addressing this critical issue concerning Cum-Ex trading described in both the Wade Initial and Wade Rebuttal Reports, both Dr. Carr and Mr. Hayden offer an alternative straw man defense of the trades, attempting instead to normalize Cum-Ex trading,[4] and describing it as if it were

---

[4] For example, Dr. Carr states that "[s]tructured transactions are commonly used, [...] for purposes of engaging in arbitrage, such as the dividend arbitrage strategy used by the pension plans."  Carr Rebuttal Report, ¶8a.  Mr. Hayden states: "Markets have a well-developed understanding of how to handle 'Cum-Ex' trades."  Hayden Report, ¶14 c.

legitimate dividend arbitrage. In doing so, they conflate Cum-Cum transactions with Cum-Ex transactions and also suggest that the development of market protocols that dealt with accidental fails in regular-way[5] market transactions somehow legitimizes these deliberately structured and fictitious Cum-Ex transactions.

8. For example, Dr. Carr states that "Cum-Cum and Cum-Ex transactions lead to the same economic exposure for a pension plan."[6] Contrary to the opinions of Dr. Carr and Mr. Hayden, the market protocols referenced by Defendants' experts are simply not reflective of the market's approach to Cum-Ex transactions when the trades at issue in this matter occurred. Setting aside Cum-Ex trades that result from the accidental failure to deliver a security, the only reason to my knowledge for a party to deliberately undertake a Cum-Ex transaction was to generate a tax reclaim on a dividend compensation payment where a different party had already received the real dividend. The fundamental difference between the structured Cum-Ex transactions at issue in this matter and a failed settlement on a regular Cum-Dividend purchase is that in this matter the Cum-Ex trades were designed such that the Cum-Ex seller did not need to own shares over the Record Date, and as a result did not incur the cost of acquiring shares on a Cum-Dividend basis. This is clearly shown in the pricing of the transactions.[7]

---

[5] As I explain later in this report, "regular-way" is a term commonly used to refer to transactions which typically take place on an exchange and use the relevant stock exchange rules. For example, the NYSE defines a regular-way contract for the sale of securities as one where settlement occurs on the second business day after the date of the contract. See, NYSE Rules, NYSE Guide, Delivery Dates on Exchange Contracts, Contracts for Sale of Securities (Rules 64, 65), p. 238, available at:
https://www.nyse.com/publicdocs/nyse/regulation/nyse/NYSE_Rules.pdf, last accessed February 21, 2022.

[6] See, Carr Rebuttal Report, Section VI.

[7] Later in this report I address at length why Mr. Hayden's interpretation of the prices of the Cum-Ex transactions is incorrect. In the Wade Rebuttal Report (¶39) I observed that the pricing of the futures and forwards in the Solo transactions was exactly 73%, which ensured the Pension Plans received 100% of the tax reclaim, which was only possible because there was no real dividend.

In contrast, a failed Cum-Cum transaction would be priced higher based on the reality that the seller must own the shares prior to the Record Date.[8]

9.      The European Securities and Markets Authority ("ESMA") Dividend Arbitrage Report provides an excellent summary of the key differences between Cum-Cum transactions and Cum-Ex transactions.[9]  As described in the ESMA Dividend Arbitrage Report, the distinction between Cum-Ex and Cum-Cum trades was well understood by market participants when the transactions at issue occurred:

> *"28. However, in some schemes achieving a dividend arbitrage is not the main objective, as the real intention is to obtain multiple issuance of tax certificates and the consequent multiple refunds of taxes to multiple persons, with only one of them having actually received the dividend distributed and paid the relevant WHT [withholding tax]. In some cases, potentially no persons have actually received any dividend, and both the trading and WHT reclaims are wholly based on fictitious shares.*
>
> *29. Those schemes, often referred to as Cum/Ex schemes, also consist in equity deals where a share transfer (either by sale or lending) occurs right before the date of the dividend payment, this time with the intention of creating the paperwork (incl. tax certificates) which allows persons to obtain tax refunds on dividend tax which was not paid, and which is likely to represent a fraud under national legislation. Those schemes can by nature be perpetrated only to the detriment of those countries where the tax law provides for WHT on the dividends distributed, in some cases associated with the issuance of tax certificates that can be later on claimed back in the form of a reimbursement from the tax authorities.*
>
> *30. Both Cum/Ex and Cum/Cum schemes foresee the transfer of shares around the dividend payment date. However, as emphasised by NCAs [National Competent Authorities] in their response to the ESMA's inquiry, in the Cum/Ex case the trade is carried out before the dividend is paid out but settlement takes place only after the distribution date whereas, in the case of Cum/Cum arrangements, transactions are carried out and settled prior to the dividend pay-out."*

---

[8] This is demonstrated by Cum-Cum transaction number 20 from Appendix F of the Wade Initial Report which was executed on a Cum-Cum basis, but settlement failed and was completed with Ex-Dividend stock.  See, trade pack ED&F-00042677 and associated emails in ED&F-00312726.

[9] ESMA Final Report on Cum/Ex, Cum/Cum and withholding tax reclaim schemes ("ESMA Dividend Arbitrage Report"), ESMA70-155-10272, September 23, 2020, available at: https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf, last accessed February 10, 2022.

10.     By 2012, market participants were well aware that Cum-Ex trades were considered both inappropriate and illegitimate.  In fact, the only jurisdiction that I am aware of where reputable market participants ever considered deliberately conducting Cum-Ex trades was Germany prior to 2012.  The ESMA Report confirms my understanding and states that, "BaFin [the German Banking Regulator] reported that, until 2012, a controversial reading of the German tax provisions seemed to have created a possibility that the economic owner should be entitled to the dividend, and therefore to the tax certificate related thereto."[10]

11.     The relevance of the year 2012 is that, with effect from January 1, 2012, Germany changed its tax law related to the dividend withholding tax, thereby removing any doubt on the question of the availability of a reclaim on a dividend compensation payment in a Cum-Ex transaction.[11]  At the time the tax law was changed, most market participants were already aware that for some time the German Tax Authorities considered structured Cum-Ex transactions to be inappropriate following previous changes in the law and related developments.

12.     Accordingly, deliberately structured Cum-Ex transactions were not considered normal practice in the equity finance markets when the transactions at issue occurred.

13.     Furthermore, the specific transactions in this matter present at least two additional issues, the first of which is specific to them, while the second applies to any deliberate Cum-Ex transaction.  I discuss each of these issues in turn.

14.     The first question is whether the Pension Plans ever actually held shares in the transactions at issue.  This question is straightforward for the Solo transactions – no Danish shares were ever held by any of the Solo Custodians.  Therefore, the transactions, Tax Vouchers, and tax reclaims thereon were

---

[10] See, ESMA Dividend Arbitrage Report, ¶10, p. 62.

[11] See, ESMA Dividend Arbitrage Report, p. 19, which states that sections 43, 44, 44a, 45a, 50d, and 52a of Einkommensteuergesetz (the German Income Tax Act) were modified effective January 1, 2012.

fictitious.[12]   In his Rebuttal Report, Dr. Carr appears to limit his arguments to questioning whether sufficient evidence exists to conclude that the Solo transactions were not real, or in the alternative, whether the Pension Plans could or did know that the transactions were not real.   In fact, these transactions were not real, a fact the Pension Plans should have been well aware of for reasons explained later in this report.[13]

15.     With respect to the ED&F Man transactions, the detailed discussion in my earlier reports,[14] which I expand on in this report, clearly demonstrates that ED&F Man and the Investment Managers used a series of intraday settlement cycles in which the same shares would be "round tripped" multiple times in the same day[15] to artificially inflate the number of shares purportedly held and dividends purportedly received, and support false Tax Vouchers on share quantities that substantially exceeded the shares actually owned by either ED&F Man or the Pension Plans.[16]   A clear loop, not dissimilar to the Solo transactions, is evident for the ED&F Man Cum-Ex transactions; the difference being that ED&F settled trades by reusing the same shares over and over again, whereas Solo had no shares and simply created fictitious book entries.

16.     If there was any remaining doubt about the shares ED&F Man Pension Plans owned, it has been dispelled by the testimony of Mr. Andrew Wall, the corporate representative witness for ED&F Man:[17]

> *"Q Okay. So can you explain to me in a little more detail how it is that ED&F used the shares that it did have in the depot to settle all the trades in one day?*

---

[12] Wade Initial Report, Section VII. E, and Wade Rebuttal Report, Section III. A. 1.

[13] In particular, see point 1 of Opinion 6.

[14] Wade Initial Report, ¶¶204 – 209 and Figure 11; Wade Rebuttal Report, Sections V. A and V. B.

[15] In his presentation which discussed later in this report, Oliver Bottomley of ED&F Man described this process as doing "multiple round trips" using "the same clip of stock."   ED&F-00053123.

[16] ED&F-00108634 and ED&F-00113799.

[17] Deposition Transcript of Mr. Andrew Wall, February 23, 2022 ("Wall Deposition"), at pp. 238-239.

*A The trades -- the trades in the depot account were of sufficient size to settle the shapes of trades reviewed individually.*

*Q Okay. And then, would the same shares be used again on the same day to settle another shape of the same shares?*

*A Yes, they would. Yes, they would. I'm sorry if you didn't hear me.*

*Q Yes. Thank you. And did the reuse of the shares on the same day happen more than once on the same day when ED&F was settling Danish trades?*

*A Yes, they did. I'm sorry.*

*Q The answer was yes, I believe. And would the shares be reused multiple times until all the shapes were settled?*

*A Yes, they would."*

17.     Mr. Wall's admission is highly significant for two reasons:

1.      It confirms that ED&F Man facilitated the Pension Plans making withholding tax reclaims on positions in Danish securities many times larger than the number of actual shares that it was able to acquire; and,

2.      As explained in the Wade Rebuttal Report with respect to the March 2014 TDC dividend event, every share which ED&F Man held at the close of business on the Record Date was required to satisfy the issuance of Tax Vouchers in the Cum-Cum transactions.  Thus, every Tax Voucher issued in respect of the March 2014 TDC Cum-Ex transactions was completely false (including both non-Annex E and Annex E Cum-Ex Tax Vouchers).  The Pension Plans never held the Danish shares listed on the Cum-Ex Tax Vouchers, never received the dividends listed on the Cum-Ex Tax Vouchers, and never suffered a single Krone of the withholding tax shown on the Cum-Ex Tax Vouchers.  ED&F, the Investment Managers and the Pension Plans took the relatively small number of shares they acquired for the Cum-Cum transactions and ran them through an intraday settlement cycle multiple times to falsely inflate both the shareholdings and the dividends allegedly received.  Each false reclaim application to SKAT on a Cum-Ex trade represents a double, triple, or even quadruple dip of the dividend on the shares actually owned.  In the case of the March 2014

TDC dividend, ED&F Man issued Tax Vouchers relating to dividends on 99.145m shares when it only actually acquired 24.845m shares for the Cum-Cum transactions. [18]

## B.  General Observations Specific to Mr. Hayden's Report

18.  Mr. Hayden admits that if it can be shown that the Inter Dealer Broker ("IDB")[19] Cum-Ex[20] sellers did not own the shares and did not receive a real dividend which they passed on to the Pension Plans, then these transactions were as invalid as the Annex E Cum-Ex transactions were.  In fact, he acknowledges this as being the "salient question."[21]  While I agree that this is a sufficient condition for

---

[18] Wade Rebuttal Report, Section V. C.  In the March 2014 TDC dividend event which I analysed in detail, there were 24.845m shares held in the BNP omnibus account at the close of business on the Record Date of March 11, 2014, and yet ED&F Man issued Tax Vouchers on positions of 99.145m shares which was almost exactly 4 times the number of shares held (ED&F-00040919, at 83-84).  I do not believe it is a coincidence that Sara Mina of ED&F Man separately stated that "Denmark is slightly more efficient settlement wise than Belgium so 25% coverage should suffice" i.e., that every individual Cum-Cum share could generate three other Cum-Ex positions (ED&F-00201236).  These conclusions are based on the analyses and opinions that are more fully described in this report as well as in the Wade Initial and Wade Rebuttal Reports.

I note that of the 99.145m total Tax Voucher positions, 64.3m are Annex E Cum-Ex positions, 10 million are non-Annex E Cum-Ex positions (see Table 1 of this report), and the remainder (24.845m) are Cum-Cum positions.

For the reasons I address later in this report, I have no reason to suspect that there are any material differences between the March 2014 TDC event and the other dividend events covered by my reports.  To the extent that the patterns of trade settlements are consistent on the other dividend events with the TDC March 2014 event, my conclusions on this TDC March 2014 event apply equally to those other events.

[19]  Wade Initial Report, footnote 4: "In this report, the term "Inter-Dealer Brokers" ("IDBs") refers to the numerous external counterparties that ED&F Man and the ED&F Man Pension Plans used for the Appendix C Cum-Ex Trades, their related hedges, and the Solo Capital broker firms' trades.  Strictly speaking, some of these firms are not IDBs, but are classified as other types of regulated financial counterparties.  The role these firms played in these transactions is consistent with the function of an IDB, which is generally taken to mean a party that acts as an intermediary between two other authorised firms to arrange or execute a transaction."

[20]  Wade Initial Report, ¶79: "A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date.  This means the transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex."

[21] "Thus, the salient question is whether there is any basis to conclude that ED&F's market counterparty did not have the right to cum-dividend shares when it executed the transaction, and if so, whether ED&F had any basis to conclude that they did not.  I have seen none, and none appears to be cited by Mr. Wade in his report."  Hayden Report, ¶39 b. (ii).  While the phrase "right to cum-dividend shares" is somewhat ambiguous, when taken with his comments earlier in the same paragraph about a short seller "who did not have the right to a dividend from the issuer", I take Mr. Hayden's view to mean that the seller must either have Cum-Dividend shares or cover the short position with a purchase of Cum-Dividend shares.

the Tax Vouchers to be viewed as invalid, a key caveat that I describe in this report is that it is not the only basis to conclude that the non-Annex E transactions were invalid.

19.     Mr. Hayden provides no evidence to demonstrate that the IDBs in fact owned shares that entitled them to dividends, but instead suggests that if the IDBs did not have the shares, then neither ED&F Man nor the Pension Plan Investment Managers could have been or were aware that the IDBs did not have the shares.[22]  Evidence on the record clearly contradicts Mr. Hayden's claim.  ED&F Man personnel were fully aware at the time of the transactions that MPT Dubai[23] did not have any shares and, shockingly, ED&F Man has made no attempt to establish whether the external IDB Cum-Ex sellers were similarly selling uncovered shorts in the non-Annex E Cum-Ex transactions,[24] despite the obvious similarities between the Annex E and non-Annex E Cum-Ex transactions.  In addition, during his deposition Mr. Wall also confirmed that MPT Dubai trades were approved and cleared by ED&F Man, again demonstrating that ED&F Man would have had the necessary information to know that MPT Dubai was selling short.[25]

---

[22] Hayden Report, ¶39 c (iii): "To the extent that Mr. Wade is suggesting that ED&F or its pension plan clients were aware that they would be receiving shares without the right to a dividend, that assertion is unsupported."

[23] ED&F Man have confirmed that MPT was not market facing and was required to execute and clear all its trades through ED&F Man.  See ED&F-00443853, which is a memo from ED&F Man to the FCA explaining the MPT Dubai trading strategy: "MCM Equity Finance Desk was responsible for checking the orders and the trades were given up to MCM to settle."

[24] Wall Deposition, pp. 261-262:

    "Q: Can you tell me, please, what investigation ED&F has done in order to find out whether or not any counterparty that was selling shares to the defendant pension plans was selling short without a covered position?

    A: ED&F would have not done any investigation into the counterparties to see whether they were selling short."

[25] Wall Deposition, pp. 245-246:

    "Q: So how was ED&F able to determine that MPT Dubai was short selling without a covered position?

    A: ED&F Man were MPT Dubai's clearing broker and would have access to the information."

20.    There are compelling reasons to conclude that the IDBs did not have the shares they claimed they had, and that ED&F Man traders and the Investment Managers would have known this at the time. The primary reason is that if they had the shares, they would not have sold their dividend rights for a price that was significantly below the prevailing market level observed in the contemporaneous and comparable Cum-Cum transactions that the same Pension Plans executed through ED&F Man.

21.    The next section of my response to Mr. Hayden's report is focused on the issue of whether the payments received by the Pension Plans represented real dividends.   Mr. Hayden discusses market customs and practices that have developed in equity financing markets at length but neglects two fundamental issues:

1.    Almost all the guidance he refers to relates to on-exchange transactions and processes designed to deal with fails of normal Cum-Dividend transactions.

2.    Neither BNP Paribas nor SEB contemporaneously agreed with his interpretation of the relevant rules because, with a handful of explainable exceptions which I covered in the Wade Rebuttal Report, both parties declined to accept any market claims on any of the Cum-Ex trades.[26]   A detailed review of the 566 SWIFT messages in the Wade Rebuttal Report confirms that the Pension Plans only received real dividends on shares acquired in Cum-Cum trades.   Ironically, the single payment which SEB made, and which Mr. Hayden devotes considerable attention to, was a Cum-Dividend purchase which failed.   In this instance SEB

---

[26] Wade Rebuttal Report, ¶¶153-155, 210-219 and footnotes 278, 279, and 353.  One notable exception relates to a transaction in respect of TDC shares in August 2014, which Mr. Hayden focuses on but, as I explain in this report, was a Cum-Dividend transaction that was subject to a genuine fail.  In this instance, SEB correctly applied the market conventions that Mr. Hayden discusses extensively in his report.  The others relate to transactions processed by BNP before July 2013, when several emails were exchanged with ED&F Man that discussed problems with market claims associated with Cum-Ex purchases.  ED&F-00137236 and ED&F-00112481.

followed the relevant market guidance, proving its decision not to process market claims on the Cum-Ex transactions was deliberate.

22.    I also reiterate my opinion from the Wade Initial Report that non-Annex E Cum-Ex transactions are fundamentally the same as the Annex E Cum-Ex transactions (which ED&F Man acknowledge were invalid).  The non-Annex E Cum-Ex transactions are therefore equally invalid.[27]  Nothing in the Hayden Report contradicts my opinion and, in fact, as I will explain, Mr. Hayden's admissions in several parts of his report support my opinion.  In this report I will also provide further detail about how the trade and custody records clearly show that the Annex E Cum-Ex transactions provide a roadmap to understanding the non-Annex E Cum-Ex transactions.  I also address various demonstrably incorrect observations in the Hayden Report.  In particular, I do not accept his suggestion that various regulatory rules would have prevented the IDBs from performing the roles I suggested and in fact, the record has numerous examples of the IDBs performing precisely such roles.

23.    Finally, and contrary to Mr. Hayden's assertion, I offered no opinions on the appropriateness or validity of the Cum-Cum transactions in the Wade Initial Report; my opinions were and are limited to the Cum-Ex transactions.[28]  Information about the Cum-Cum transactions is included in both the Wade Initial Report and this report simply as contemporaneous evidence of market pricing and the conduct and expectations of parties in equity financing transactions.

### C.    General Observations Specific to Dr. Carr's Report

24.    My overriding response to Dr. Carr's Rebuttal Report is that he did not properly engage with the evidentiary record.  As laid out in my previous reports, the fundamental issue which he does not properly address is that there never were any Danish shares held by the Solo Custodians.  In the Carr

---

[27] Wade Initial Report, Section VII. B and Appendix E. 2.

[28] See, for example, Hayden Report ¶44g, "Cum-Cum trades that Mr. Wade recognises were proper in Appendix F."

Rebuttal Report he appears to fall back on a position that either the evidence is not conclusive that the transactions are fake, or in the alternative, that the Pension Plans could not have known that the transactions were fake.

25.     A good example of his lack of proper engagement with the record is evident when Dr. Carr makes the following non-sequitur:

26.     "I note that the SKAT Experts' dismissive statements about the structured nature of the transactions do not address, one way or another, whether the Plans owned any shares in Danish companies. If the Solo Custodians' role in locating liquidity for trades in the market is evidence that those trades are fake, then the vast majority, if not all, of the trillions of euros of OTC trades reported every year would be fake, according to the SKAT Experts."

27.     First, I see no basis for extrapolating my conclusions on the Solo transactions to questioning the very nature of the global OTC market.  More importantly, as I have laid out at considerable length in my previous reports, the evidentiary record is clear: the Solo trades are not fake because they are OTC; neither are they necessarily fake simply because their purported terms were not those on which any arm's-length counterparties would transact.  However, they are demonstrably fake because there never were any shares; because the loops were demonstrably circular with no real risk other than the possibility of denial of the tax reclaim; and because none of the Pension Plans nor intermediaries had the financial capacity to undertake trades of sizes they claim to have executed.

### D.      Summary of Opinions Related to Mr. Hayden's Report

28.     **Opinion 1: If the IDBs had pre-existing rights to a real dividend, none of them would have entered into the Cum-Ex transactions on the terms they employed.**

1.  Mr. Hayden points to a de minimis price difference between Annex E trades that ED&F Man has acknowledged as improper and non-Annex E trades.  In fact, his explanation merely highlights the slight premium that was necessary for ED&F Man to pay to include external

IDBs in the non-Annex E trades. This premium was demonstrably not incurred in the Annex E trades which were only restricted to internal parties.

2. Mr. Hayden's suggestion that it is economically rational to sell a dividend for any price above 73% is wrong and ignores contemporaneous evidence that a tax-disadvantaged owner could earn around 90%.

3. IDBs with existing long positions may have been able to earn 85% or more of a real gross dividend payment by simply doing nothing.

4. Evidence in the record and my market experience suggest that the availability of Danish shares was subject to constraints.

29.     **Opinion 2: Mr. Hayden's conclusion that the payments ED&F Man received were real dividends passed on through market claims is wrong, contradicted by the contemporaneous actions of the custodians, and unsupported by his extensive citations which simply establish that OTC transactions can be executed on whatever terms the parties agree.**

1. Mr. Hayden and I agree on the definition of a market claim but not its application to the transactions at issue. Except for one Cum-Dividend transaction that failed, the industry market claim guidance he cites is irrelevant.

2. OTC trades are not subject to the extensive exchange rules cited by Mr. Hayden. Therefore, his citations to support his opinions on OTC trades are irrelevant and unpersuasive.

3. The HMRC guidance on Manufactured Overseas Dividends cited by Mr. Hayden highlights the precise point at issue and supports my position, not Mr. Hayden's.

4. The contemporaneous and irrefutable evidence of the actions of BNP Paribas and SEB in this very record confirm that my approach is correct.

30.     **Opinion 3: Mr. Hayden's claims that various regulatory restrictions would have prevented the IDBs from undertaking transactions in the same way as MPT Dubai in the Annex E Cum-Ex transactions is demonstrably wrong and there are multiple examples where participation in the transactions at issue would have been unlawful if his analysis were correct.**

1. ED&F Man acted as prime broker in these transactions and Mr. Hayden's assertions to the contrary are incorrect.

2. The short selling regulations cited by Mr. Hayden are a complete red herring as demonstrated by the actual actions of both MPT Dubai and ED&F Man.

3. The intermediation of share sales, offsetting futures, and the facilitation of financing transactions using futures by the IDBs were not prohibited practices in and of themselves (as opposed to as part of the overall scheme to generate false Tax Vouchers in support of reclaim applications), as suggested by Mr. Hayden. Instead, it was a customary activity for IDBs and there are numerous examples in the record of such transactions in the record.

31. **Opinion 4: Evidence in the record overwhelmingly suggests that the non-Annex E Cum-Ex transactions were executed in a very similar way to the Annex E Cum-Ex transactions, and I re-affirm the opinions in the Wade Initial Report on non-Annex E Cum-Ex transactions.**

1. Mr. Hayden's claims that the timing of the trades indicates that they could not be linked transactions proves precisely the opposite. The pricing and timing of the Cum-Ex purchases and futures demonstrates that the trades were part of co-dependent circles.

2. Mr. Hayden's admission that the recycling unwind of the Acer TDC March 2014 position was inappropriate is significant because the position unwound was created in part by Acer purchasing 6 million non-Annex E Cum-Ex shares from Lutetia. The unwinds provide an unambiguous roadmap to how ED&F Man and the Pension Plans created a misleading impression of the positions owned by the Pension Plans.

32. **Opinion 5: The Pension Plans made tax reclaims based on Tax Vouchers for share quantities that substantially overstated the shares actually owned and dividends received. ED&F Man facilitated this by recycling shares through intraday settlement, which supported the creation of false Tax Vouchers for the Pension Plans to apply for a double, triple and quadruple dip refund.**

1. A complete reconciliation of the TDC share movements on March 12, 2014, plus corroborating evidence from various contemporaneous communications, demonstrate a planned and deliberate process of recycling shares to justify larger tax reclaims than the number of shares which ED&F Man could actually source. The share counts involved appear to amount to a quadruple dip of shares actually held by ED&F Man on behalf of the Pension Plans in order to receive four times the tax reclaims.

14

2. Mr. Hayden's criticism of the detail of the ADTV calculations ignores the substantive point that it is implausible that ED&F Man really acquired such large positions and would have been unable to risk manage them if it could. In any event, ED&F Man has now admitted that it did not really acquire the shares it claimed.

### E.    Summary of Opinions Related to Dr. Carr's Report

33.    **Opinion 6: Dr. Carr ignores the comprehensive evidentiary record that no shares were ever held by the parties in connection with tax reclaims and that the Solo trades were conducted with contrived circularity and no economic risk. Dr. Carr's claim that the Solo transactions carried normal market risk ignores all available evidence and is incorrect.**

1.    Dr. Carr's claim that the pension plans could have reasonably assumed that the Solo transactions were real ignores all available evidence and is incorrect.

2.    Dr. Carr's claim that IDBs' participation in the Solo transactions is evidence that they were not fictitious ignores all available evidence and is incorrect.

3.    Dr. Carr's claim that the Solo transactions were "bespoke" and therefore legitimate ignores all available evidence and is incorrect.

4.    Dr. Carr's claim that the securities lending transactions were real and legitimate ignores all available evidence and is incorrect.

5.    Dr. Carr's claim that the pension plans had economic exposure to the shares and therefore a claim to dividends ignores all available evidence and is incorrect.

6.    Dr. Carr's claim that the circularity of the Solo transactions does not imply they are fictitious ignores all available evidence and is incorrect.

7.    Dr. Carr's claim that offsetting trades in Solo's accounts could somehow legitimize the Solo transactions ignores all available evidence and is incorrect.

### III.    BASES FOR OPINIONS RELATED TO MR. HAYDEN'S REPORT

#### A.    Opinion 1: If the IDBs Had Pre-Existing Rights to a Real Dividend, None of Them Would Have Entered into the Cum-Ex Transactions on the Terms They Employed

34.    The fundamental question I address in this opinion is whether it was economically rational for reasons other than a false tax reclaim for a Cum-Ex seller to enter a Cum-Ex transaction priced at around 77-82% of the gross dividend if that seller actually owned the real dividend. Agreeing to such pricing

15

would have been economically irrational of the IDBs, who likely could have obtained 85% of the gross dividend simply by holding the shares, or easily entered alternative transactions at close to 90% of the gross dividend. Therefore, the pricing of the Cum-Ex transactions is very strong evidence that the Cum-Ex sellers in the non-Annex E Cum-Ex transactions did not actually receive a real dividend, which further suggests that the non-Annex E trades are fundamentally the same as the Annex E Cum-Ex transactions.

35.    Mr. Hayden misstates the relevant cost for the IDBs in his determination of the economic rationality of the Cum-Ex trades. He states that, "through the market claim process, these shareholders paid the 73% dividend payment to ED&F. Even if such costs arose out of a securities lending transaction and not the purchase of shares, they would be economically rational for a market counterparty without tax-advantaged treatment."[29]

36.    There are three possible ways in which an IDB could have covered its Cum-Ex sale to the Pension Plans. The fact that the IDB paid 73% to the Pension Plans is not a relevant point of comparison in any of these three situations. In fact, while Mr. Hayden and I disagree on the characterization of the dividend compensation payment, we agree that the payment is simply an inevitable consequence of agreeing to enter into the transactions at the Cum-Dividend price. The three possible approaches can be described as follows:

1.  **Option 1:** An IDB has an existing long position it is simply selling and so it just delivers those shares on T+4, or alternatively and equivalently, buys the shares in a regular-way market purchase at the same time it enters into the Cum-Ex sale.

---

[29] Hayden Report, ¶50a. Elsewhere in this report I explain at length why it is incorrect to refer to these payments as market claims in the sense that Mr. Hayden does.

2. **Option 2:** The IDB does not own the shares and enters into a future[30] on T+0,[31] but then arranges a stock loan to borrow the relevant shares in time to settle the Cum-Ex sale on T+4. Note that one cannot entirely rule out that the IDBs may have borrowed shares for a few days to deliver under the Cum-Ex sales in some transactions. However, for the IDB to be in receipt of a real dividend to pass on, these stock loans would have needed to settle before the Record Date, which is implausible for the reasons described below.

3. **Option 3:** The third possibility is the futures hedge and Ex-Dividend purchase approach, which was used by MPT Dubai in all the Annex E Cum-Ex transactions that I have reviewed.[32] In this scenario, the IDB purchases futures to hedge price risk on the Trade Date (T) of the Cum-Ex sale. Next, on T+1 it purchases the shares on a regular-way T+3 Ex-Dividend basis[33] and sells futures to offset the Trade Date futures purchase (i.e., the initial futures hedge). For reasons I describe later in this report, it is overwhelmingly likely that this was the approach used in the non-Annex E Cum-Ex sales.

37.     In the first option, which Mr. Hayden suggests may have been used by Lutetia Capital,[34] the dividend compensation payment made to the Pension Plans is not the relevant point of comparison. Instead, it is the question of what Lutetia Capital would have received had it held onto the shares or what its alternative options were (i.e., its opportunity cost). For a stock loan that settled before the Record Date, the relevant cost of the hedge is the dividend compensation payment paid by the IDB under the stock loan.

---

[30] Of course, in theory, other hedges could be used. However, as I discuss later in this report, there is overwhelming evidence that the Cum-Ex sales were matched with futures hedges.

[31] Where T+0 equals the Trade Date.

[32] I explain this approach in some detail in the Wade Initial Report. See, for example, the description of the Annex E Cambridge Way – MPT Dubai COLOB 2013 transaction. Wade Initial Report, Section VII. B. 1.

[33] Note that I assume a standard market settlement cycle of T+3 here. Similar logic applies to later trades, but with T+3 for the Cum-Ex sale and T+2 for the regular-way purchase.

[34] Hayden Report, ¶49c. iii.

38.     Contemporaneous evidence strongly supports the notion that the true opportunity cost in these trades was around 88-92% of the dividend (significantly higher than the 79.8% average observed in the Cum-Ex transactions).  As I will explain below, many IDBs could have earned 85% or more of the gross dividend without doing anything if they were the existing owners of Danish shares.  Accordingly, even if I set aside my own market knowledge and experience as well as other evidence of coordination included in this and my earlier reports, it is implausible that the Cum-Ex sellers received the real dividend.

>    **1.     Mr. Hayden Points to a de Minimis Price Difference Between Annex E Trades That ED&F Man Has Acknowledged as Improper and Non-Annex E Trades. In Fact, His Explanation Merely Highlights the Slight Premium That Was Necessary for ED&F Man to Pay to Include External IDBs in the Non-Annex E Trades. This Premium Was Demonstrably Not Incurred in the Annex E Trades Which Were Only Restricted to Internal Parties.**

39.     Appendix C of the Wade Initial Report includes 86 Cum-Ex trades which took place at an average "all-in" pricing of 79.8% of the gross dividend.  Mr. Hayden provides two key objections to my analysis.  The first is his claim that I have not appropriately distinguished between Annex E and non-Annex-E Cum-Ex transactions.  He recalculates an average all-in price of 79.6% for the Annex E Cum-Ex trades and 81.7% for the non-Annex E Cum-Ex trades.[35]  In view of contemporaneous evidence which suggests that a real dividend was worth 87-92% of the gross dividend, the results of his analysis do not impact any of my earlier conclusions or the analysis in the forthcoming sections because they are still substantially below the observed market price for real dividends.

40.     Mr. Hayden concludes his analysis by stating that "the cum-ex structure conferred cost advantages vis-à-vis the cum-cum structure."[36]  I agree that Cum-Ex trades had considerable advantages both in cost and ability to scale, which all stemmed from not having the inconvenience of sourcing or paying for real shares with real dividend entitlements.  His attempt to differentiate between Annex E

---

[35] Hayden Report, ¶50 c.

[36] Hayden Report, ¶50 e.

and non-Annex E transactions only demonstrates the cost advantage of using an internal captive IDB compared to paying for the similar services of an external IDB.

41.     Mr. Hayden's second point is that a handful of outlier transactions demonstrate that my use of pricing as an indicator is unreliable.[37]  In fact, of the 86 Cum-Ex transactions reviewed there are only three outliers trades that occurred at a price above 83%.[38]

42.     In his report, Mr. Hayden highlights these three transactions as well as one Cum-Cum trade that took place at 79.3%.[39]

43.     I reject Mr. Hayden's conclusion that these isolated exceptions prove that my analysis of Cum-Ex pricing is flawed.  Rather, based on my review of the evidentiary record I conclude that these exceptions can be explained by the fee arrangements used for passing the net profits between ED&F Man, the Investment Managers, and the Pension Plans.[40]

44.     For example, in the case of Trade 44 (Annex E Newsong IC DC Sept 2014) it appears that the pricing of the hedging instrument does not reflect the actual terms of the deal agreed between Acer and ED&F Man and that in fact, the parties had agreed to pricing of 80% of the gross dividend like so many other Cum-Ex transactions.

---

[37] Hayden Report, ¶50 e.

[38] Wade Initial Report, Appendix C, Trades 2, 3, and 44.

[39] Hayden Report, ¶50 d.

[40] This reason clearly explains the pricing of Trade 44 as I will explain below.  It is possible that the differences on Trades 12 and 13 could also be explained by one or more routine factors that reflect the inherent imperfections of a large trading operation, such as the inevitable occasional booking error, or some other one-off impacts for which the parties agreed to adjust pricing.

45. In this transaction, Acer and ED&F agreed to round trip[41] 50,000 shares in 10 shapes of 5,000 each and instead of the normal futures hedge they entered into a total return swap ("TRS").[42] The settlement of this transaction was facilitated by a stock borrow of 5,000 shares from Jefferies which crossed the Record Date of September 29, 2014.[43]

46. Taking the price of the TRS at face value, it appears that the "all-in" dividend sourcing cost is 99.7% (as included in Appendix C of the Wade Initial Report). The TRS confirm suggests that the actual all-in cost was 100%.[44] However, a different story is shown by the "P&L summary" produced by ED&F Man and shared with Acer.[45] The sum of column "X" of this spreadsheet shows a net loss of DKK339 from the perspective of Newsong. However, the "P&L summary" table ignores the TRS and simply deducts the ED&F Man brokerage and stock loan costs plus an amount labelled "Div", which is an amount equal to 27% of the gross dividend on the 5,000 shares borrowed from Jefferies. Column "AC" helpfully shows the various "P&L Summary" items as a percentage of the gross dividend, and it can be seen that the "Trade Profit" is 20% of the gross dividend i.e., the real pricing of this transaction from Newsong's perspective was 80% of the gross dividend, in line with the other Cum-Ex transactions.

47. Accordingly, I reject the suggestion that the pricing of outliers (which comprise approximately 3% of the transactions reviewed) is meaningful to an overall understanding of how these schemes were

---

[41] Since the use of such techniques is discussed extensively elsewhere in this report and my earlier reports, I do not repeat that discussion here.

[42] See, ED&F-00189961 for the original trade request, ED&F-00081248-57 for the Cum-Ex purchase confirms, and ED&F-00189967 for the TRS confirm.

[43] ED&F-00317370.

[44] The TRS confirm notes that the Dividend Amount will be "equivalent to 100% of the gross dividend" such that it appears that the TRS passed the full benefit to ED&F Man and then the parties must have allocated the appropriate profit split later once the tax reclaim had been received. Note that the parties referred to the TRS as a "Price Return Swap" or "PRS" but given that it includes payments of a Dividend Amount it appears to be a TRS. ED&F-00189967. The difference between this and the calculated 99.7% appears to be the net loss of DKK339.

[45] See, AIGKAMCO_00000553.xlsx which is a spreadsheet prepared by ED&F Man and sent to Alan Goldman of Acer for his "review/approval".

20

arranged. The participants' actions clearly demonstrate agreement that approximately 7% of the gross dividend (or 26% of the tax reclaim) [46] was reasonable compensation for the IDBs' role in executing the Cum-Ex transactions. This is what the relative consistency of the Cum-Ex transaction pricing demonstrates.

### 2. Mr. Hayden's Suggestion That It Is Economically Rational to Sell a Dividend for Any Price Above 73% Is Wrong and Ignores Contemporaneous Evidence That a Tax-disadvantaged Owner Could Earn Around 90%

48. The European equity finance market in which the IDBs operated in at the time of the transactions at issue was very well developed. There was a range of counterparties that were actively looking to match advantaged and disadvantaged counterparties. Relying on the trade packs that I have reviewed in this case alone, one can see that Scotiabank, Morgan Stanley, Natixis, Macquarie, MUFG, HSBC, ICAP, Link, GFI Securities, Commerzbank AG, and Cantor Fitzgerald all actively transferred Danish shares around the dividend events.[47] Similarly, all the largest equity finance businesses engaged in various forms of stock lending of similar equity finance transactions during the relevant time period. In summary, the evidentiary record in this matter clearly demonstrates that there was an established market level for transferring shares with the right to real dividends.

49. Appendix F of the Wade Initial Report includes 53 different Cum-Cum trades arranged by ED&F Man for its clients. The average dividend price of these trades is 89.5%. Trade 23 is priced the lowest in this sample of trades at 87.7%. This average dividend price is substantially higher than the 79.8% average calculated for the Cum-Ex transactions and represents a difference of 9.7% of the gross dividend. In terms of equity spreads, this amount is a very large margin.

---

46 7% compensation is calculated by taking the Appendix C average price of 79.8% and subtracting 73% Net Dividend rounded to one significant figure. This is 25.9% (= 7%/ 27%) of the withholding tax reclaim.

47 See the following trade packs and other documents for trades including each of these counterparties: Scotiabank: ED&F-00444356, Morgan Stanley: ED&F-00193974, Natixis: ED&F-00112387, Macquarie: ED&F-00257556, MUFG: ED&F-00045042, HSBC: ED&F-00202588, ICAP: ED&F-00190440, Link: ED&F-00190797, GFI Securities: ED&F-00190899, Commerzbank AG: ED&F-00193949, and Cantor Fitzgerald: ED&F-00212376.

50.     To put this margin into context, for a trade of 2 million shares over the TDC March 2014 dividend event, 9.7% of the gross dividend is the equivalent of DKK426,800,[48] which represents a spread of around 40 bps[49] on a relatively short-dated trade.  This was a very significant margin compared to typical financing spreads which, in my experience, often ranged between 5-20 bps annualized (i.e., less than 1 basis point on a one-week trade).[50]  It is inconceivable that a sophisticated financial institution with a meaningful quantity of shares that were entitled to a real dividend would give up a real dividend at levels of around 80% of the gross dividend when it could have 'upgraded' its dividend level to 88-92% depending on the supply and demand for a given dividend event.[51]  It is equally inconceivable that sophisticated market participants like ED&F Man and the Investment Managers would have been unaware of the significance of the price differentials between the Cum-Ex and Cum-Cum transactions such that I reject entirely the suggestion that they might not have known that the Cum-Ex sellers did not own shares that were entitled to a real dividend.[52]

---

[48] Gross dividend per share of DKK2.2 x 2m shares x 9.7%.  2 million is not the largest trade.  For example, in this same dividend event Hamlyn LP "acquired" 24m shares.  ED&F-00041067.

[49] The spread is the opportunity cost divided by the transaction notional.  Using DKK53 as a prudent approximation of the value of a TDC share at a Cum-Dividend price, the spread is 40.3 bps = (DKK426,800 / (2,000,000 x DKK53).

[50] 20 basis points per annum / 52 weeks = 0.38 basis points of fee as an absolute amount of the transaction notional.

[51] Supply and demand can vary for a range of reasons.  For example, high dividend yield shares were more attractive because there was more opportunity for profit.  Similarly, during peak times of the European dividend season (approximately March to June), traders needed to allocate balance sheet, funding lines, and credit limits to the most valuable dividend events which made particular dividends more or less in demand.

[52] By way of example, two spreadsheets relating to Acer trading activity clearly show that Acer was well aware of the distinction.  The first (ACER_00010838.xlsx), is a January 30 (pre-trade) chart used to plan trades and determine the amount of capital that would be needed to trade.  The second (ACER_00003910.xlsx) is a post-trade spreadsheet from Mr. Goldman of Acer to Kingham that has the trades actually completed.  Both spreadsheets contain an all-in column where it can clearly be seen that Cum-Cum transactions are meaningfully higher than Cum-Ex transactions.  In the post-trade spreadsheet, it can be seen that Cum-Cum is 91.5%, non-Annex E Cum-Ex is 84.5% and Annex E Cum-Ex is 80%.  Stacey Kaminer of Acer tried to explain these differences at her deposition as a function of the "underlying dividend entitlement" of the seller but this is non-sensical.  The market price of an asset is determined by the aggregate supply and demand for the asset across all market participants – the tax status of the seller may determine the minimum price at which the seller is prepared to sell but it is of no relevance in determining what any buyers would be prepared to pay to acquire the shares.

51.     In addition, many of the IDBs were not as tax-disadvantaged as Mr. Hayden assumes.

### 3.     IDBs With Existing Long Positions May Have Been Able to Earn 85% or More of a Real Gross Dividend Payment by Simply Doing Nothing

52.     As explained above, the relevant question is what the IDBs' alternative courses of action were if they held shares and considered using those shares to settle a Cum-Ex sale.  Mr. Hayden states that a tax disadvantaged holder would have suffered withholding tax of 27%.[53]   However, his argument ignores the existence of the double taxation treaties which Denmark has entered into, many of which reduce the dividend withholding tax rate to 15%.  In particular, under the Denmark-United Kingdom Double Tax Treaty in force at the time, the withholding tax rate was limited to 15% such that the correct 'do nothing' point of comparison had the U.K. tax resident IDBs held shares over the Record Date is 85% of the gross dividend.[54]

53.     For example, MUFG Securities EMEA PLC ("MUFG")[55] was a common non-Annex E Cum-Ex seller.  It is incorporated in England and Wales.  According to its annual accounts for the year ended

---

[53] Hayden Report, ¶50 a.  Note that in his footnote, Mr. Hayden refers to a 42% marginal rate in Denmark, but it is not relevant for a couple of reasons.  First, the rate he quotes is a Personal Income Tax rate which was not relevant to any of the IDBs because they are corporates and not subject to Danish corporate income tax in any event.  Second, withholding tax is a tax on gross income and is accordingly grossed up when preparing accounting profits under IFRS.  Any expenses paid would generally be deducted to generate a net profit for accounting and tax purposes.

[54] See, Article 10(2) of the U.K./DENMARK DOUBLE TAXATION CONVENTION, signed November 11, 1980 (as amended by protocols signed July 1, 1991, and October 15, 1996), which provides that:

> "(2) However, subject to the provisions of Council Directive 90/435/EEC of 23rd July 1990, such dividends: (a) may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State the tax so charged shall not exceed 15 per cent. of the gross amount of the dividends;"

Available at:
https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/496664/denmark-uk-dta-consol_-_in_force.pdf, last accessed February 24, 2022.

[55] Note that MUFG was known as Mitsubishi UFJ Securities International Plc during the Relevant Period.  See, Companies House Change of name NM01 filed July 1,2016. Available at https://find-and-update.company-information.service.gov.uk/company/01698498/filing-history/MzE1MjAzODA0MmFkaXF6a2N4/document?format=pdf&download=0, last accessed February 3, 2022.

December 31, 2014, MUFG was "the London-based international capital markets subsidiary of [Mitsubishi UFJ Financial Group]" and was active in fixed income, equity and structured finance products."[56]  Therefore, it was subject to U.K. corporation tax on its profits.[57]  Accordingly, it would have been entitled to a partial refund of 12% on any Danish dividends received meaning that a dividend paid by a Danish company was worth 85% of the gross dividend to MUFG. The dividend was potentially worth more prior to January 1, 2014, under the earlier form of the U.K. manufactured overseas dividend rules.  Under these rules it was possible for certain dealers to credit the overseas tax that they suffered against certain other U.K. tax liabilities.[58]

54.     Based on my experience and detailed understanding of market practice at the time, as a rational market participant, MUFG would not have entered into a transaction under which it agreed to sell its rights to a dividend[59] worth 85% of the gross dividend at an all-in pricing level of 77.9%[60] using shares it had from a long inventory position that it expected to hold over the dividend Record Date.[61]

---

[56] See, Principal Activities Section of the Directors Report on page 1 of the Annual Report for Mitsubishi UFJ Securities International PLC for the year end December 31, 2014.  Available at https://find-and-update.company-information.service.gov.uk/company/01698498/filing-history/MzEyMzgxMzA0MWFkaXF6a2N4/document?format=pdf&download=0, last accessed February 3, 2022

[57] Ibid. See, note 7 ("Taxation").

[58] A discussion of these rules is beyond the scope of this report.  The HMRC guidance on those rules up to January 1, 2014, is available at: https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74300, last accessed February 3, 2022.

[59] See, for example, Trade 6 in Appendix C of the Wade Initial Report (ED&F-00044265 at 71) in which MUFG sold 1.5m Tryg shares to ED&F Man on a Cum-Ex basis.  The trade date was April 18, 2013, and it settled T+4 on April 24.  This trade was conducted in relation to the dividend with Record Date April 23, 2013, and this dividend was declared on February 7, 2013.  Bloomberg.

[60] Ibid.  ED&F Man purchased 1.5m shares from Mitsubishi at DKK 479.40 per share (ED&F-00044265, at 71) and sold offsetting futures at DKK 459.1581 per share (ED&F-00044265, at 74).  The gross dividend was DKK 26 per share (ibid), which equates to dividend pricing of (479.40 – 459.1581) / 26 = 77.9%.

[61] In many cases it is not possible to determine the tax residence of the Cum-Ex seller because the legal entity name of the seller is not specifically provided, and most large financial institutions operate through a variety of entities and branches.  However, one can see that ICAP Securities Limited was another Cum-Ex seller (see ED&F-00026581- ED&F-00026595, at 89) that is also incorporated in England and Wales.  Note 12 to its accounts for the year end March 31, 2014, also indicates that it was subject to U.K. Corporation Tax (accounts

24

55.     Even in the absence of other strong evidence cited elsewhere in this report, it is my opinion that an economically rational and sophisticated arm's-length counterparty like MUFG would not have entered into a transaction under which it sold the right to a dividend more than 7 dividend points below the market level.[62]

56.     That leaves two alternative explanations:

1.     MUFG did not own the long position, contrary to Mr. Hayden's suggestion; or

2.     MUFG and ED&F Man intended to double-dip the same dividend with MUFG claiming a refund up to 85% and ED&F Man claiming a full refund on behalf of the Pension Plan.

57.     In either of the above two situations, ED&F should not have issued the Tax Vouchers because its clients were not the owner of the dividend.  The evidence from the futures hedging and settlement records cited in later in this report supports the first alternative explanation.

### 4.     Evidence in the Record and My Market Experience Suggest That the Availability of Danish Shares Was Subject to Constraints

58.     Danish shares on the whole are held by relatively few individuals and institutions, who hold them for long periods.  As a result, they are generally illiquid.[63]  In my experience, sourcing Danish

---

available from Companies House https://find-and-update.company-information.service.gov.uk/company/00500777/filing-history?page=4, last accessed February 24, 2022).

Further, based on my knowledge from the Relevant Period, the majority of the IDBs listed in Appendix 2 of the Statement of Agreed Facts at ¶10 operated through a U.K. broker/dealer.

[62] Seven dividend points means 7% of the dividend.  Selling a long position via the Cum-Ex transactions would result in a material loss compared to the available alternatives that yielded 85 to 90% of the dividend.

For example, using the 77.9% pricing in the previous footnote versus the 85% available to MUFG by doing nothing, (85% - 77.9%) * DKK 26 dividend per share * 1.5 million shares = 7.1% * DKK 26 * 1.5m = DKK 2,769,000.  This is approximately $484,000, using the exchange rate of 0.1751 given in ED&F-00044265, at 79.

If I instead use the average Cum-Cum dividend price of 89.5%, I get (89.5% - 77.9%) * DKK 26 dividend per share * 1.5 million shares = DKK 4,524,000 or approximately $792,000.

[63] Wade Initial Report, ¶¶68, 103, and 143.

shares for stock lending trades involved time and effort beyond what one would need to invest to source, for example, French, or German shares.

59.     The evidence produced in this matter is supportive of this view. For example, I reviewed a Bloomberg chat between Freddie Ireland, an ED&F trader, and a trader at Scotiabank.[64]  In the chat, Mr. Ireland asks his counterparty to borrow some shares of several Danish firms, each in a different shape.[65]  As can be seen from the specific shares and shapes, Mr. Ireland is trying to unwind trades on behalf of the Acer pension plans.[66]  However, sourcing Danish shares is not that easy.  After a few minutes, the Scotiabank trader replies, "Will check these… Danish are usually a little more tricky." More than an hour later the Scotiabank trader reports back, "Can do: MAERSKB DC 8,000 NOVOB DC 2,290,000 at 75bps, waiting to hear on the others… I have partials on the others, waiting to hear from another lender."[67]  Mr. Ireland was not at all surprised that his counterparty was only able to find two shapes of the seven he asked for.  He replied, "ok bud thanks… MAERSKB I thought would be the tough one!... we can try again tomorrow, no hurry."[68]  Mr. Ireland contacted the Scotiabank trader the next morning to inquire about the rest of the shapes he needed.[69]  This time it took the Scotiabank trader over 2.5 hours to confirm that he had located the rest.[70]  Another 1.5 hours passed before the trader

---

[64] ED&F-00444356.  In the chat, the Scotiabank trader is identified only by his Bloomberg username.  Bank of Nova Scotia is the official name of Scotiabank.

[65]  ED&F-00444356, at 57: "(Jun 10 10:41:04 AM EDT) FIRELAND (ED & F MAN CAPITAL):  have some GC non div Danish borrows… can you help? … Stock Borrow COLOB DC 430,000 DANSKE DC 2,912,500 DNORD DC 86,000 MAERSKB DC 8,000 NOVOB DC 2,290,000 TDC DC 3,030,000 TRYG DC 85,000… 13-16/6."  There follows the specific requests (stock codes and shapes) and the dates for the requested borrow.

[66] See the discussion elsewhere in this report.

[67] ED&F-00444356, at 58.

[68] Ibid.

[69] ED&F-00444356, at 59: "(Jun 11 04:15:44 AM EDT) FIRELAND (ED & F MAN CAPITAL): anything back on the remaining names yet?"

[70] ED&F-00444356, at 59: "(Jun 11 06:52:55 AM EDT) SBREATHNACH (BANK OF NOVA SCOTIA): Should be good on all these at 75bps… Just firming them up."

confirmed three more shapes,[71] then another hour to confirm the Danske shares, with a note that "DNORD is proving more difficult looking around some more for this."[72]  At this point the chat ended, apparently without the last of the seven shapes being confirmed.

60.      In my experience, this chat reflects the reality of the market.  Danish shares were not a priority for sales teams to source compared to the more liquid and lucrative French, German, and Italian shares, and so were more difficult to find.  Mr. Ireland needed seven different shapes and was only able to locate six over two days.

61.      As the chat makes clear, at the time of the request to borrow the shares, they had general collateral ("GC") status.[73]  This is market terminology meaning that there is no particular reason why the shares are in particular demand.  Occasionally, shares will go "special" which typically indicates an upcoming corporate action like a dividend, merger, or rights issue or a specific reason why the market wants to be able to short the shares.  When shares go special, stock lenders charge more to lend shares and also restrict loans to their favored clients.  These Danish shares were all GC because there was a considerable period before their respective Record Dates.

62.      Notwithstanding their GC status, the challenge of sourcing Danish shares comes into clearer focus when the size of the shapes Mr. Ireland was borrowing is compared to the size of the position that ACER was unwinding.  For example, Mr. Ireland sourced 3,030,000 TDC shares, whereas ACER unwound a position exactly 10 times as large over the next few days.[74]  Given the considerable effort it took to locate 3.03 million TDC shares when they were not in particular demand, it is very hard to imagine that ED&F Man traders would have been able to locate the 74.3 million TDC shares it claimed

---

[71] ED&F-00444356, at 60: "(Jun 11 08:28:26 AM EDT) SBREATHNACH (BANK OF NOVA SCOTIA): These are done COLOB DC 430,000 66.39 TDC DC 3,030,000 7.24 TRYG DC 85,000 71.77."

[72] Ibid.

[73] ED&F-00444356, at 57: "(Jun 10 10:41:04 AM EDT) FIRELAND (ED & F MAN CAPITAL):  have some GC non div Danish borrows… can you help?"

[74] See the discussion elsewhere in this report.

Cum-Ex over the Record Date, when the shares would have been in much greater demand regardless of how hard ED&F Man tried.

**B.** **Opinion 2: Mr. Hayden's Conclusion That the Payments ED&F Man Received Were Real Dividends Passed on Through Market Claims Is Wrong, Contradicted by the Contemporaneous Actions of the Custodians, and Unsupported by His Extensive Citations Which Simply Establish That OTC Transactions Can Be Executed on Whatever Terms the Parties Agree.**

**1.** **Mr. Hayden and I Agree on the Definition of Market Claim but Not Its Application to the Transactions at Issue.  Except for One Cum-Dividend Transaction That Failed, the Industry Market Claim Guidance He Cites Is Irrelevant.**

63.    Mr. Hayden and I agree that an appropriate definition of the market claims is the one given by the TARGET2-Securities ("T2S") Corporate Actions Standards which are published by the European Central Bank.[75]  The standards define a market claim as:

"*a process to reallocate the proceeds of a distribution* **to the contractually entitled party** [emphasis added]."[76]

64.    Mr. Hayden however rejects the plain English meaning of the definition and instead appears to interpret them as:

*a process to reallocate the proceeds of a distribution to [***the buyer in all instances where the buyer agreed to buy the shares before the Ex-Dividend Date]*.[77]

---

[75] T2S Corporate actions standards – Market claims, available at:
https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2SMarketClaimSta
ndards.en.pdf?bf450b0be5b3dabe36b05487e03be4e0, last accessed February 18, 2022.

[76] T2S Corporate actions standards – Market claims, p. 3, available at:
https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2SMarketClaimSta
ndards.en.pdf?bf450b0be5b3dabe36b05487e03be4e0, last accessed February 18, 2022.

[77] See, for example, Hayden Report, ¶32 d. which quotes SEC guidance: "if you purchase before the ex-dividend, you get the dividend."  Later, in ¶33 Mr. Hayden cites a series of authorities in support of the proposition that "the holder of the shares immediately prior to the ex-dividend date will receive the dividend."  Read literally, the second statement means that the Cum-Ex purchaser would not receive the dividend.  I agree with this interpretation, but for different reasons which I discuss below.  However, Hayden Report, ¶33 read in

28

65.     Mr. Hayden supports his interpretation with various citations about the T2S standards on corporate actions and guidance from various exchanges. However, as covered in a later section, he and I agree that these trades were over the counter ("OTC") trades and therefore the guidance he cites is inapplicable because it assumes that the parties have transacted using regular-way exchange terms. In addition, he selectively cites parts of the guidance, and a more careful review shows that it speaks to a range of possible processes that can be applied, depending on what is indicated in the contract between the parties. Finally, he also conflates the process of sub-custodians passing on a real dividend receipt to the ultimate owner of record with a market claim where the sub-custodian itself did not receive a real dividend but instead has to recover the payment from a third-party custodian who held the shares over the Record Date. Although in both cases a cash credit may be passed along through a chain of sub-custodians, it does not mean that the nature of the payment is the same. However, for reasons provided elsewhere in this report, this final point is moot, because the evidence overwhelmingly suggests that in any event the ultimate payer of the dividend compensation payments in the Cum-Ex transactions did not have a real dividend to pass on.

66.     First, Mr. Hayden cites a number of sources for his interpretation of a market claim, and I address each of these in turn.

67.     Mr. Hayden discusses the T2S[78] procedures and guidelines, but all these various rules and procedures do is to put in place a wide range of procedures to make sure that the real dividend is passed

---

totality suggests that what Mr. Hayden means to say is that anyone who agrees to purchase shares before the Ex-Dividend Date will receive the dividend.

[78] T2S describes itself as "a safe platform where the exchange can happen simultaneously, i.e., where delivery versus payment is possible." It goes on to say:

> "Instead with T2S we have a common platform on which securities and cash can be transferred between investors across Europe, using harmonised rules and practices. Currently 20 European countries use T2S.

> Banks pay for securities on the platform using the account they have with their central bank, so the money used to settle transactions is central bank money. As a result, transaction risk is greatly reduced."

Available at: https://www.ecb.europa.eu/paym/target/t2s/html/index.en.html, last accessed February 15, 2022.

to the contractually entitled party.  These procedures and guidelines do not support Mr. Hayden's view that any trade executed before the Ex-Dividend Date grants the buyer the right to a dividend.  Rather, the T2S guidance simply confirms that all permutations of settlement are possible and provides guidelines on what to do in each case.

68.     For example, Mr. Hayden refers to T2S Corporate Action Standards: Market Claims guidance[79] and notes that its provisions refer to "the scenario where the contractually entitled party has not received the underlying securities (there is a pending underlying transaction) at close of business on Record Date."[80]  The footnote to this statement is as follows:

> *"However, and in line with the market standards for CAs [Corporate Actions], the T2S standards also cover the scenario where the buyer creates the market claim to the seller, when trade date is on or after Ex Date and Actual Settlement Date is on or before Record Date (i.e., there is no pending transaction).  In some markets this case is referred to as "reverse market claim."*

69.     The Corporate Actions Joint Working Group – Market Standards for Corporate Actions Processing ("CAJWG Guide"),[81] which is also published on the ECB website in the Corporate Actions Sub-group section[82] defines two different settlement dates as follows:

> 1.     Actual Settlement Date – "Date on which the settlement effectively takes place."

> 2.     Intended Settlement Date – "Date on which a Transaction is due to settle."

---

[79] Hayden Report, ¶37.

[80] Hayden Report, ¶37a.

[81] The CAJWG Guide is available at:
https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg120606_MarketStandardsForCorporateActionsProcessingCAJWGStandardsRevised2012Updated2015.en.pdf?5a5c8308c24a6618ed600daf627df86c, last accessed February 15, 2022.

[82] See, https://www.ecb.europa.eu/paym/target/t2s/governance/html/casg.en.html, last accessed February 15, 2022.

70.     Although the CAJWG Guide points out that definitions "given in this glossary are for the purpose of the standards on Corporate Actions only and are not intended to have any legal connotations or to reflect current market practices,"[83] it later states, "[c]oncurring Bilateral Input should allow to determine whether the underlying trade is "ex" or "cum" and the (I)CSD or CCP2 should take this into account for the creation of a Market Claim, irrespective of the actual Ex Date."[84]  The latter statement confirms that the guidance is intended to provide processing standards that correctly achieve what the parties have contractually agreed and not set overall determinative rules.

71.     The T2S market claim standards themselves permit transaction parties to include an Opt-Out, Cum-Dividend, or Ex-Dividend indicator in the confirming SWIFT message for the transaction.[85]

72.     The Clearstream Compensation Handbook,[86] which Mr. Hayden also quotes as an authoritative source for his position, is equally non-determinative.  It simply reiterates that the processing should allocate the dividend to the contractually entitled person and explains the various processing options. For example, Mr. Hayden quotes section 2.4 of the handbook which states that market claims are processed "if a security is traded "cum" (with coupon) but settled after entitlement,"[87] but incorrectly suggests that the guidance means that any trade before the Ex-Dividend Date must have a market claim processed.  However, he ignores sections that appear later in the same chapter on OTC transactions.

---

[83] Ibid. Glossary, at p. 6.

[84] Ibid, p. 41.

[85] The SWIFT ISO Standards include a NOMC Identifier and SPEX and SPCU Identifiers which can be used in relevant SWIFT Messages to signify a Special Ex (which is the same as a Cum-Ex trade as defined in the Wade Initial Report) and Special Cum transaction.  However, the guidelines were significantly updated in 2015, so these particular codes may not have been available at the relevant time.  For details on NOMC identifier, see, https://www.iotafinance.com/en/SWIFT-ISO15022-View-Code-NOMC.html, last accessed February 23, 2022; for details on SPEX and SPCU identifiers, see, https://www.iso20022.org/15022/uhb/mt541-33-field-22f.htm, last accessed February 23, 2022.

[86] Available at: https://www.clearstream.com/resource/blob/1316782/43a60afa470c37ba74f7cb2d6949e71c/compensation-handbook-cata-en-data.pdf ("Clearstream Compensation Handbook"), last accessed February 15, 2022.

[87] Hayden Report, ¶37 c. and Clearstream Compensation Handbook, Section 2.4.1.

These sections explain that there are three flags: Ex flag, Cum flag, and Opt-out flag. The description of the Ex-flag states that if "both counterparties set the flag TTCO//XCPN the trade is treated as an ex-trade, irrespective of the trade date. In such cases, no market claims are executed but reverse claims are processed."[88] Again, it is clear that the guidance on processing does no more than explain how parties should process settlements depending on the intended terms of their transaction.

73.     Finally, Mr. Hayden refers to the International Securities Services Association ("ISSA") guidance which states that a "market claim instruction type should be used to ensure that proceeds of a distribution (cash and/or securities) reach the contractually entitled parties in case they have not already received full entitlement on record date."[89]   However, the full entitlement referred to in the ISSA guidance is simply a question of whether the buyer has received the full number of shares which they are entitled to by the Record Date.  Market claims are processed independently of the share settlements themselves under T2S and are not processed until Payment Date.  In this context, full entitlement means that a party expected to buy 100 shares Cum-Dividend and all 100 settled on or before the Record Date.  This scenario is markedly different from one with a partial settlement, e.g., 60 shares settled and there is a market claim on the remaining 40 shares.  In the Cum-Ex transactions at issue in this matter there was no entitlement at the Record Date, so no market claim needed to be processed.

74.     In conclusion, the guidance cited by Mr. Hayden is irrelevant in this matter as it simply returns one to the question of what the parties contractually agreed to.  For the reasons provided in the Wade Initial Report and elsewhere in this report, the parties structured the Cum-Ex transactions to deliver Ex-Dividend shares, and the seller had no intention of selling any rights to a dividend, primarily because the seller did not have any.

---

[88] Clearstream Compensation Handbook, Section 2.5.1.

[89] Hayden Report, ¶37 c iii. and ISSA Annex to the Report on Global Corporate Actions Principles, available at: http://issanet.org/content/uploads/2013/04/ISSA_Issuer_Outreach_Final.pdf, last accessed February 15, 2022.

**2.      OTC Trades Are Not Subject to the Extensive Exchange Rules Cited by Mr. Hayden.  Therefore, His Citations to Support His Opinions on OTC Trades Are Irrelevant and Unpersuasive.**

75.      Mr. Hayden and I agree that the trades at issue in this matter are OTC transactions.[90]  In spite of this commonality, Mr. Hayden relies considerably on exchange trading rules, yet the vast majority of them do not apply to the transactions at issue.

76.      Mr. Hayden states without authority that "the rules governing the sale and purchase of shares on exchange are designed to ensure that the holder of the shares immediately prior to the ex-dividend date will receive the dividends."[91]  Instead, the exchanges create specific rules governing the terms on which transactions on the exchange take place, including standard settlement cycles.  One of the consequences of these rules is that regular-way exchange traded purchases traded (i.e., contracted) prior to the Ex-Dividend Date contractually pass the right to dividends to the buyer.  In any event, the guidance and rules cited by Mr. Hayden are irrelevant because none of the Cum-Ex transactions were governed by the exchange rules.  Having said that, I will address the various points raised by Mr. Hayden because his partial description of many of these rules creates a false picture even for on-exchange transactions.

77.      Mr. Hayden disputes the interpretation of the SEC guidance cited in the Wade Initial Report which defines the Record Date as "the date by which a shareholder is required to own shares (meaning that the shareholder is the registered owner of the shares in the shareholder register) to be entitled to

---

[90] See, for example, Hayden Report, ¶34 where Mr. Hayden makes several references to the benefits and pricing of OTC transactions as well as observing that I have not relied on any Copenhagen Stock Exchange or Danish Securities Law prohibition on extended settlement dates in OTC trades with the clear implication that he considers the Cum-Ex transactions to be OTC transactions.

[91] Hayden Report, ¶33.

receive a dividend."[92]  He states that it "does not say that the record date has an effect on who is entitled to the dividend. Rather it states that a purchase before the ex-dividend date carries a dividend."[93]

78.     The relevant part of the SEC citation in full is as follows:

> *"When a company declares a dividend, it sets a record date when you must be on the company's books as a shareholder to receive the dividend. Companies also use this date to determine who is sent proxy statements, financial reports, and other information.*
>
> *Once the company sets the record date, the ex-dividend date is set based on stock exchange rules. The ex-dividend date for stocks is usually set* **one business day before** *the record date. If you purchase a stock on its ex-dividend date or after, you will not receive the next dividend payment. Instead, the seller gets the dividend. If you purchase before the ex-dividend date, you get the dividend."*[94]

79.     Contrary to Mr. Hayden's claim, it is clear that the issuing company sets the basic condition for an investor to acquire the right to receive a dividend.  The investor must be a registered shareholder on the Record Date.  As such, the SEC guidance and associated citation reaffirms my definition of the Record Date.

80.     The second paragraph of the SEC citation above is premised on an obvious implicit assumption that the investor using the investor.gov website buys or sells under regular-way exchange conditions.  To illustrate, the NYSE rules define regular-way securities transactions and determine various conditions which apply to them, including dividend rights. In particular, Rule 235 states:

> *"Transactions in stocks shall be ex-dividend or ex-rights on the business day preceding the record date fixed by the corporation or the date of the closing of transfer books. Should such record date or such closing of transfer books occur upon a day other than a business day, this Rule shall apply for the second preceding business day. The Exchange may, however, in any specific case, direct otherwise."*[95]

---

[92] Wade Initial Report, ¶29.

[93] Hayden Report, ¶32 d. and related footnote.

[94] Available at: https://www.investor.gov/introduction-investing/investing-basics/glossary/ex-dividend-dates-when-are-you-entitled-stock-and, last accessed February 15, 2022.  Emphasis in original.

[95] Available at: https://nyseguide.srorules.com/rules/document?searchId=867829828&treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7BA07B716-0F73-46CC-BAC2-43EB20902159%7D--WKUS_TAL_19401%23teid-227, last accessed February 14, 2022.

81.     The regular-way sale rules of the exchange determine the Ex-Dividend Date, and this is confirmed by changes made when the SEC changed the standard settlement cycle for U.S. listed equities from T+3 to T+2.  This change required the NYSE to update its exchange rules to align with the new requirements from the SEC.  An announcement at the time stated the following:

> "On March 22, 2017, the SEC adopted amendments to Rule 15c61(a) to shorten the standard settlement cycle from T+3 to T+2. In order to conform its rules to the amendments, the [NYSE Operated Exchanges] proposed new rules to reflect regular way settlement as occurring on T+2 and which will, among other things, shorten the time period for which transactions in stocks shall be ex-dividend or ex-rights."[96]

82.     The SEC guidance highlights the difference between a regular-way exchange sale of securities prior to the Ex-Dividend Date and an OTC Cum-Ex transaction in which the parties agree to deliberately settle after the Record Date.  In sum, an exchange-governed transaction contractually entitles the buyer to the real dividend, but a Cum-Ex transaction does not.

83.     Similarly, Mr. Hayden refers to the London Stock Exchange ("LSE") rules for Special Cum transactions.  He states that the "exception recognized by the LSE reinforces the general rule that the purchase of a share prior to the ex-dividend date entitles the purchaser to a dividend, and the purchase of a share on or after the ex-dividend date does not."[97]

84.     However, the general rule is very clearly stated four sections before the definition of Special Cum trades noted by Mr. Hayden.  It contains the following provision:

> "A trade in a security effected on a day (including a trade effected before the mandatory period) that the Exchange makes a security ex an entitlement or at any time thereafter, shall be settled ex that entitlement, unless otherwise agreed at the time of dealing, or as specified in rule 5250."[98]

---

[96] Available at: https://www.ust2.com/pdfs/NYSE-T2-Announcements.pdf, last accessed February 15, 2022. This amendment changed both Rule 235 and the definition of regular-way securities sales and settlement requirements by one day.

[97] Hayden Report, ¶33c.

[98] LSE Rule 5200, available at: https://docs.londonstockexchange.com/sites/default/files/documents/rules-lse.pdf, last accessed February 15, 2022.

85.     This general rule indicates that a sale of securities on the LSE before the Ex-Dividend will transfer the right to the dividend unless the parties have agreed otherwise.  Again, these rules are irrelevant because the transactions at issue were OTC transactions and not subject to LSE rules. However, even if they had been exchange-traded, the terms of the trade would still be a question of what the parties agreed.  The consistent use of terms like "T+4"[99] in the trade emails is clear evidence that the parties intend to deliver Ex-Dividend shares.  Furthermore, as explained elsewhere in this report, the evidence strongly suggests that the Cum-Ex sellers of shares were selling short[100] and so it makes no sense that they intended to enter into a contract under which they were obliged to pass on a real dividend.

86.     Mr. Hayden notes that I do not refer to any Danish law on this point in the Wade Initial Report and suggests it is significant that I do not support my proposition by any Danish Law citations.[101]  For the same reasons that I think that the SEC and LSE guidance is of limited assistance in reviewing these transactions, Danish stock exchange rules are similarly irrelevant.  In any event, the Danish rules appear to envisage a departure from the general rule for regular-way purchases in a similar way to the LSE

---

[99] See, for example, ED&F-00040919, at 49.  The subject of this email is "Confirmation TDC 22,300,000 T+4." See also, Wall Deposition, p. 209:

"Q And the subject line is, 'Confirmation TDC, 22,300,000 T plus 4.'  Do you see that?

A I do, yes."

[100] In the case of the Annex E Cum-Ex transactions this is an agreed fact.  See, for example, ED&F-00443853, at 54, in which Rosenblatt writes to the FCA that MPT "entered into a short sale" in the first step of its "trading strategy" around dividends.  See also, Wall Deposition, p. 247: "The issue was MPT Dubai short sold the shares on the trade date with no covering position on the trade date."  I note that there is no difference in the way the non-Annex E Cum-Ex transaction trades were executed or confirmed by the parties.

[101] Hayden Report, ¶30.

rules discussed above.[102]  Equally, Mr. Hayden makes no suggestion that the concept of Record Date is somehow different in Denmark.

87.    Mr. Hayden acknowledges that parties are free to depart from the exchange regular-way purchase terms.  He refers to LSE rules which allow trades to be subject to the exchange settlement so long as the parties agree to settle transactions "no more than 20 days after the time of the trade."[103] Similarly, he references VP Securities rules permitting settlement on "any settlement date from the trading day, T+0 to T+365."[104]  He also asserts that OTC transactions "generally look to exchange transactions and price their transaction in the same way."  He claims, without any identified authority, that those entering into OTC transactions "consider, as a default rule, that shares purchased prior to the ex-dividend date carry the right to a dividend."[105]

88.    Mr. Hayden's assertions mischaracterize the structuring and pricing of OTC transactions.  Two fundamental questions that any trader asks when pricing a trade are: (i) What do I think my counterparty will be prepared to pay? and, (ii) What is my cost of executing this transaction?  Both questions require reference to factors beyond the prevailing market price for exchange-traded shares.  Mr. Hayden appears to be suggesting that parties would agree to transact at the prevailing market price for regular-way sales

---

[102] The Nasdaq Market Model for Nasdaq Nordic Markets which includes the Nasdaq Copenhagen Exchange allows for Manual Trades and section 2.1 includes the following which would allow both Cum-Ex and Ex-Cum trades to be arranged:

> "**Manual Trade with special dividend handling**
> If Manual Trade is executed during the ex-dividend period where the dividend or other form of distribution accrues to the buyer instead of the seller; or executed during the cum-dividend period where the dividend or other form of distribution accrues to the seller instead of the buyer, Member needs to submit this information when reporting Manual Trade using Special dividend transaction indicator. Nasdaq Nordic publishes MiFID post- trade flag 'SDIV' as part of the trade publication."

Available at: https://www.nasdaq.com/docs/2021/12/01/Nasdaq-Nordic-Market-Model-2021_09.pdf, last accessed February 15, 2022.

[103] Hayden Report, ¶34 d.

[104] Hayden Report, ¶34 f.

[105] Hayden Report, ¶34 b.

irrespective of the settlement terms, but this claim defies both economic logic and my professional experience of how such trades are negotiated. A purchase where the price is agreed upon today but not required to settle for 365 days (allowed by VP Securities)[106] is a forward transaction. The appropriate method for pricing a forward is covered in the Wade Initial and Rebuttal Reports and also by Dr. Carr.[107] It is given by the formula:

*Forward Price = Current Market Price + Interest – Expected Dividends*

89.     The approach advanced by Mr. Hayden suggests that the "Expected Dividends" term should be zero irrespective of the settlement date of the contract. This is simply wrong. If one agrees to sell shares today but not settle for 365 days, they will need to adjust the sale price to account not just for the nearest dividend, but also an expectation of any dividends that may be announced and declared in the coming twelve months. The illustrative principles that apply to a 365-day OTC forward sale apply equally to a 4-day OTC Cum-Ex transaction.

### 3.     The HMRC Guidance on Manufactured Overseas Dividends Cited by Mr. Hayden Highlights the Precise Point at Issue and Supports My Position, Not Mr. Hayden's

90.     Mr. Hayden opines that the payments the Pension Plans received were real dividends based on the HMRC Manufactured Overseas Dividend ("MOD") rules.[108] In doing so, he misunderstands how these rules worked and fails to recognize that the HMRC rules clearly distinguish between (i) Cum-Dividend sales which fail, and (ii) deliberately structured Cum-Ex transactions. His conclusion would, of course, apply to the Cum-Cum AIG TDC August 2014 transaction which was contracted to be a Cum-Dividend purchase settling before the Record Date, but failed to settle on time. It does not apply,

---

[106] Hayden Report, ¶34 f.

[107] Wade Initial Report, ¶¶57 and 251, Wade Rebuttal Report, ¶145, and Carr Report, ¶¶73 – 75.

[108] Hayden Report, ¶39 a.

however, to any of the other Cum-Ex trades which all are addressed in the earlier part of the section which he describes. I describe this point in further detail below.

91.     As an initial matter, it is important to quote the full section of the HMRC manual in the correct order to best understand these definitions and their evidence of contemporaneous market practice:[109]

> "*Manufactured payments* **normally** [emphasis added] *arise under repos (CFM46100) or stock loans (CFM74110) where the transaction crosses an interest or dividend date. For example, where a loan of overseas securities is outstanding over the dividend date, the lender does not receive the real dividend to which it would have been entitled had it not lent the securities. The borrower therefore makes a payment - a manufactured payment - to the lender as compensation for not receiving the real dividend.*
>
> *Manufactured payments* **also occur** [emphasis added] *where a dealer sells securities 'cum div' (with dividend) but delivers securities that are 'ex div' (without dividend). The sum that the dealer pays to the buyer to compensate it for not receiving the real dividend is a manufactured payment. The sales that give rise to such payments are often 'short' sales (CFM74110): as the dealer does not own the securities at the time of selling them, it is required to acquire them between the date of the bargain and the delivery date and may only be able to acquire 'ex div' stock.*
>
> *Where the recipient of a dividend simply passes on the dividend to which it is not entitled, this is not a manufactured payment. For example, a person may make a 'cum div' sale out of his existing shareholding (a `long' position) and receive the dividend* **merely because the company register has not been updated to reflect the change of ownership** [emphasis added]*. The passing on of this dividend to the purchaser is not dividend manufacture. See CIR v Roberts 13TC277 and CIR v Oakley 9TC582.*"[110]

92.     Contrary to Mr. Hayden's claims, HMRC guidance plainly and clearly states that the payments in a Cum-Ex transaction (i.e., a transaction "*where a dealer sells securities 'cum div' (with dividend) but delivers securities that are 'ex div' (without dividend)*") are manufactured dividends and expressly distinguish such payments from a real dividend being passed on.  Put another way, HMRC guidance

---

[109] As an aside, contrary to what Dr. Carr claims in his report (Carr Report, ¶97), the MOD rules were of direct relevance to transactions undertaken in respect of non-U.K. shares including Danish shares because they applied to all transactions relating to the transfer of securities undertaken by U.K. financial counterparties up until the end of December 2013, when they were heavily modified.  Thereafter, the rules still applied, albeit in a different form.

[110] See, Her Majesty's Revenue and Customs Corporate Finance Manual, published April 16, 2016, updated November 23, 2021, available at https://www.gov.uk/hmrc-internal-manuals/corporate-finance-anual/cfm74430, last accessed February 28, 2022.

states that the payment made by the Cum-Ex sellers in the transactions at issue are not real dividends but payments which simply happen to be calculated by reference to the real dividend.  As a result, irrespective of whether the Cum-Ex seller did in fact receive real dividends, ED&F Man should not have issued the Tax Vouchers on these payments.

93.     Additionally, two other points are visible from the HMRC excerpt above:

1.  Although manufactured dividends are **normally** a result of stock loans and repos, the guidance explicitly states that they **also** occur in Cum-Ex transactions of the type at issue in this case.

2.  The final paragraph, which is the only one Mr. Hayden relies upon, is not intended to apply to a Cum-Ex transaction but instead describes a unique situation where a Cum-Cum transaction was executed, but the shareholder register was not correctly updated prior to the payment of the dividend because of delays that result in the seller receiving the dividend instead of the buyer. This is clearly what the T2S definition of the contractually entitled person is referring to. The Cum-Cum purchaser is contractually entitled to receive the dividend (by the purchase contract) but does not receive it because it is incorrectly paid to the seller who is still shown as the owner on the shareholder register.  Accordingly, the seller must pass on the dividend.

94.     ED&F Man itself has conceded that the fact that the Pension Plans were in receipt of a payment which was the same amount as the net dividend is not determinative of the nature of that payment.[111]

---

[111] For example, the following discussion about the reasons why the Annex E Tax Vouchers were invalid took place during Mr. Wall's deposition:

"Q So looking at that first sentence, "When completing the Annex E tax vouchers which were in a standard form template, Michael Meade of ED&F Man's operations desk took into account the relevant pension plans' entitlement as of the trade date." Is that an accurate statement?

A (Witness reviewing.) That statement would be accurate, yes.

Q Is the next statement, "He did not understand at the time that the payments received by the pension plans could not constitute dividends net of WHT (i.e., although equivalent in value, they were not dividends which had been paid by the underlying Danish company)." Is that accurate?

As I explained elsewhere in this report, ED&F Man has not conducted any investigation into the position of the non-Annex E Cum-Ex sellers and therefore, even on its own suggested interpretation, has no basis to conclude that the payments received were dividends.  Up until December 31, 2013, ED&F Man was required to complete special U.K. tax returns relating to MODs,[112] which indicates that it would have been keenly aware of these rules and the distinctions made by HMRC.  The HMRC MOD rules, which were a leading authority in this area, defined the behavior of the largest equity trading businesses based in London during the relevant period and provide strong corroboration that my interpretation of the meaning of market claim is correct.  Put another way, irrespective of whether the Cum-Ex seller was long or short at the time of sale, the payment received by the Pension Plans was not a real dividend or even a market claim, but a dividend compensation payment (or MOD to use the HMRC terminology). I am not aware of any basis for issuing Tax Vouchers on a dividend compensation payment purporting to be a Tax Voucher for a real dividend.

### 4. The Contemporaneous and Irrefutable Evidence of the Actions of BNP Paribas and SEB in This Very Record Confirm That My Approach Is Correct

95.     The essential feature of a Cum-Ex purchase is that, by design, the purchase does not settle until after the Record Date.  Hence, as I have stated in my prior reports,[113] a purchaser of Cum-Ex shares is

---

A (Witness reviewing.)

In the preparation for this deposition, I have been advised that Michael Meade has said he did not understand at the time that the payments were -- did not constitute dividends.

Q So is the answer to my question, "Yes, Mr. Oxford, that's an accurate statement?"

A Yes, Mr. Oxford, that's an accurate statement."

Wall Deposition, pp. 70 – 71.

[112] See, for example, ED&F-00044265, at 81-82 which is the form of dividend reconciliation sheet used for the 2013 dividend events which includes columns labelled "QI", "AUKI", "App C Req", and "App C Rec".  These terms all relate to the operation of the U.K. MOD rules and meant Qualified Intermediary, Authorised U.K. Intermediary, Appendix C Required and Received.  Appendix C was a form of notice that could be supplied along a chain of manufactured payments to indicate that the ultimate recipient was an overseas person and thus avoid a U.K. tax charge on the manufactured dividend.

[113] Wade Initial Report, Opinion 1, and Wade Rebuttal Report, Opinion 9.

not entitled to receive the real dividend.  The evidentiary record is unambiguous in supporting the conclusion that this fact was widely understood by market participants at the time, including by both of ED&F Man's custodians, BNP Paribas and SEB.  Evidence for this conclusion can be divided into two broad categories: SWIFT messages indicating receipt of dividends and communications between ED&F Man and its custodians.

96.     The first category of evidence is SWIFT messages.  As I explained in the Wade Rebuttal Report, the presence of SWIFT MT566 messages is a necessary, but not sufficient, condition to demonstrate receipt of a dividend.[114]  Such messages were received from ED&F Man's custodians.[115]  The presence or absence of SWIFT MT566 messages is thus a helpful proxy in assessing dividend receipt– in particular, the absence of an MT566 message implies that a dividend was not received.

97.     As Mr. Warren pointed out in his report,[116] and I confirmed in the Wade Rebuttal Report,[117] MT566 messages are absent from trade packs related entirely to Cum-Ex purchases.  In trade packs related to both Cum-Cum and Cum-Ex purchases, the MT566 messages relate only to the shares purchased in Cum-Cum transactions.  A handful of exceptions to this rule arises and is informative, as

---

[114] Wade Rebuttal Report, ¶¶153 and 219, and footnotes 278 and 279.  Mr. Hayden seems to voice the opposite view when he writes that "parties to OTC transactions also consider, as a default rule, that shares purchased prior to the ex-dividend date carry the right to a dividend."  Hayden Report, ¶34 b.

[115] As explained in the Wade Rebuttal Report, ¶218, the SEB and BNP Paribas MT566 messages can easily be distinguished by the Message ID prefix.

[116] Warren Report, Appendix 1, pp. 6, 9, column "Outside Dividend Payment Documentation."

I note that for Annex E Schedule 2 transactions, Mr. Warren fails to recognize that the MT566's present in these trade packs relate only to Cum-Cum shares.  Compare Warren Report, Appendix 1, p. 9 to the trade packs ED&F-00040919, at 85 (AIG TDC March 2014), ED&F-00041108, at 74 (Kamco LP TDC March 2014), and ED&F-00045804, at 65 (AIG Danske Bank March 2014).

I also note that Mr. Warren erroneously claims that an MT566 is present in the Moira TDC March 2014 trade pack ED&F-00041236, which consists entirely of Cum-Ex purchases.  Despite including some Cum-Cum purchases, the Kamco LP Novo Nordisk March 2014 trade pack ED&F-00049309 is also missing an MT566, but the relevant MT566 for this dividend is included in ED&F-00049371, at 84 and matches the total number of Cum-Cum shares held at BNP as expected.  Thus, this appears to be merely an omission in the trade pack.

[117] Wade Rebuttal Report, ¶¶152-154, 210, and 216.

discussed in detail in the Wade Rebuttal Report.[118]  The majority of these exceptions were either subsequently reversed[119] or marked with the CLAI indication,[120] and were issued by BNP Paribas prior to realizing its error in making such payments and starting to reverse them, as I discuss below.

98.     One remaining exception noted by both Mr. Warren[121] and Mr. Hayden[122] relates to a Cum-Cum purchase of TDC shares in August 2014 for which the settlement initially failed and was delayed until after the Record Date.  I described this exception as well in the Wade Rebuttal Report.[123]

99.     Although Mr. Hayden opines that this exception is evidence that a market claim generally entitles the claimant to file a Tax Voucher, in fact, upon closer examination the highly unusual nature of this single transaction is readily apparent.  As far as I can tell, this transaction is the only example in the record of a Cum-Dividend purchase where the intended settlement failed.[124]  There appears to have been an attempt to pass the cost of the fail onto Maple Securities from whom ED&F Man borrowed the shares, but ED&F Man appeared to accept that it would need to "wear" the cost.[125]  This is possibly explained by a separate email from Michael Meade of ED&F Man to Simon Dakin at ICBKFS who clarifies that the trade was agreed to settle on the Record Date and "the 2,000,000 shs were incorrectly

---

[118] Wade Rebuttal Report, ¶¶210-219.

[119] See, for example, ED&F-00076918, at 31-42, ED&F-00077325, at 39-50, and ED&F-00044265, at 83-94.

[120] See, for example, ED&F-00047428, at 43 and ED&F-00047516, at 30.

[121] Warren Report, footnote 33.

[122] Hayden Report, ¶44 b.

[123] Wade Rebuttal Report, footnote 278.

[124] See the confirm in ED&F-00042680, at 81 which is marked for settlement on the Record Date.  See also, the Warren Report, footnote 33.

[125] In a Bloomberg Chat between Oliver Bottomley of ED&F Man and "ASUTHERLAND1" of Maple Securities, Mr. Bottomley states "I hear my op's were asking you guys to pay a short sale fine last week, this is not for you, apologies they weren't supposed to forward on to you."  Later he asks, "were you just failed into?" and gets the reply "that's right - our lender was short to deliver the shares to us. as I mentioned to Freddie when we have SBL [Stock Borrow/Lend] to SBL trades then we wouldn't ever expect our borrower to pass down short fail fines."  ED&F-00042905, at 44-46.

delivered to another of your clients." [126]  Thus, it appears that there may have in fact been two fails: (i) an initial late delivery by Maple Securities; and (ii) a subsequent misallocation of the shares within ICBKFS.

100.    As Mr. Warren explained, "these 2,000,000 shares were attributed on the dividend reconciliation sheets to 'ICBC (due to incorrectly allocated stock)'." [127]  Such notes of incorrectly allocated stock are absent from other dividend reconciliation sheets which include very large Cum-Ex positions, [128] a fact which combined with the fact that the transaction was Cum-Cum,  clearly sets this particular TDC August 2014 purchase apart and categorically distinguishes it from the many other Cum-Ex purchases conducted by ED&F Man.

101.    Setting aside the noted exceptions, ED&F Man's custodians BNP Paribas and SEB did not issue SWIFT MT566 messages related to Cum-Ex transactions (Annex E or other). [129]  Such an MT566 message would be one of the most basic prerequisites for proving receipt of a dividend.  Instead, the only pieces of evidence available for the vast majority of Cum-Ex dividend payments are emails discussing market claims with counterparties and ShadowSuite messages, which simply document cash movements booked internally and independently of ED&F Man's custodians' records. [130]

---

[126] ED&F-00312726, at 27-28.

[127] Warren Report, footnote 33.

[128] See, for example, ED&F-00040919, at 83-85, ED&F-00045804, at 63-65, and ED&F-00076369, at 85-87.

[129] See, for example, BNP's MT566 messages cited in the previous paragraph as well as SEB's discussion of MT566 messages in ED&F-00273945, at 47: "SEB will automatically monitor all trades with contractual settlement date **(based on normal settlement cycle)** prior to or on record date and automatically compensate all trades (both credits and debits) that are failing over record date**, provided that the trades are following a normal settlement cycle** and are subject to a market claim according to Danish market rules.  SEB will confirm all market claims via SWIFT MT566."  Emphasis added.

[130] See, for example, ED&F-00040919, at 88-90.  These three pages show net dividend compensation payments received by ED&F Man in their ShadowSuite system.  ED&F-00040988 relates to the 1 million shares purchased Cum-Cum, and ED&F-00040989 and ED&F-00040990 each relate to 2 million shares purchased Cum-Ex.  As stated elsewhere in this report, one of these Cum-Ex purchases is Annex E and one is not.

102.    Second, BNP Paribas also made clear to ED&F Man that Cum-Ex purchases did not entitle the purchaser to real dividends.  This was memorialized in a volume of email communications between ED&F Man and BNP.   One email of note was sent by Pierre-Antoine Patinet of BNP to Miguel Senra of ED&F Man on June 26, 2013.   The email reads in part, "as the counterpart[y] did not agree (contractual date > record date) with the claims on trades attached, please liaise directly with your counterpart[y] to solve this break."[131]   As explained in the Wade Rebuttal Report,[132] Mr. Patinet's parenthetical explanation for the rejection of the market claim (contractual date > record date) demonstrates that, from the perspective of both BNP Paribas and the custodian used by the Cum-Ex seller, it was perfectly normal and reasonable for a market participant not to pay a market claim on a share purchase with a contracted settlement date after the Record Date, notwithstanding that the purchase was agreed to before Ex-Dividend Date (i.e., was a Cum-Ex purchase).

103.    Mr. Senra responded to Mr. Patinet, "this is extremely worrying, that a big institution like yourselves are [sic] unable to market claim these huge amounts.  As a % of success, I believe this has been quite poor, I need to understand why?"[133]  The reason is simply that a Cum-Ex purchase does not entitle the purchaser to receive the real dividend.

104.    In fact, the email thread continued with increasingly impassioned pleas from Mr. Senra for a detailed record of failed market claims,[134] to which Mr. Patinet replied on June 27, 2013  "I am not able to provide you with a time frame as it is a huge data collection work [sic]."[135]  Five days later, on July 2, 2013, Mr. Patinet sent an Excel file to Mr. Senra.[136]  Mr. Senra replied, "I don't think the attached

---

[131] ED&F-00137236, at 41.

[132] Wade Rebuttal Report, ¶213.

[133] ED&F-00137236, at 41.

[134] ED&F-00137236, at 39-41.

[135] ED&F-00137236, at 38.

[136] ED&F-00137236, at 37.

spread sheet encompasses all the market compensation cum dividend debits we have suffered across ALL our accounts."[137]   The record is clear that BNP Paribas did not consider a Cum-Ex transaction to entitle the purchaser to a dividend or market claim and did not process any future market claims after these events took place.

105.     Another email exchange later in July 2013 sheds additional light on Cum-Ex issues between ED&F Man and BNP.  Mr. Senra requested a tax voucher for a position in Tryg A/S[138] saying, "let me know if you can provide a credit advise/tax voucher [sic] on each of these holdings."[139]  Roxane Bataille of BNP responded, referencing the previous emails with Mr. Patinet, "I am not able to provide you a credit advise [sic] from BNP letterhead.  Pierre-Antoine already advised you about a regularization as the counterpart[y] did not agree with the claims."[140]  Mr. Senra then explained that Pierre-Antoine's regularization "relates to the market claims which we have independently claimed from the counterparty themselves…and successfully.  This has no bearing as this was a cum dividend holding entitlement which you paid us on, then subsequently debited us on."[141]

106.     In other words, BNP Paribas initially paid ED&F a net dividend on shares that were purchased Cum-Ex, then reversed the payment ("subsequently debited us").  Ms. Bataille replied to Mr. Senra, "we've never received the funds, that is why we claimed your counterparty to receive the funds.  The

---

[137] ED&F-00137236.

[138] This position relates in part to Trade 6 in Appendix C of the Wade Initial Report.

[139] ED&F-00112481, at 84.

[140] ED&F-00112481, at 83.

[141] ED&F-00112481, at 82.

claims were not accepted by the counterparty. Thus, your account was debited accordingly."[142,143] Again, this reversal is another explicit action undertaken by BNP Paribas that reinforces its position that Cum-Ex purchases did not entitle the purchaser to a dividend. As discussed elsewhere in this report, market claims are typically processed at the custodian level and it is reasonable to conclude that one of the reasons that BNP Paribas was unable to process the claims is that the seller's custodian did not receive the real dividend because, as I will demonstrate later, it is almost certain that the seller only acquired Ex-Dividend shares to complete the sale.

107.    Finally, as detailed in the Wade Rebuttal Report, from August 2014 onwards, SEB acted as custodian for ED&F Man's Danish shares and there is not a single instance of a real dividend or market claim MT566 in respect of a Cum-Ex transaction.

108.    In fact, in relation to the failed Cum-Cum transaction discussed above, SEB makes clear its understanding of the rules as I will now explain. One email thread cited in that footnote is ED&F-00273945, which includes correspondence between ED&F Man and SEB. In one email dated August 26, 2014, Patrik Bjernalt of SEB wrote to Michael Meade of ED&F Man:[144]

> "**SEB will automatically monitor all trades with contractual settlement date (based on normal settlement cycle) prior to or on record date** and automatically compensate all trades (both credits and debits) that are failing over record date, **provided that the trades are following a normal settlement cycle** and are subject to a market claim according to Danish market rules. SEB will confirm all market claims via SWIFT MT566. [emphasis added]"

---

[142] Note that in this case I conclude that the counterparty that BNP Paribas is referred to is the custodian who delivered the shares to BNP Paribas to settle the transaction as these market claims would take place at a custodial level. ED&F Man later arrange to collect dividend compensation payments from the Cum-Ex sellers but for the reasons given elsewhere in this report and discussed extensively in the Wade Initial Report and Wade Rebuttal Report this is nothing more than a contractual payment which can be seen as a return of excess purchase price. Wade Initial Report, ¶¶85 – 90, 158 and 166; Wade Rebuttal Report, ¶¶140 – 149.

[143] ED&F-00112481, at 81-82.

[144] ED&F-00273945, at 47.

109.    This email demonstrates a few key points.  First, SEB expected to handle market claims on behalf of its clients and had a well-developed process for doing so.  This is in accordance with my experience that it would be normal for genuine market claims to be handled at the custodian level because it is the custodians who are responsible for settlement and market claims are a function of settlements not happening in accordance with the intended contractual settlement.

110.    Second, SEB was obviously aware of the use of longer-than-normal settlement cycles in so-called "Cum/Ex Schemes"[145] and refused to apply the market claims process entirely for the Cum-Ex transactions.  SEB's qualification that its process only applied to trades with a "normal settlement cycle" even appears twice in the same sentence.  Thus, rather than the market having a "well-developed understanding of how to handle 'Cum-Ex' trades"[146] as Mr. Hayden opined, the evidence is that SEB voices the exact opposite view in this email, namely, that it had a well-developed understanding that they should not handle Cum-Ex trades in any way.

111.    SEB seems to have also appreciated the complexities of untangling Cum-Ex settlements in an omnibus account.  In a prior email in the same document, Charlotte Freij of SEB wrote to ED&F Man:[147]

> "SEB are happy to provide tax vouchers on the dividend and the tax we have deducted on your account.  **However we cannot supply you with tax vouchers on your underlying client level as you requested.  Legally it becomes very difficult for us to verify positions and tax other than the ones we are responsible for.**

---

[145] ESMA Final Report on Cum/Ex, Cum/Cum and withholding tax reclaim schemes ("ESMA Dividend Arbitrage Report"), ESMA70-155-10272, September 23, 2020, available at: https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf, last accessed February 10, 2022.

[146] Hayden Report, ¶14 c.

[147] ED&F-00273945, at 54-55.

**This is an argument for that** [sic] **account segregation for the tax -exempt clients would be preferable for you but then as you stated will have issues with the settlements instead** [emphasis added]."

112.    Clearly, SEB was aware of the risk of incorrect Tax Vouchers being issued and the requirement to fully understand the nature of the broader arrangements.  SEB declined to issue Tax Vouchers in support of individual pension plan positions specifically because "legally it becomes very difficult for [SEB] to verify positions"[148] in an omnibus account.  Although the email which Ms. Freij is responding to is not included in this document, she did write that "as you stated [you] will have issues with the settlements"[149] if the Pension Plans' accounts were to be segregated.  This risk around settlement relates to precisely the type of settlement round-tripping that can be observed in the BNP Paribas omnibus account, which I will explain in later in this report.  Without the ability to use an omnibus account and recycle shares for the Cum-Ex transactions, ED&F Man would not have been able to settle the transactions which it claims justified the Tax Vouchers that it issued to the Pension Plans.

113.    The simple fact is that BNP Paribas and SEB both confirmed through their actions, and in the case of BNP Paribas its stated position, that they did not accept there was a market claim on these transactions.

---

[148] ED&F-00273945, at 54.

[149] ED&F-00273945, at 54-55.

C. **Opinion 3: Mr. Hayden's Claims That Various Regulatory Restrictions Would Have Prevented the IDBs From Undertaking Transactions in the Same Way as MPT Dubai in the Annex E Cum-ex Transactions Is Demonstrably Wrong and There Are Multiple Examples Where Participation in the Transactions at Issue Would Have Been Unlawful if His Analysis Were Correct.**

1. **ED&F Acted as Prime Broker in These Transactions and Mr. Hayden's Assertions to the Contrary are Incorrect**

114. Mr. Hayden disagrees that ED&F Man acted as prime broker[150] to the Pension Plans. The opinions expressed in the Wade Initial Report would be equally applicable to any UK regulated financial institution undertaking the activities which ED&F Man undertook for the Pension Plans[151] whether ED&F Man was a regulated prime broker or not. However, I will begin by addressing the question of whether ED&F Man provided prime brokerage services as it is one of a number of criticisms raised by Mr. Hayden in his report which demonstrates his misapprehension of the U.K. regulatory regime.

115. First, the FCA adopts the definition of prime broker given by the Alternative Investment Fund Managers Directive as follows:[152]

> *'prime broker' means a credit institution, a regulated investment firm or another entity subject to prudential regulation and ongoing supervision, offering services to professional investors primarily to finance or execute transactions in financial instruments as counterparty and which may also provide other services such as clearing and settlement of trades, custodial services, securities lending, customised technology and operational support facilities.[153]*

---

[150] See, Hayden Report, ¶51 a. His reference to the Wade Initial Report, ¶194 appears to have been a typo, and I assume he intended to refer to ¶174, where I discuss the highly unusual risk sharing and margin arrangements between the Acer Pension Plans and ED&F Man.

[151] Mr. Hayden confirms that ED&F Man was an FCA regulated investment firm. See, Hayden Report, ¶51 a. footnote 72, the FCA Register (available at: https://register.fca.org.uk/s/, last accessed February 28, 2022), and the Agreed Facts (Hashemi Exhibit 4430, ¶2).

[152] See, the FCA Handbook Glossary, available at: https://www.handbook.fca.org.uk/handbook/glossary/G2811.html, last accessed February 5, 2022.

[153] See, Article 4(1) (af) of AIFMD Directive 2011/61/EU available at: https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:174:0001:0073:EN:PDF, last accessed February 5, 2022.

116.     The FCA further defines prime brokerage services as:[154]

> "*a package of services provided under a prime brokerage agreement which gives a prime brokerage firm a right to use safe custody assets for its own account and which comprises each of the following:*
>
>> *(a) custody or arranging safeguarding and administration of assets;*
>>
>> *(b) clearing services; and*
>>
>> *(c) financing, the provision of which includes one or more of the following:*
>>
>>> *(i) capital introduction;*
>>>
>>> *(ii) margin financing;*
>>>
>>> *(iii) stock lending;*
>>>
>>> *(iv) stock borrowing;*
>>>
>>> *(v) entering into repurchase or reverse repurchase transactions;*
>>
>> *and which, in addition, may comprise consolidated reporting and other operational support.*"

117.     The services provided by ED&F Man in respect of the Pension Plans encompass all of (a), (b), and (c)(ii), (iii), and (iv).  It is therefore unclear on what basis Mr. Hayden believes that ED&F Man did not act as a prime broker.  The only supporting citation for Mr. Hayden's claim is a link to the FCA Register, which for the reasons outlined below, contradicts his own position.

118.     Mr. Hayden has ignored the basic principles of authorization in the U.K.  All U.K. regulated activity is governed by the Financial Services and Markets Act 2000 ("FSMA").  The general principle

---

[154] Accessed via hyperlink in the definition of prime broker in the FCA Handbook, available at: https://www.handbook.fca.org.uk/handbook/glossary/G2811.html, last accessed February 5, 2022.

applicable here is that all activity related to financial activity is prohibited unless it is either exempt or a specific authorization has been granted (this is known as the "general prohibition").[155]

119.     Regulated activities are principally defined under the Regulated Activities Order[156] which issued under the authority granted by FSMA.  It defines a range of activities which are regulated and also exemptions which apply.  For example, a person buying or selling securities purely for their own account is prohibited by the general prohibition but then given a general exemption.

120.     Neither FSMA nor the Regulated Activities Order use the term prime broker or prime brokerage services as they approach regulation from the perspective of specific types of activity.[157]

121.     Firms like ED&F Man can seek authorization from the FCA or Prudential Regulation Authority ("PRA") to be given one or more permissions to carry out activities.  Mr. Hayden cites the FCA register which summarizes the permissions that ED&F Man currently has,[158] but the FCA register link given by Mr. Hayden indicates that ED&F Man has, amongst others, the following permissions:

---

[155] Section 19 FSMA 2000 reads as follows:

   The general prohibition.

   (1) No person may carry on a regulated activity in the United Kingdom, or purport to do so, unless he is—

   (a) an authorised person; or

   (b) an exempt person.

   (2) The prohibition is referred to in this Act as the general prohibition.

Available at: https://www.legislation.gov.uk/ukpga/2000/8/section/19, last accessed February 5, 2022.

[156] The Financial Services and Markets Act 2000 (Regulated Activities) Order 2001. Available at: https://www.legislation.gov.uk/uksi/2001/544/contents/made, last accessed February 5, 2022.

[157] For FSMA, see, https://www.legislation.gov.uk/ukpga/2000/8, last accessed February 23, 2022; for The Financial Services and Markets Act 2000 (Regulated Activities) Order 2001, see, https://www.legislation.gov.uk/uksi/2001/544/contents/made, last accessed February 23, 2022.

[158] See, Hayden Report, footnote 72 which states that "ED&F is only registered with a specific activity license under reference number 194926, under which it is not authorized to do business as a prime broker. See

1. Arranging, safeguarding and the administration of assets

2. Arranging (bringing about) deals in investments

3. Dealing in investments as agent

4. Dealing in investments as principal

5. Making arrangements with a view to transactions in investments

6. Sending and receiving dematerialised instructions

122.    Based on my experience, including experience as an FCA Approved Person (including at various times a CF1 Director and CF3 Chief Executive authorization), these permissions covered all the activities which ED&F Man undertook in connection with the transactions at issue in this case.  I do not believe that Mr. Hayden is suggesting that ED&F Man was not regulated to carry on all of the activities which relate to this matter, not least because if he were, then that would mean that ED&F Man committed an offence exposing it to criminal sanction and the risk that its customers might seek to void their transactions.[159]

---

https://register.fca.org.uk/s/firm?id=001b000000MfISLAA3.”  Note that the FCA Register only provides details of the current permissions, so it is possible that ED&F Man had different permissions at the time.  However, for the reasons given in this section, I see no reason to conclude that ED&F Man did not have the permissions required to undertake the activities relevant to the transactions at issue.

[159] See FSMA, Section 26, which provides “as to Agreements made by unauthorised persons:

(1) An agreement made by a person in the course of carrying on a regulated activity in contravention of the general prohibition is unenforceable against the other party.

(2) The other party is entitled to recover—
(a) any money or other property paid or transferred by him under the agreement; and

(b) compensation for any loss sustained by him as a result of having parted with it.

(3) “Agreement” means an agreement—

(a) made after this section comes into force; and

(b) the making or performance of which constitutes, or is part of, the regulated activity in question.

(4) This section does not apply if the regulated activity is accepting deposits.”

Available at: https://www.legislation.gov.uk/ukpga/2000/8/section/26, last accessed February 5, 2022.

123.   As such, contrary to Mr. Hayden's assertion, ED&F Man *was* a prime broker and in any event, was regulated by the FCA for the activities it undertook in this matter.

>   **2.   The Short Selling Regulations Cited by Mr. Hayden Are a Complete Red Herring as Demonstrated by the Actions of Both MPT Dubai and ED&F Man**

124.   Mr. Hayden cites to Article 12 of EU Regulation 236/2012 (the "SSR")[160] as authority for the proposition that the IDBs executing the Cum-Ex Sales to the Pension Plans could not have done so unless they had the right to borrow shares at the time the trade is executed and, by inference, therefore, must have covered their Cum-Ex sales such with shares which they held over the Record Date.

125.   Even if he were right, it still does not address what Mr. Hayden describes as the "salient question," which is whether there is any basis to conclude that ED&F's market counterparty did not have the right to Cum-Dividend shares.  However, Mr. Hayden is plainly wrong, as I will now explain.  As described in the hypothetical transaction in the Wade Initial Report, it was possible for the Cum-Ex seller to cover its sale with a borrow which settled after the Record Date, thus complying with the short sale rule whilst not requiring the IDB Cum-Ex seller to pay the market cost of a dividend compensation payment.[161]  This is the very essence of a Cum-Ex arbitrage, which Mr. Hayden does not appear to have properly understood.[162]  Furthermore, as explained below, there were other even more straightforward ways to comply with these rules and at least some of the Cum-Ex sellers were likely completely exempt.

126.   As Mr. Hayden mentions, Article 12 of the Short Sale Rule, broadly speaking, prohibits short selling for EU listed shares where the short seller has not located a borrow to cover the settlement of the short.  The relevant clause is:

---

[160] Hayden Report, ¶40 a(ii).

[162] See, Hayden Report, Section VII B 4, starting at p. 57.

*"A natural or legal person may enter into a short sale of a share admitted to trading on a trading venue only where one of the following conditions is fulfilled:*

*(a)the natural or legal person has borrowed the share or has made alternative provisions resulting in a similar legal effect,*

*(b)the natural or legal person has entered into an agreement to borrow the share or has another absolutely enforceable claim under contract or property law to be transferred ownership of a corresponding number of securities of the same class so that settlement can be effected when it is due;*

*(c)the natural or legal person has an arrangement with a third party under which that third party has confirmed that the share has been located and has taken measures vis-à-vis third parties necessary for the natural or legal person to have a reasonable expectation that settlement can be effected when it is due."[163]*

127.    What Mr. Hayden ignores is that these rules were supplemented by subsequent Implementing Technical Standards,[164] which clarified the definitions of the terms above and provide a range of exemptions which the IDBs could have relied upon.  It is my expectation, based on experience, that the most likely exemptions which could have been used are:

1.  A verbal or electronic locate confirmation from a third party – all that was required was the IDB's verbal confirmation with any broker dealer that it would be able to locate the shares for a borrow – either party had no commitment to actually cover the short with that counterparty.

2.  The 'easy to borrow or purchase confirmation', which was interpreted by many IDBs during the Relevant Period to mean that the shares sought should be on a list of easy to borrow shares which were regularly published by various broker-dealers and generally covered virtually all main index listed equities.[165]

---

[163] Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32012R0236, last accessed February 5, 2022.

[164] In particular, see, Article 6 of 827/2012. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32012R0827, last accessed February 5, 2022.

[165] For example, as ESMA notes, in practice virtually all main index listed shares (including the shares in this case) met the definition of liquid shares and so were automatically deemed easy to borrow.  See, ESMA70-156-

55

128.    ESMA itself has noted the fundamental weakness of the commitment required by Article
12(1)(c) in a paper consulting upon the amendment of these rules.  In particular, ESMA observes that
'easy to borrow' shares may not in fact be available to borrow:[166]

> *"The low level of commitment required from the third-party can be illustrated in several ways:*
>
> *a. Recital (19) of the SSR specifies that the third-party confirmation essentially relates to the assessment by the third party of its ability to make the shares available for settlement. Whereas it does not necessarily imply that the shares are already available to that third party at the time of the location confirmation, nor does it seem to require a firm commitment from that third party to make the shares available as necessary.*
>
> *b. In line with that, ESMA notes that the language used in Article 12(1)(a) and (b) of the SSR significantly differs from the language used under letter (c): whereas in the first two cases the SSR refers to legally enforceable claims, letter (c) only refers to "have a reasonable expectation that the settlement can be effected when it is due".*
>
> *c. A particular source of concern is that these third parties can distribute 'easy to borrow or purchase lists' as if they were genuine "easy to borrow or purchase confirmations" to several short sellers without taking into account the overall amount to be delivered on a given settlement date. This could eventually lead, in case of coexistence of several short selling strategies coinciding in time and target, to a 'drought' in the relevant shares on the relevant date, creating the conditions for a 'short squeeze'."*

129.    Mr. Hayden also omits various exemptions to the basic prohibition in Article 12 of the SSR,
the first of which is the complete exemption for market making activity provided by Article 17.  Article
17(1) provides:

> *"Articles 5, 6, 7, 12, 13 and 14 shall not apply to transactions performed due to market making activities."*[167]

130.    Article 2(1)(k) defines market making as follows:

> *"'market making activities' means the activities of an investment firm, a credit institution, a third-country entity, or a firm as referred to in point (l) of Article 2(1) of Directive 2004/39/EC,*

---

[footnotes]

[3914] Consultation Paper - Review of certain aspects of the Short Selling Regulation, September 21, 2021, Section 4.2.2, ¶¶177-179, p. 42, available at: https://www.esma.europa.eu/sites/default/files/library/esma70-156-3914_consultation_paper_on_the_review_of_certain_aspects_of_the_short_selling_regulation.pdf, last accessed February 21, 2022.

[166] Ibid. Section 4.2.3, p. 43.

[167] Ibid.

*which is a member of a trading venue or of a market in a third country, the legal and supervisory framework of which has been declared equivalent by the Commission pursuant to Article 17(2) where it deals as principal in a financial instrument, whether traded on or outside a trading venue, in any of the following capacities:*

*(i)by posting firm, simultaneous two-way quotes of comparable size and at competitive prices, with the result of providing liquidity on a regular and ongoing basis to the market;*

*(ii)as part of its usual business, by fulfilling orders initiated by clients or in response to clients' requests to trade;*

*(iii)by hedging positions arising from the fulfilment of tasks under points (i) and (ii);"*[168]

131.    Mr. Hayden specifically cites MUFG as being a UK regulated entity which is subject to the Short Sale Rule, but MUFG is currently listed on the FCA website as an entity that relies on the market making exemption from these short sale rules.[169]

132.    Finally, Mr. Hayden also fails to explain why, in his analysis, ED&F Man did not breach the SSR in respect of all of the Annex E transactions.  In each of those transactions MPT Dubai sold short under a Cum-Ex sale to a pension plan on a T+4 basis.[170]  The following day, it purchased the shares back from the Pension Plan or an intermediating IDB on a T+3 basis.  Assuming that MPT Dubai pre-

---

[168] Ibid.

[169] Available at: https://www.fca.org.uk/publication/documents/market-makers-authorised-primary-dealers.pdf, last accessed February 5, 2022.  Unfortunately, it is not possible to definitively determine from publicly available records whether MUFG relied on this exemption during the Relevant Period.  However, based on my experience, this would be a fairly routine notification for any regulated entity with a meaningful equity dealing business.  Natixis, Cantor Fitzgerald, GFI Securities, Morgan Stanley, Scotiabank, HSBC, and Macquarie are all counterparties that are listed in Appendix 2 of the Statement of Agreed Facts, ¶10 that also appear in this list as well.

[170] Mr. Wall acknowledged this fact: "The reason that MPT Dubai did not cover the short, as can be evidenced in the first flowchart there, Trade 1 settlement occurs on the same date as Trade 2 settlement.  The opening trade would be done on a T plus 4 basis.  The closing trade by MPT would be done on a T plus 3 basis.  And that would mean that the trade settled on the same day."  Wall Deposition, p. 184.

Note that as MPT Dubai was executing and clearing its trades through ED&F Man and the shares were EU listed shares ED&F Man would have needed to satisfy itself that these transactions were appropriate.

confirmed a borrow with ED&F Man which it would have been required to do,[171] in many of the relevant dividend events ED&F Man still did not have access to a sufficient pool of shares to be able to 'allocate' them to MPT Dubai in order for it to satisfy the SSR in the way that Mr. Hayden suggests it was required to.

133.    For example, on the March 2014 TDC dividend event, MPT Dubai entered into short sales over a total of 22.3m shares on March 6, 2014.[172] On this date the total number of shares held by ED&F Man on behalf of all of its clients was 6.5 million.[173]

134.    Accordingly, one must dismiss Mr. Hayden's references to the short selling regulation as irrelevant.

---

[171] See ED&F-00443853, which is a Memorandum on MPT Trades sent to the FCA in which ED&F Man confirmed to the FCA that MPT Dubai cleared all its transactions via ED&F Man. Similarly, in the interview of Stephen Hawksworth of ED&F Man by the FCA (ED&-00445297) the following responses were given:

At 445:

> Q: In this case, the question is whether your expectation was that Dubai, MPT Dubai would interact with customers, or was it purely proprietary business that they would be making their own reclaims?
>
> A: Purely proprietary, they should have no knowledge of anything that any client is doing.

At 446:

> Q; No other external institutions providing money to him [MPT Dubai]?
>
> A: No.
>
> Q: Sorry can I just clarify the, so MPT Dubai's trading activities were being by the London office, by your London Office, MCM?
>
> A: Yes.

[172] ED&F-00040919, at 49.

[173] See ED&F-00604196.xlsx, tab "DK0060228559" (ISIN of TDC).

**3.** **The Intermediation of Share Sales, Offsetting Futures, and the Facilitation of Financing Transactions Using Futures by the IDBs Were Not Prohibited Practices in and of Themselves (as Opposed to as Part of the Overall Scheme to Generate False Tax Vouchers in Support of Reclaim Applications), as Suggested by Mr. Hayden. Instead, it was a Customary Activity for IDBs and There are Numerous Examples of Such Transactions in the Record.**

135. Similarly, Mr. Hayden asserts that the IDBs could not have been part of coordinated transactions between the ED&F Man Pension Plans and Cum-Ex Seller. He states:

> *"an IDB-to-IDB sale of a hedge would be a proprietary position for each IDB, precluded by the regulatory framework under which they operated. As a rule, IDBs do not take proprietary positions but rather trade as a "riskless principal" matching market counterparties. ED&F's risk mandate for its Equity IDB states that the IDB's trading would be conducted "against market counterparties on a back-to-back basis".[174]*

136. Mr. Hayden confirms the restricted permissions of many of the IDBs which I identified in the Wade Initial Report.[175] As I will explain in this and later sections of this report, those permissions are highly significant to understanding the full nature of the schemes. It is unclear why Mr. Hayden believes that entering into either the back-to-back sale of shares or futures would result in a proprietary position.[176] It was precisely my point that if an IDB entered into a future with one counterparty one can be confident that the IDB must have an equal and opposite position with some other market counterparty (which would not result in a net proprietary exposure). The focus of the U.K. regulation is on the types of risks that an IDB is allowed to take, and a key requirement is that the IDB cannot take directional market positions. In any event, the evidentiary record includes multiple examples of IDBs performing exactly the role of back-to-back trading. One only needs to look at the transactions around the TDC March 2014 dividend to find examples of IDBs intermediating both share sales and futures on a back-to-back basis.

---

[174] Hayden Report, ¶49 d. iii.

[175] Wade Initial Report, ¶139-142.

[176] ED&F Man's corporate representative agreed in his deposition that MPT Dubai and Volcafe conducted back-to-back sales of this form. Wall Deposition, pp. 218-219.

### a)     Share Intermediation

137.    March 7, 2014, alone yields three examples of Link, ICAP, and Cantor Fitzgerald intermediating share sales:

1.  ED&F Man sells 22.3m TDC shares to Link at a price of DKK50.65.  On the same date MPT Dubai purchases the same number of shares at exactly the same price from Link.[177]

2.  ED&F Man sells 6m shares to Cantor Fitzgerald at a price of DKK 50.655 and again MPT Dubai does a back-to-back purchase from Cantor Fitzgerald.[178]

3.  ED&F Man sells 9m shares to ICAP at a price of DKK50.6 per share.  MPT acquires these shares at the same price from ICAP.[179]

### b)     Futures Intermediation

138.    On March 6, 2014, Volcafe entered back-to-back futures between Hamlyn and MPT Dubai. Hamlyn sold 240,000 futures over TDC shares at a price of DKK50.88 which was executed with Volcafe.  On the same date, MPT Dubai bought exactly the same number of futures at the same price from Volcafe.[180]

### c)     Financing using Futures

139.    In the Wade Initial Report, I explained that based on both the evidentiary record and my professional experience, a number of the share sales and futures hedges were coordinated and that this is the most likely way that the Cum-Ex sellers hedged their short sale.  Mr. Hayden suggests that "to

---

[177] ED&F-00190797 and ED&F-00113799.

[178] ED&F-00215701 and ED&F-00251998.

[179] ED&F-00190349 and ED&F-00414071.  See also, ED&F-00190437 which is an email discussing this rehypothecation.

[180] See ED&F-00041059, at 70 (Hamlyn sale) and 71 (MPT Dubai purchase).

orchestrate such a number of individual market participants to transact business at scale, with non-standard trading conditions, across multiple securities products, would have required some sharing of information for all parties to conduct their piece of the transaction at the right time and in the right way."[181]

140.     On the contrary, the only additional technique required was a straightforward sales vs future financing transaction.  I refer to this transaction as a "Futures Financing" for ease of reference, although it is sometimes called a 'share-futures cross' or 'cross' and is similar to an exchange for physical transaction.[182]  The following two transactions are both economically equivalent to a secured loan, and so to each other:[183]

---

[181] Hayden Report, ¶49 c. ii.

[182] An exchange for physical is a common technique whereby the owner of some asset (often a commodity but equally a share or bond) agrees to give up that asset in return for a future over that asset.  Because the future hedge counterparty is given the asset which can act as a hedge for the future as part of the exchange the parties do not need to reconcile potentially differing views on the market value of the asset and can simply agree to execute the new future at exactly the same price as the sale of the asset.  See, Nasdaq Futures – Rules, Section 12 Exchange for Related Positions, available at:
https://listingcenter.nasdaq.com/assets/rulebook/nfx/rules/NFX_Rules.pdf, last accessed February 21, 2022.

[183] Note, there are legal differences which can be important for various tax, accounting, and other legal requirements, but in broad economic terms they are equivalent.  There can also be significant differences in the risks that participants have in default or unusual situations (e.g., unexpected corporate actions such as special dividends, rights issues, mergers etc).

**Figure 1**

Stock Loan or "Repo"



**Figure 2**

Futures Financing



141.     In both cases, the Share Lender raises cash financing against shares it held before the transaction and continues to maintain exposure to the price changes of the shares during the life of the transaction. There are some differences with respect to the specific mechanics of each transaction type:

1.     **Stock Loan** – The shares are provided as collateral with title transfer and the Share Borrower has the legal obligation to return the same or equivalent shares at the end of the transaction.

2.     **Sale and Repurchase ("repo")** – The shares are sold at the start of the transaction, but the Share Lender simultaneously agrees to repurchase them for a fixed price, which is typically the initial price plus accrued interest minus dividends paid during the life of the repo.

3.     **Futures Financing** – As in the case of a repo, the Share Lender sells the shares outright at the start of the transaction.  In this case however, the Share Lender buys a futures contract under which the Share Lender has agreed to buy a fixed number of shares at a future date. This is analogous to the repurchase leg of a repo, but it is a separate exchange cleared contract which can be settled independently.  At the unwind of the financing, the Share Lender can close out the future and the initial cash received on the day one sale plus the gain or loss on the future should allow the share lender to repurchase the shares in the market to re-establish its holding of the shares.

142.     A common variation used in equity finance markets is a sale vs future with a third party IDB intermediating one or both legs.  In this transaction the Lender sells the shares directly to the borrower, but the futures are arranged and executed with a third party IDB as follows.

**Figure 3**



143.    The economics of this transaction are the same as the standard Futures Financing transaction, but under accounting standards at the relevant time, this was often considered to be a de-recognition event by the Share Lender, which reduced its balance sheet.[184]  In general terms, this is because the Share Lender is under no obligation to re-purchase the shares from the Share Borrower and because the future is an independent and exchange-traded contract which generally can be cash settled.

144.    There are many examples of this type of transaction in the evidentiary record, but I will use a futures financing with Morgan Stanley to demonstrate the concepts in practice.

---

[184] Under International Accounting Standard 39 Financial Instruments: Recognition and Measurement ("IAS39"), which was the accounting standard for determining how to account for all financial assets and derivatives at the relevant time, the key principle is that an entity accounts for an asset it purchases (e.g., the shares) immediately on acquiring contractual rights to the cash flows from that asset and then subsequent transactions are tested to see if they meet the threshold for de-recognising the asset.  De-recognition was often desirable because it reduced the balance sheet size of the entity and in general the starting point for regulatory capital calculations was the accounting balance sheet.

145. On March 5, 2014, Stacey Kaminer, on behalf of Acer, emailed Oliver Bottomley of ED&F Man to indicate that AIG and Kamco were interested in acquiring 1m shares each of TDC. Shortly thereafter, she confirmed the pricing to Mr. Bottomley by stating, "For the equities, 52.90 and for the futures 50.8862 (ref 52.90)."[185]

146. She also suggested that "MINT might have some liquidity on the futures,"[186] but in a separate email we see that, in fact, at Oliver's suggestion it was decided to use Tradition.[187] The Tradition entity which executed the future was TFS Derivatives Limited, which is a limited scope activity firm under the FCA rules. It is permitted to deal in futures but with a limitation that it may "only deal on own account in MiFID financial instruments for the purpose of (i) fulfilling or executing a client order, or (ii) gaining entrance to a clearing and settlement system or a recognized exchange when acting in an agency capacity or executing a client order."[188]

147. Shortly thereafter,[189] ED&F Man executed a purchase of 2 million shares from Morgan Stanley at 52.90 exactly,[190] as well as the corresponding futures hedge at 50.8862 (ref 52.90) with Tradition –

---

[185] ED&F-00040919, at 20.

[186] MINT is a reference to MEQ Realisations Limited (previously known as Mint Equities Limited until August 24, 2010) which was a U.K. FCA regulated IDB at the time and was part of the BGC Partners Group. Information about MEQ Realisations Limited available at: https://find-and-update.company-information.service.gov.uk/company/05071454/filing-history, last accessed February 23, 2022. Information about acquisition of Mint Partners and Mint Equities by BGC Partners Group available at: https://www.bgcpartners.com/bgc-partners-acquires-mint-partners-key-businesses/, last accessed February 23, 2022.

[187] ED&F-00205422. TFS Derivatives Limited is a member of the Tradition Group and is a U.K. FCA regulated IDB specialising in derivatives.

[188] See, the limitations in its dealing in investments as principal permission on the FCA Register which can be viewed at https://register.fca.org.uk/s/firm?id=001b000000MfJVVAA3, last accessed February 10, 2022. It is my expectation that it had a very similar limitation at the time of these transactions.

[189] The complete process including agreeing with Tradition and executing the trades with Morgan Stanley and Tradition took less than 81 minutes because the initial email confirming required prices from Stacey Kaminer was at 14:39 and Oliver sends the confirms at 16:20. ED&F-00040919, at 20.

[190] ED&F-00040919, at 37.

precisely the rates which Ms. Kaminer requested.[191]  If, as Mr. Hayden suggests, these two transactions

were independent, this would be a truly miraculous execution by ED&F Man.

148.     Thereafter, the following transaction has taken place:

**Figure 4**



149.     Based on my experience, there are several considerations that make it obvious that this was a

pre-arranged Future Financing between ED&F Man and Morgan Stanley.

150.     First, the pricing of the borrow is approximately 91.5% of the gross dividend.[192]  Ignoring the

financing cost embedded into this transaction, which was very small in view of low Danish interest

---

[191] ED&F-00040919, at 28 and 29.

[192] Sale price of shares minus future prices divided by gross dividend = (52.9 − 50.88862) / DKK2.2 per share = 91.5%

rates at the time, this is exactly the market range or price that would reasonably have been expected for such a transaction.[193]

151.     Ms. Kaminer quotes the future price she wants to trade at with a precision to 4 decimal places. She originally suggests using MINT as a counterparty, then agrees to switch to Tradition,[194] and yet Mr. Bottomley still manages to obtain the precise rate on a transaction which constituted 83.5% of the reported exchange ADTV for the 30-day period around the Record Date.[195]  This is because the real counterparties to this trade who actually negotiated the trade prices are Morgan Stanley and Acer, and they will have negotiated this price upfront and then agreed on execution terms separately.  Contrary to Mr. Hayden,[196] I would not expect to see detailed written evidence of this trade arrangement, primarily because many traders would have done a significant amount of planning of trades by phone and then confirmed via email and Bloomberg chat only once the terms were agreed.

152.     Ms. Kaminer does not set a limit level or indicate a price range for the trade and there was no negotiation evident between ED&F Man and Morgan Stanley (all of which strongly indicate that the terms had been agreed before her first email).  I understand from Counsel that no telephone records were available for production, which is unsurprising because during the Relevant Period market participants typically only kept telephone recordings for three to six months.  This was because such call records were generally only referred to if there was a dispute on the trade terms which had been

---

[193] See the earlier discussion of Cum-Cum dividend pricing.  The Danish 3M CIBOR rate on this date was 0.2750%.  Bloomberg.

[194] Oliver Bottomley emails Stacey Kaminer to say, "I can see interest at Tradition at the moment on your futures FYI," to which she replies, "Tradition is fine."  ED&F-00205422.

[195] ADTV of 2,393,898 taken from Wade Initial Report, Appendix D.

[196] "To orchestrate such a number of individual market participants to transact business at this scale . . . would have required some sharing of information for all parties to conduct their pieces of the transaction at the right time and in the right way.  If so, I would have expected to see some evidence of this information sharing in writing, which I am not aware exists."  Hayden Report, ¶49 c ii.

agreed verbally. If the trades were successfully confirmed, matched, and settled, there was no need to refer to the recordings, so the recordings were overwritten.

153.    As Mr. Hayden has confirmed and as cited above, an IDB like Tradition was only permitted to trade on a matched basis so that Tradition executed another matching future with someone else. It is wholly implausible that its counterparty was anyone other than Morgan Stanley.

1.    First, if Tradition had not done the trade with Morgan Stanley, it would have required another party who just happened to be in the market at virtually the exact same time who would have been attempting to trade a future at that exact price, at a level of precision to 4 decimal places and exactly matching Ms. Kaminer's up-front target prices and weighted averages.

2.    Second, even if, implausibly, there were such a party for the Tradition trade, then Morgan Stanley would have had to find a different market counterparty to re-hedge its position. Even large dealers like Morgan Stanley are rarely in the position of taking large directional positions on any asset, let alone two million shares of TDC, a relatively illiquid Danish stock.[197]  Even if Morgan Stanley had been permitted to take a directional position, it is highly unlikely that it would have chosen to approach ED&F Man to execute such a proprietary risk-taking position.

154.    In virtually every Cum-Ex transaction I have reviewed, each Cum-Ex purchase was matched with a short futures contract, and each unwind disposal transaction was matched with a long future. I will highlight some more examples of this in the next section of the report where I describe the overwhelming evidence that the actions of the IDBs were carefully coordinated by ED&F Man and the Investment Managers.

---

[197] This is due to a combination of market risk and regulatory capital consumption reasons. Generally, the desks involved in these sort of financing trades have a "Delta-One" mandate which means they cannot execute complex options and they are required to hedge market risk on all trades.

**D.** **Opinion 4: Evidence in the Record Overwhelmingly Suggests That the Non-Annex E Cum-Ex Transactions Were Executed in a Very Similar Way to the Annex E Cum-Ex Transactions, and I Re-affirm the Opinions in the Wade Initial Report on Non-Annex E Transactions**

155.    Contrary to Mr. Hayden's claims that my original opinion[198] that the non-Annex E transactions were fundamentally equivalent to the Annex E transactions but using external IDBs instead of MPT Dubai is "undercut by the very exemplar trade"[199] I analyzed, the evidentiary record is clear that they are fundamentally equivalent.

156.    There are three main elements which are substantially similar across the two categories of Cum-Ex transactions.

1.    The Cum-Ex sale by the IDB is hedged by buying a future which is an equal and offsetting position to the one undertaken by the relevant Pension Plan.

2.    The IDB is able to acquire the shares to complete the delivery of its Cum-Ex sale using shares which are delivered under an Ex-Dividend regular-way sale by ED&F Man (often this is a rehypothecation trade under which ED&F Man sells the shares on a T+3 basis and buys a future).  Crucially, this means that ED&F Man is providing shares to the IDB which it is settling into the Pension Plan in the original Cum-Ex Sale and also that the IDB does not have the shares over the Record Date and so the Tax Vouchers are invalid.

3.    The settlement records show that large volumes of shares were "round-tripped" through external and internal IDBs to complete the transactions using a much smaller number of shares than the number on which tax reclaims were made.  I will address this point in detail in Opinion 5.

---

[198] Wade Initial Report, Section VII. B.

[199] Hayden Report, ¶45.

69

157.    In reviewing the evidence for these conclusions, I will address various demonstrably wrong points which Mr. Hayden makes in his report about the supposed lack of evidence of coordination.

> **1.    Mr. Hayden's Claims That the Timing of the Trades Indicates That They Could Not Be Linked Transactions Proves Precisely the Opposite. The Pricing and Timing of the Cum-Ex Purchases and Futures Demonstrates That the Trades Were Part of Co-Dependent Circles.**

158.    In his report, Mr. Hayden addresses the non-Annex E AIG-Lutetia TDC 2014 transaction which was described in detail in the Wade Initial Report.[200]  Mr. Hayden suggests that the timing difference between the Cum-Ex purchase and the futures hedge by the AIG is significant.  For the reasons described below, his suggestion is wrong, but even if there were any significance to the trade timing difference, it would even more clearly indicate that the trades must have been linked.

159.    At 09:26 on March 6, Ms. Kaminer emailed ED&F Man requesting trades on behalf of three of the Acer Pension Plans for two million shares each.[201]  She wrote that they were "looking for pricing of 52.55 on the equity and 50.736 on the future" and continued to communicate that she had "heard that Marianna may have liquidity on the futures."  Later that day,[202] the trades were successfully negotiated, with Lutetia agreeing to sell the six million shares at the identical rate called for up front by Ms. Kaminer

---

[200] Wade Initial Report, Section VII B 2.

[201] ED&F-00040919, at 54.  It is not actually 100% clear whether this is 09:26 U.K. time or US time because she sends a follow up email which is timestamped as 16:28 which is either two minutes later or 7 hours later (the time difference between London and Utah being 7 hours) and it would be unusual to have two different time zones for the same sender on the same printed document but without detailed evidence of the meta data for these emails I cannot be sure and for the reasons explained I do not consider it to be of any relevance.

Stacey had her passport notarized in Utah in January 2014 (ED&F-00006022), and Kamco LP's address on their Tax Vouchers is in Park City, Utah (ED&F-00222454, at 58).

[202] The first confirms appear to be sent at 16:49 although for several reasons given later in this report, I do not think this time is particularly relevant. ED&F-00040919, at 66.

of DKK52.55 per share and Marianna issuing futures confirms at the exact rate called for by Ms. Kaminer of 50.736.[203]

160.    Mr. Hayden claims that the timing difference of one hour between the receipt of the confirms on the sale and futures is a pertinent factor, but this claim ignores the wider set of circumstances, which follow:

> a)    **Timing Differentials are Irrelevant and, In Any Event, Would Simply Confirm the Coordination if There Had Not Been a Time Difference Between Trades**

161.    Mr. Hayden cites the timing difference of just over an hour between the confirms as significant, suggesting that this means the trades were not linked.[204]   However, Mr. Hayden appears to be basing his conclusion on the time that the confirms were received by ED&F Man rather than the actual trade negotiation time, which neither of the counterparties included on their confirms in any event.[205]

162.    Even if his point on timing were correct, this would actually point even more strongly to coordination between the parties because he ignores the gap between the time when Ms. Kaminer suggests the pricing the Pension Plans are "looking for" and the time that the confirms are received. Given that she specifies both the pricing on the shares and the futures with a level of precision to several decimal places even a time gap of a few minutes would have made it impossible for ED&F Man to execute at those exact prices given the natural intraday volatility of listed equities.   She ordered the purchase at a price of DKK52.55 and the futures at a price of DKK50.736, which ED&F Man successfully provided.   Further, given that this is a purchase of six million shares with corresponding

---

[203] In fact, the futures are split into 6 shapes in pairs of 12,000 at 50.74 and 8,000 at 50.73 each, giving a weighted average execution price of 50.736 for each combined hedge of 20,000 futures (matching the 2 million shares for each Acer Pension Plan).  See ED&F-00040919, at 67-71.

[204] Hayden Report, ¶49 c. i.

[205] Mr. Hayden refers to a time gap of over an hour and cites ED&F-00047364, at 66 and 72.  The first of these pages is an email from Hamza Kuraishi of Mariana Capital to Mr. Bottomley attaching the futures confirmation which appears to have been received at 17:56.  The second is an email from Ross Liddard of Volcafe to Lutetia Capital with the purchase confirmations which appears to have been sent at 16:49.

futures and share trades, if independent, this would have required finding counterparties willing to conduct equal and opposite transactions of approximately 250% of the 30-day ADTV of 2.4m shares and at the precise levels at which Ms. Kaminer specified.

163.     Mr. Hayden's comments on the relevance of the timing of these trade confirmations are simply wrong.  OTC Futures Financings like this transaction were negotiated off-exchange and then booked and confirmed later by the relevant traders or their middle offices.  The trade reporting rules for such trades in Europe at that time were far less rigorous than the U.S. Consolidated Tape reporting requirements[206] and so the timing of the receipt of the confirms is of no relevance.

### b)     Mr. Hayden Also Points to Slight Pricing Differentials to Reject Coordination of Trades but Such Pricing Differences Do Not Mean Trades Were Not Coordinated

164.     Mr. Hayden asserts that I provided "no support for the suggestion that any collusion between different IDBs occurred" and also that my opinions that two IDBs acting independently could still be part of a coordinated structured transaction was "meritless."[207]  I do not accept either of these contentions.  The evidence is clear that ED&F Man closely coordinated various matching buys, sells and hedging through futures.  In the Wade Initial Report, my opinion was that the IDBs could be parties to entirely legitimate trades which taken together created a complex structured transaction which when viewed in its entirety was wholly inappropriate.

165.     The Cum-Ex purchase and future trades that were described combined to price the dividend at approximately 82.5% of the net dividend.[208]  This level is slightly higher than the pricing for the internal Annex E trades but still within the expected and consistent range for Cum-Ex transactions as shown in

---

[206] For details of trade reporting in the EU, see the ESMA Interactive Single Rulebook which contain the rules which have been substantially overhauled starting with EU Directive 2014/65/EU and the follow up technical standards and rulemaking. https://www.esma.europa.eu/databases-library/interactive-single-rulebook/clone-mifir/article-26, last accessed February 28, 2022.

[207] Hayden Report, ¶49 d.

[208] (52.55 − 50.736)/2.2 = 82.5%

Appendix C of the Wade Initial Report.  I have addressed at length elsewhere in this report why this pricing is not consistent with Lutetia holding the shares at the time of the trade.

166.     Mr. Hayden also opines that trade price differences indicate a lack of coordination, but in fact they demonstrate an apparent connection between the two trades, because it is inconceivable that ED&F Man could have independently found sellers for shares and buyers of futures for a position size of 6 million shares where the sellers and buyers just coincidentally agreed to trade at prices which so closely matched the pricing specified by Ms. Kaminer up front.

### c)     Other Alternatives Suggested by Mr. Hayden Are Implausible

167.     Mr. Hayden suggests that Lutetia could have sold the 6 million shares out of an existing long position and so would have "had no reason for it to hedge its sale with a future."[209]  This suggestion requires one to believe that Lutetia independently held a position of 6 million shares (worth approximately DKK314 million at the executed trade price) which it just so happened to wish to sell on March 6 at exactly the price that Ms. Kaminer suggested the Acer Pension Plans wanted to buy.  This is simply not plausible but, even if this had been the case, how would Marianna have hedged its future position if Lutetia was selling out of an existing long position without taking a position which Mr. Hayden suggests would be an unauthorized proprietary position?[210]

168.     As discussed above, and as Mr. Hayden himself confirms, Marianna was another limited license broker, and so would have had to enter into a matching future with another counterparty.[211]  This would

---

[209] Hayden Report, ¶49 c. iii.

[210] Hayden Report, ¶49 d. iii.

[211] The FCA Register for Mariana UFP LLP (which is the new name for Mariana Capital Markets LLP) confirms that Mariana is limited to Dealing investments as principal with a limited licence.  This is summarised as" matched principal broker.  Unable to: (i) hold financial instruments for own account unless it meets the 'matched principal exemption conditions' as defined in the FSA's Glossary of defined expressions used in the FSA's Handbook and (ii) underwrite MiFID financial instruments and/or place MiFID financial instruments on a firm commitment basis."  Available at: https://register.fca.org.uk/s/firm?id=001b000000NMblRAAT, last accessed February 10, 2022.

have required Marianna to find a party other than Lutetia to buy a future with the equivalent notional value of precisely 6 million shares which would, in turn, have almost certainly involved some other market participant wanting to sell 6 million shares and use the futures as a hedge. Again, the idea that Marianna could find such a party and agree to execute a future at the exact prices at which Ms. Kaminer requested up front is totally implausible based on my own experience.

169.    The following diagram demonstrates what actually happened. Just like in the Annex E Cum-Ex transaction, Lutetia agreed to the Cum-Ex sale creating a short position which it hedges with a future which is booked on a back-to-back basis through Mariana, and which matches this hedge with the future that the Pension Plan used to hedge its Cum-Ex purchase.

**Figure 5**



170.    The identification of the trade structure described immediately above is a significant conclusion because, as discussed elsewhere in this report, Mr. Hayden has acknowledged that "the salient question

is whether there is any basis to conclude that ED&F's market counterparty did not have the right to cum-dividend shares."[212]  ED&F Man and Mr. Hayden have already conceded that they did not have any such right in the Annex E Cum-Ex transactions.  Previously, I have explained why the dividend pricing leads me to conclude that Lutetia did not have an existing long position at the time it entered into the Cum-Ex purchase.  The evidence in this section is overwhelming that Lutetia hedged its Cum-Ex sale price risk with a future and so there is no remaining basis left to suggest Lutetia did in fact hold the shares over the Record Date because there is no reason to hedge its Cum-Ex sale if it was already naturally long the shares and looking to sell them as Mr. Hayden suggests.

171.    Later in this report, I will explain that my review of all the settlement records and the evidence of ED&F Man and the Pension Plans recycling shares in settlement cycles strongly indicates that the shares which Lutetia used to complete the Cum-Ex sale were recycled shares delivered to it by ED&F Man.

> **2.    Mr. Hayden's Admission[213] That the Recycling Unwind of the Acer TDC March 2014 Position was Inappropriate is Significant Because the Position Unwound was Created in Part by Acer Purchasing 6 million Non-Annex E Shares from Lutetia.  The Unwinds Provide an Unambiguous Roadmap to How ED&F Man and the Pension Plans Created a Misleading Impression of the Positions Owned by the Pension Plans.**

172.    In the Wade Initial Report I explained how ED&F Man and the Pension Plans created the false impression of long term investment positions in the accounts of the Pension Plans to claim long-term share ownership of the relevant shares which they felt would be supportive of their tax reclaims.[214] Various factors led me to this conclusion: the lack of shares, absence of real risk or opportunity for

---

[212] Hayden Report, ¶39 b. ii.

[213] Mr. Hayden states that "[the unwind analysis] is nothing more than the comparison of the unwinding of an Annex E trade with the unwind of an Annex E trade" and later states that it is "hardly surprising that ED&F would unwind those positions the exact same way it had unwound the other Annex E positions, as the trades were executed similarly.  I understand that ED&F admits the similarities between the Annex E trades."  Hayden Report, ¶47.

[214] Wade Initial Report, ¶133-134.

75

profit, lack of arm's-length funding or margin provided by the Pension Plans, and the inability of the Pension Plans to exercise any voting rights of the shares. Several of these factors were highlighted by the unwind of the positions. The Acer Plans collectively held "positions" of 30.3m[215] shares of TDC for approximately four months across three transaction categories (Cum-Cum, Annex E Cum-Ex, and non-Annex E Cum-Ex). However, as explained in the Wade Initial Report, these positions were all unwound using 3.03m shares borrowed from Scotiabank for 2 business days in June 2014.[216] This pattern can be seen in transactions by other Investment Managers as well, which I will explain below.

173.    In his report, Mr. Hayden dismisses my discussion of the unwinds as being irrelevant, stating that all I have shown is that my "criticism of the methods by which ED&F settled the transactions to unwind its clients' equity positions applies only to the Annex E trades."[217]

174.    As described below, the unwind transactions which I explained in the Wade Initial Report covered all of the Acer Pension Plan positions. The fact that all these positions were unwound using only 10% of the shares in the purported position is highly significant for two principal reasons:

      1.     It clearly demonstrates how ED&F Man used smaller numbers of shares to settle much larger positions – techniques which can be seen throughout the transactions at issue and which ED&F Man has now admitted to utilizing not only to unwind positions but in their efforts to settle purchases of Danish shares..[218] This clearly

---

[215] ED&F-00040919, at 83.

[216] The stock loan was traded to settle on June 13, 2014 and unwind on June 16, 2014 (Friday to Monday). ED&F-00444356 and ED&F-00255639.

[217] Hayden Report, ¶55.

[218] Wall Deposition, pp. 213-214:

    "Q And what is the reason that MPT would split a transaction into smaller parts?

    MR. BINDER: Objection to form, and beyond his scope as a corporate representative of ED&F.

    MR. OXFORD: I'm just asking for the witness' understanding from ED&F's perspective.

renders the accounting records used by ED&F Man to produce the Tax Vouchers unreliable.

2.  It represents further evidence of the fundamental similarity between Annex E and non-Annex E transactions because they were unwound in the same way and even using the same shares.

175.    Mr. Hayden appears to agree with the distinction between Annex E and non-Annex E trades, but nonetheless asserts that "AIG's March 2014 position in TDC" is "an Annex E trade",[219] which is factually wrong.  Contrary to Mr. Hayden's opinion, AIG's March 2014 position in TDC consisted of three trades,[220] only one of which is included in Annex E.[221]  However, he erroneously claims that "the example Mr. Wade provides regarding ED&F's liquidation of client positions actually relates to an Annex E trade, and not to a non-Annex E trade, as the document argues."[222]

---

A The trade would be split into smaller parcels or lot size, if you like. Smaller trades are easier to settle.

Q Why are they easier to settle?

A You need less trades to settle smaller trades than you do to settle one big trade.

Q Can you explain what you mean by that? Feel free to use an example, if that's easier.

A ED&F were a clearing broker of MPT Dubai. ED&F held a depo account with certain amounts of Danish securities in it. Smaller parcels of shares would be used to settle these smaller splits of trades."

[219] Hayden Report, ¶47 a.

[220] ED&F-00040919, at 76.  I also note that, as expected, there are three MT545 SWIFT messages in this trade pack, one for each of the three trades.

[221] 1 million of the remaining 3 million shares relates to a Cum-Cum purchase, namely Trade Number 6 from the Wade Initial Report Appendix F, while the other 2 million are the shares purchased from Lutetia (Trade Number 25 in the Wade Initial Report Appendix C).  The 2 million shares purchased from MPT Dubai fall under Trade Number 22 in the Wade Initial Report Appendix C.

[222] Hayden Report, ¶17.

176.    He also states that "it is hardly surprising that ED&F would unwind those positions the exact same way it had unwound the other Annex E positions, as the trades were executed similarly."[223]

177.    He does not, however, substantively address my observation that these trading positions were settled using only 10% of the shares that ED&F Man booked on its Pension Plan statements.  He also does not substantially address my observation that apart from the tax reclaim there is absolutely no gain or loss opportunity from the Pension Plan "positions" which are fully hedged, not exposed to funding costs, and not investing surplus cash and so not able to benefit from their "holding" of the shares.

178.    Mr. Hayden's position is also contradictory in asserting that it is "not possible to match fungible shares of stock"[224] while simultaneously claiming to be able to match a large unwind to a specific smaller trade.  I agree that dematerialized shares are fungible as a general matter, but this does not prevent one from performing basic identification of positions and quantities.  For example, if a person owns 2m shares and then sells 2m shares, then it must be the specific shares 2m shares which were owned that were sold.  Equally, a claimed position of 30.3m shares which can be liquidated using only 3.03m shares raises fundamental arithmetical questions.  Mr. Hayden suggests that the principles of internalized settlement do not "standing alone, suggest any wrongdoing."[225]  In fact, the Pension Plans are claiming they had a combined long position of 30.3m shares and that these were returned by ED&F Man following its earlier rehypothecation of these positions and then sold to the market by the Pension Plans, but in fact only 3.03m shares were ever acquired, and these were shares borrowed from Scotiabank.[226]

---

[223] Hayden Report, ¶47 b.

[224] Hayden Report, footnote 53.

[225] Hayden Report, ¶47 e.

[226] As noted in Figure 8 of the Wade Initial Report, ED&F Man recycled the same shares to settle positions ten times the size of the shares they actually borrowed.

179.     As I stated in the Wade Initial Report, "ED&F Man borrowed 3,030,000 shares and then used them to close out total positions of 30,300,000 across all its clients.  This is the total number of shares on which all the Acer ED&F Man Pension Plans made tax reclaims for the TDC dividend on 11 March 2014."[227]

180.     Indeed, ED&F Man discussed this exact unwind in email correspondence with Stacey Kaminer of Acer, and these emails demonstrate agreement by both parties that the unwind would include all Acer positions.  Sara Mina of ED&F Man wrote to Stacey Kaminer of Acer on April 11, 2014: "We will be able to unwind **all** of your open futures positions and roll into a TRS [emphasis added]."[228]   A subsequent email in the same document includes a spreadsheet[229] listing every Acer-managed position and its swap replacement, and AIG appears in this spreadsheet twice: once for 2 million shares, presumably the Annex E Cum-Ex purchase,[230] and again for 3 million shares, which includes the 1 million Cum-Cum shares plus 2 million non-Annex E Cum-Ex shares.

181.     Despite the evidentiary record, Mr. Hayden attempts to defend his assertion that the unwind only relates to Annex E transactions by claiming that, "although AIG's March 2014 position in TDC included non-Annex E components, it is nevertheless an Annex E trade, listed on Schedule 2 of Annex E."[231]  This argument is reminiscent of Mr. Warren's, who asserted that, because an MT566 message appears in a given trade pack, dividends were received on all trades included in the trade pack.[232]

---

[227] Wade Initial Report, footnote 138.

[228] ED&F-00190456, at 57.

[229] ED&F-00190456, at 56-57.

[230] The TDC rows in this spreadsheet are separated into two sections, one associated with futures expiring in June 2014 and the other with futures expiring in July 2014.  The July section relates to Annex E trades, as is evident by comparing the quantities associated with each pension plan to ED&F-00041236 at 37-46 and 48.

[231] Hayden Report, ¶47 a.

[232] See, Wade Rebuttal Report, ¶154: "These trade packs contain SWIFT messages representing only the Cum-Cum shares, not the larger Cum-Ex position, yet nonetheless Mr. Warren seems to conclude that the entire position in the Tax Voucher is backed by a SWIFT MT566 message."

Neither argument makes any attempt to reconcile share quantities in the specific trades involved to the alternative record in question: Mr. Hayden does not check the quantities against Annex E, and Mr. Warren did not check them against the MT566 messages.  Had Mr. Hayden checked, he would have observed that the shares purchased from Lutetia are not included in Annex E.[233]  They were however included in the unwind, which is therefore evidence that share recycling techniques were used in both Annex E and non-Annex E Cum-Ex transactions.

182.    In fact, I have reviewed additional email correspondence that indicates recycling shares in this manner was a standard practice at ED&F Man.   An internal email from Paul Regan to Oliver Bottomley includes a spreadsheet that associates a TDC position of 24 million shares, which matches  Hamlyn's Cum-Ex position,[234] with a "Split" of only 1.2 million shares and a "Multiple" of 20.[235]  Five other securities also have "Multiple" values of 20, and almost all securities in the spreadsheet have a "Multiple" above 10, suggesting that ED&F traders fully understood and were accustomed to the practice of recycling small shapes to settle much larger positions.  Over the period of July 14-16, 2014, when the Hamlyn position was unwound, the BNP custody statement has 42 settlements, all of which are in the amount of 1,200,000 shares and these appear to have again been borrowed from Scotiabank.[236]

---

[233] The required comparison of the number of shares in Annex E Schedule 2 to the numbers of shares involved in AIG's TDC March 2014 transactions is straightforward.  Annex E Schedule 2 of the ED&F Re-Amended Defence reports an "Amount of overpayment by SKAT (DKK)" related to AIG's TDC March 2014 position of DKK 1,188,000 (ED&F Re-Amended Defence, Annex E, Schedule 2). A simple calculation shows that this overpayment equates to an inappropriate claim of 2 million shares of TDC over this dividend (DKK 1,188,000 overpayment / 27% withholding tax = DKK 4,400,000 gross dividends not received.  DKK 4,400,000 gross dividends not received / DKK 2.2 dividend per share = 2 million shares).   Clearly these are the 2 million shares purchased from MPT Dubai.

[234] See the dividend reconciliation sheet ED&F-00040919, at 83 which shows Hamlyn's position of 24 million shares.

[235] ED&F-00261246.

[236] ED&F-00604196.xlsx, at tab "DK0060228559".  In July 2014, this tab shows 21 transfers of 1.2 million shares into the account, 21 transfers of 1.2 million shares out of the account, and no other transactions.  See also ED&F-00301242 for an ED&F Man Stock Loan summary statement dated 4 August 2014 which includes a borrow of 1.2m TDC shares with settlement date of July 15, 2014.

183.    As I will explain in the next section, this obvious and transparent recycling of shares on the position unwinds is also evident in the transactions used to create these positions in the first place.

**E.      Opinion 5: The Pension Plans Made Tax Reclaims based on Tax Vouchers for Share Quantities that Substantially Overstated the Shares Actually Owned and Dividends Received.    ED&F Man Facilitated This By Recycling Shares Through Intraday Settlement, Which Supported the Creation of False Tax Vouchers For The Pension Plans To Apply For a Double, Triple, and Quadruple Dip Refund**

184.    A point that I have made earlier in this report and my earlier reports, is that there is clear and consistent evidence throughout the documents I have reviewed that ED&F Man and the Investment Managers coordinated to generate positions that were much larger than the real number of shares that they could source, and that ED&F Man purported to settle such positions by recycling the shares it did hold on behalf of the Pension Plans.  Subsequent to the submission of my previous reports, ED&F Man has admitted to doing so.[237]  Mr. Hayden suggested that my claim that ED&F Man did not have sufficient shares for the non-Annex E Cum-Ex transactions was "unsubstantiated"[238] but a detailed reconciliation of the settlement movements for the TDC March 2014 dividend event clearly demonstrates how the parties recycled shares on both the Annex E and non-Annex E Cum-Ex transactions and further illuminates how the transactions were matched by IDB, often on a shape by shape basis, leaving no doubt that the non-Annex E transaction settlements differ only in their use of an external IDB instead of ED&F Man affiliates MPT Dubai or Volcafe.[239]

---

[237] See the extract of Mr. Wall's testimony cited in Section II.A of this report, as well as at Wall Deposition, pp. 213-214 and 217-219.

[238] Hayden Report, ¶17.

[239] Based on the fact that the pricing, key structural design elements, unrealistic share sizes, absence of evidence of real dividend receipts, and use of small shape settlements are all substantially similar across all the Annex E and non-Annex E transactions I have reviewed in preparing my reports, I have no reason to suspect that there are in fact any material differences between the March 2014 TDC event and the other dividend events covered by my reports.  To the extent that the patterns of trade settlements are consistent on the other dividend events with the TDC March 2014 event my conclusions on this TDC March 2014 event will apply equally to those other events.  Finally, I note that Mr. Wall's testimony on the use of small shapes and recycling was not confined to any specific events or transactions, and he did not attempt to distinguish between Annex E and non-Annex E Cum-Ex settlements.

185.    As will be demonstrated below, in the case of the March 2014 TDC dividend, ED&F Man issued Tax Vouchers relating to dividends on 99.145m shares when it only actually acquired 24.845m shares for the Cum-Cum transactions.  The balance of the positions result from Cum-Ex trades, 64.3 million on Annex E, and 10 million non-Annex E.  These 74.3 million Cum-Ex shares were "settled" by round-tripping the 24.845 million Cum-Cum shares multiple times on the settlement day, resulting in false Tax Vouchers and false reclaims in respect of 74.3 million shares of TDC.

186.    The number of shares actually held at BNP over the TDC March 2014 Record Date versus the number of shares for which Tax Vouchers were issued suggests that the participants nearly achieved a "quadruple dip" over this dividend, meaning that for every share actually acquired for a Cum-Cum transaction the participants claimed to have received four times the amount of dividends actually received and suffered four times the amount withholding tax actually paid.[240]

187.    Finally, in this section I will address Mr. Hayden's objection to the ADTV analysis in my Initial Report.  I do not accept that any of Mr. Hayden's objections are of any relevance to the opinions I have given in this or my earlier reports.  In particular, Mr. Hayden ignores that ED&F Man's own risk metric was ten times more conservative that the measure I used; a risk metric which it would have breached on all of the dividend events had they been real positions with real risk.[241]  He also fails to address the more substantive point, which is that I used ADTV simply as a metric to highlight the implausible sizes of the positions which were claimed.  This second point is now moot because ED&F Man has admitted that it did not have the shares that it claimed to own.

---

[240] ED&F Man held 24.845 million shares in the BNP omnibus account over the Record Date (Wade Rebuttal Report, ¶¶190-192), yet issued Tax Vouchers on 99.145 million shares (ED&F-00040919, at 83-84).  See also the prior explanation of recycling in this report, and the reconciliation presented in Table 1 in this section. 99.145 million equals approximately 4 times the 24.845 million shares held at BNP.

[241] See, Wade Initial Report, Appendix D.  Using my ADTV calculation every single dividend event would breach 20% of ADTV which was the threshold used by ED&F Man.  I address the irrelevance of the precise basis on which ADTV is calculated to my opinions later in this report.  In summary, there are only three dividend events out of 28 reviewed for which the position claimed is less than 200% of ADTV meaning that my ADTV measure would need to have been ten times lower than that used by ED&F Man for the positions to have been permitted under ED&F Man's own risk metrics, which is implausible.

1.  **A Complete Reconciliation of the TDC Share Movements on March 12, 2014, Plus Corroborating Evidence from Various Contemporaneous Communications Demonstrate a Planned and Deliberate Process of Recycling Shares in Order to Justify Larger Tax Reclaims Than the Number of Shares Which ED&F Man Could Actually Source.  The Share Counts Involved Appear to Amount to a Quadruple Dip of Shares Actually Held to Receive Four Times the Tax Reclaims.**

188.    The settlement round tripping orchestrated by ED&F Man appears to have been planned right from the beginning of the establishment of ED&F Man's Equities business in 2012.[242]  A presentation attached to an email sent by Oliver Bottomley on August 16, 2012, is highly instructive.[243]  It lays out a proposal for transactions executed across three consecutive dates, under which the following steps were envisaged to occur.

---

[242] See, Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts, ¶3.

[243] ED&F-00053123 and ED&F-00053124.  The same presentation appears in Hashemi Exhibit 4418.

**Figure 6**



189.   **Figure 6, August 7, 2012**: Pension Plan Investment Manager (shown as having five 401k Pension Plans) purportedly buys TDC shares from Volcafe, which is a short seller, but as shown on the diagram no such shares would actually exist because ED&F Man would rehypothecate those shares and route them back round to Volcafe to cover its short.  As the presentation states*: "neither entity has any holdings nor has and [sic – he obviously means "any"] stock actually been injected into the structure".* Another entity (labelled Massey)[244] does the same transactions in the opposite direction using NOVOB shares.  This is highly reminiscent of the Solo transactions because the Pension Fund Investment

---

[244] Massey Fund ("Massey"): an investment fund registered in Gibraltar and owned by GT Nominees Limited (who were owned by Arunvill) and managed by Arunvill).  Massey became a client of ED&F Man on 26 March 2012.  See Statement of Agreed Facts, Appendix 2.

Manager is "buying" shares indirectly from itself.  The shares it buys are delivered to it via a loop which requires it to indirectly lend the incoming shares to Volcafe so that Volcafe can settle its sale.  Mr. Bottomley also helpfully confirms a point I had made in the Wade Initial Report, which is that the Investment Managers and Pension Plans intended to manufacture false long term holdings.[245]  He states, "we want to leave this trade running all year to show holdings," but they obviously do not want to actually take any market risk because he confirms this will be eliminated with a performance swap.  In the Solo transactions the participants generated false holdings and false reclaims with no shares at all.  In the ED&F Man transactions the false holdings and false reclaims were generated by reusing the shares from the Cum-Cum transactions, on which reclaims were already being made.

---

[245] Wade Initial Report, ¶¶133-134.

**Figure 7**



190.   **Figure 7, August 8, 2012**: The Investment Manager acting on behalf of the five Pension Plans buys shares in a Cum-Ex purchase (T+4) from a broker and sells them to Massey on a T+3 basis to reverse the purchase done the previous day.  It appears that they are replacing the Cum-Cum position, which was claimed be established on August 7, with a Cum-Ex position to avoid the need to source Cum-Dividend stock.  Importantly, step 7 states: "*Crucially the fund sells this T+3 into Volcafe, this allows the trade to appear as an arbitrage between the two dates*."  The presentation also states: "*This process can be repeated using the same clip of stock in most markets, in some it isn't possible, such as Denmark. One hindrance can be the cut off of settlement times, e.g., Denmark at 11:30, makes it difficult to do multiple round trips. The key part is the external stock coming in from the Broker. The end result*

86

*is the pension fund Long 1m shares of Cum Dividend stock and Massey with a hedged position.*"  As

the earlier discussion of the unwinds demonstrated, the settlement issue in Denmark was obviously

solved by the time the Danish Cum-Ex trading was in operation at ED&F Man.

**Figure 8**



191.  **Figure 8, August 9, 2012**: The Pension Plans loan out their TDC shares on a T+3 basis and the

shares go round the same loop to be sold by Volcafe back into the market.  The presentation states:

"*Need to cover the short sale and so borrow from ED&F, who in turn use the stock that the Pension

fund we're [sic] long from the previous leg Ex-Dividend stock is used whereas the fund went long Cum

Dividend stock previously.*"  It also states that "*The timing of this leg is unimportant in terms of the*

*dividend as all is done ex-dividend. However, we would look to do as soon as possible due to the financing costs of carrying the position. Particularly with the price of internal cash at circa +5%.*"

192.     The exact details of this proposal are irrelevant, and it differs in several respects from the actual transactions which I have reviewed.  However, what is striking about it is the transparency of the way it explains the intention to settle Cum-Ex transactions using Ex-Dividend shares and the desire to recycle shares and avoid having to incur funding costs on holding shares.

193.     We can see the core concepts of this presentation being implemented in the transactions undertaken for TDC shares in the March 2014 dividend.

194.     On March 6, 2014, ED&F Man arranged for the Acer Pension Plans to purchase 22.3m shares on a Cum-Ex basis from MPT Dubai.[246]

195.     On March 7, ED&F Man sells 22.3m shares to Link at a price of DKK50.65 per share.[247]

196.     Also on March 7, MPT Dubai agrees to buy 22.3m shares from Link on a regular T+3 basis, also at a price of DKK50.65.[248]

197.     Mr. Wall, ED&F Man's corporate representative, implausibly suggested that that the shares passed between MPT Dubai and ED&F Man via Link may not have been the same shares and suggested that the use of Link as an IDB in the middle provided anonymity.[249]  It is unclear what anonymity Mr.

---

[246] ED&F-00113789.

[247] ED&F-00108634.

[248] ED&F-00113799.

[249] This specific loop of transactions was discussed by Mr. Wall, ED&F Man's section 30(b)6 witness, on February 23, 2022.  See, Wall Deposition, pp. 217-219:

> "Q No need to apologize. I want you to make sure you have an opportunity to review the documents before you answer the question, so I appreciate that. So would you agree with me, sir, that the documents we've reviewed in the last few minutes show that the TDC shares sold by MPT Dubai were sold to the pension plans in Ms. Kaminer's e-mail at the document Bates 938?

Wall thought would be provided and from whom in this situation, given that ED&F Man approved, cleared, and settled both sides of the trade.

198.     The details of the two confirms from Link for these trades are substantially identical apart from the direction of the transaction (one denotes ED&F Man as the Buyer and the other as the Seller).  The prices and shapes are completely identical so there cannot be any doubt that MPT Dubai sold short on March 6, 2014, and covered this short with the purchase from Link.  Equally it can be seen that Link matched this transaction with the rehypothecation sale by ED&F Man.[250]  A clear loop, not dissimilar to the Solo transactions, is evident; the only substantive difference being that ED&F settled trades

---

A (Witness reviewing.)

I cannot confirm those exact shares were sold to the pension plan. Shares in those -- in that size of order and price were sold to the pension plans.

Q So the same shares -- withdrawn. The shares that MPT was selling in the Volcafe confirmation and the shares that the pension plans that Ms. Kaminer was requesting shares for were identical in trade date, settlement date, price, amount, and split. Correct?

A That's correct, yeah.

Q So, in effect, what was happening was MPT Dubai was selling these shares to the pension plans via Volcafe as an IDB. Correct?

Q You can answer, sir.

A MPT was selling an amount of shares of TDC at a price and an amount to the IDB. The pension plans bought an amount of TDC shares at that -- at that price that the -- at the price that MPT Dubai sold.

Q Not --

A I do not know whether they're the same shares. That's why both counterparties will trade through an IDB, to provide anonymity.

Q But we can agree that the shares that MPT Dubai sells and the pension plans buy are identical in trade date, settlement date, price, amount, and split?

A We can agree to that, yeah."

[250] ED&F-00108634 & ED&F-00113799.

reusing the same shares over and over again whereas Solo had no shares and simply created fictious book entries.[251]

## Figure 9

TDC Share Movements on March 12, 2014



[251] Wall Deposition, pp. 238-239:

"Q Okay. And then, would the same shares be used again on the same day to settle another shape of the same shares?

A Yes, they would. Yes, they would. I'm sorry if you didn't hear me.

Q Yes. Thank you. And did the reuse of the shares on the same day happen more than once on the same day when ED&F was settling Danish trades?

A Yes, they did. I'm sorry.

Q The answer was yes, I believe. And would the shares be reused multiple times until all the shapes were settled?

A Yes, they would." Deposition of Mr. Wall, February 23, 2022, at pp. 238-239.

199.    Using a similar approach to that explained in the Wade Rebuttal Report,[252] it is possible to match the settlement of these transactions via MT536 SWIFT messages from the original transaction to the custody records of BNP Paribas and the in-and- out shapes can be seen on March 12, 2014, matching the amounts on the Link confirms.[253]  Thus, it is evident that the T+4 vs T+3 settlement arbitrage which Mr. Bottomley outlined in his presentation was put into practice.  Various communications quoted in my previous reports indicate that ED&F Man significantly improved the optimization of their Danish settlement.  In an email discussing the unwind of this position in June 2014, Sara Mina of ED&F Man states that *"Denmark is slightly more efficient settlement wise than Belgium so 25% coverage should suffice."*[254]  In fact, as discussed elsewhere in this report they were considerably more efficient than this, achieving a 10% share requirement to unwind the TDC positions.

200.    There is only one plausible source for the shares which were used to settle this loop and that is the shares which ED&F Man had acquired for Pension Plans in Cum-Cum transactions.[255]  Link has a perfectly matched transaction and would expect ED&F Man's re-hypothecation sale settlement to deliver the securities for its onward sale to MPT Dubai.  The statement confirmation indicates that Link was paid DKK16,000 for this transaction (about 0.1 basis points),[256] so it is inconceivable to me that they would have agreed to source even 10% of the shares to settle these trades, because the cost to Link of borrowing the stock would have been an order of magnitude higher than its DKK16,000 fee.  Also recall that 22.3m shares is approximately nine times the ADTV of TDC at the relevant time, so even if Link had been prepared to borrow the shares it would have found it very challenging to source enough

---

[252] See section IV. F Wade Rebuttal Report for an explanation of the process used to match SWIFT statements to settlement lines in the BNP custody records.

[253] See ED&F-00604196 tab "DK0060228559" (ISIN of TDC) which is the BNP omnibus account's custody records, compared to ED&F-00190797 and ED&F-00113799.

[254] ED&F-00201236.

[255] Mr. Wall of ED&F Man agreed that ED&F Man was the original source for the shares settling MPT Dubai's short sale in his deposition.  Wall Deposition, pp. 237-239.

[256] Brokerage on the two confirms of DKK16,000 = (DKK2,000 + DKK14,000) / Total Consideration of DKK1,129,509,000. ED&F-00113799.

shares.[257]  It seems equally implausible that MPT Dubai had 22.3m shares (or even a fraction of this amount) on hand to initiate the settlement of these trades.  If it did, why did it enter into the completely matching purchase transaction to cover its Cum-Ex short?

201.    Mr. Wall has confirmed that one of the reasons why these large trades were broken into small shapes was to facilitate settlement, and the fact that the shapes match on both legs of the transaction (i.e., ED&F Man vs Link and Link vs MPT Dubai) was evidently done to ensure that the same shapes were able to pass smoothly through the settlement cycle.[258]  The techniques used for such settlement recycling were described in detail in the Wade Initial Report.[259]

202.    I am certain that the shares used to settle this loop were shares which ED&F Man had at the close of business on March 11, which as I demonstrated in the Wade Rebuttal Report are completely accounted for by the Cum-Cum transactions on which various ED&F Man Pension Plans made tax reclaims.  As Mr. Hayden and ED&F Man both acknowledge, the Annex E Cum-Ex trades (to which these 22.3m shares sales relate) were inappropriate and the Tax Vouchers should not have been issued.

---

[257] 30-day ADTV was 2,393,898. Wade Initial Report, Appendix D.

[258] Wall Deposition, pp. 213-214:

> "Q And what is the reason that MPT would split a transaction into smaller parts?
>
> MR. BINDER: Objection to form, and beyond his scope as a corporate representative of ED&F.
>
> MR. OXFORD: I'm just asking for the witness' understanding from ED&F's perspective.
>
> A The trade would be split into smaller parcels or lot size, if you like. Smaller trades are easier to settle.
>
> Q Why are they easier to settle?
>
> A You need less shares to settle smaller trades than you do to settle one big trade.
>
> Q Can you explain what you mean by that? Feel free to use an example, if that's easier.
>
> A ED&F were a clearing broker of MPT Dubai. ED&F held a depo account with certain amounts of Danish securities in it. Smaller parcels of shares would be used to settle these smaller splits of trades."

[259] Wade Initial Report ¶¶188-189 plus subsequent examples.

However, they maintain the position that the non-Annex E transactions were different and should be distinguished. The evidence does not support this position.

203. I have matched every single settlement that goes through on March 12, 2014, to a Cum-Ex purchase or rehypothecation transaction relating to one of the Pension Plans or Investment Manager Funds which ED&F Man provided services to at this time and these transactions also match to the dividend reconciliation worksheet for this dividend event. When the transactions are sorted by the broker with which they are executed, a clear pattern of matching blocks of shares going into and out of the account emerges. ED&F Man does all of its rehypothecation trades through one of Volcafe, Link, ICAP, or Cantor Fitzgerald and we can also see that MPT Dubai covers its Annex E Cum-Ex sales with these same brokers.[260] The only transactions on this date which are not with Volcafe, Link, ICAP, or Cantor Fitzgerald are the non-Annex E Cum-Ex purchase from Lutetia Capital and MUFG. Summarizing the total amounts going in and out to each broker, we can see the overall position is as follows:

**Table 1: Buy and sell transactions settling on March 12, 2014, by IDB**[261]

| IDB | Buys | Sells | Net |
|---|---|---|---|
| Link | 39,300,000 | (43,795,000) | (4,495,000) |
| Icap | 9,000,000 | (11,000,000) | (2,000,000) |
| Cantor | 7,000,000 | (11,000,000) | (4,000,000) |
| Volcafe | 9,000,000 | (9,000,000) | 0 |
| Lutetia | 6,000,000 | 0 | 6,000,000 |
| MUFG | 4,000,000 | 0 | 4,000,000 |
| Total | 74,300,000 | (74,795,000) | (495,000) |
| Annex E | 64,300,000 | (64,300,000) | |
| Non-Annex E | 10,000,000 | (10,495,000) | (495,000) |

[260] See the list of documents related to TDC March 2014 transactions in this report within the Materials Considered for this report.

[261] Note where there is a transaction from ED&F Man to Link, Link to MPT and MPT to ED&F Man I have treated that as a sale to Link and a buy from Link and ignore the intra-ED&F Man Group transaction.

204.    The sum of the shapes that enter the account is 74.3 million, and the sum of the shapes leaving is 74.795 million.  Of these share movements, we see that there are 64.3m shares on each side which represent the Annex E Cum-Ex trades which are round-tripped through one of the IDBs.[262]  The remaining 10 million buys are in 3 shapes of 2 million shares from Lutetia,[263] and 1 shape of 4 million shares from MUFG.[264]  Further, we can see that the Link, ICAP, and Cantor Fitzgerald sells which cannot be matched directly with MPT Dubai total 4.495m, 2m and 4m shares respectively.  The 0.495m shares are related to a Cum-Cum transaction undertaken by the Cubix Investment Manager.[265]  The 4m shares delivered to Cantor Fitzgerald are in a single shape of 4m shares, matching the shape received from MUFG.[266]  The shares delivered to Link and ICAP and received from Lutetia are both delivered as 3 shapes of 2m.[267]

---

[262] ED&F-00040919, at 84.  64.3 million shares are held at Volcafe, representing Annex E transactions (short sales by MPT Dubai).  This is also the sum of the shares associated with overpayment for this dividend in the ED&F Re-Amended Defence, Annex E.

[263] ED&F-00193696, ED&F-00193697, and ED&F-00193698.

[264] ED&F-00041857, at 93.

[265] Oliver Bottomley of ED&F Man is instructed by his manager Victoria Foster to rehypothecate a minimum of 4.95m shares of the Cubix holding of 5m shares TDC on March 7, 2022 (ED&F-00251859).  He successfully sells 6.495m shares to Link in shapes of 3x2m and one of 0.495m (ED&F-00206575).  In fact, had Cubix held Cum-Cum positions of 4.995m shares on the Record Date (ED&F-00040919 at 83) and so clearly Mr. Bottomley was actually re-financing at least some other shares but the odd lot of 0.495m undoubtedly relates to Cubix given it is the only such shape across all the ED&F Man Pension Plans.  As I highlight later, the Lutetia purchase arrives in 3 shapes of 2m.  ED&F-00193696, ED&F-00193697, and ED&F-00193698.

[266] ED&F-00041857, at 93, ED&F-00211966, and ED&F-00211963.

[267] ED&F-00193696, ED&F-00193697, and ED&F-00193698.  Here I note that in my Initial Report (¶123) I identified a sale to Link of 2m shares as being a rehypothecation trade for the non-Annex E AIG position, a point which Mr. Hayden highlighted as questioning the validity of my opinions on this transaction (Hayden Report ¶45 a. iii.).  He took "no position" on whether these were the same shares purchased from Lutetia and based on the admission of recycling by ED&F Man this is perhaps an academic question.  It is clear that 3 lots of 2m shares were delivered to Link and ICAP by ED&F Man on March 12, 2014 and 3 equivalent shapes were received back from Lutetia on the same date.  ED&F Man had 24.35m shares in its omnibus account at close of business on March 12, 2014 and these shares were re-financed and/or returned to the Cum-Cum share providers over the coming days as explained in the Wade Rebuttal Report, ¶190.

205.    Combined with the other reasons given elsewhere in this report,[268] it is inconceivable that the non-Annex E Cum-Ex transactions with Lutetia and MUFG are not carbon copies of the MPT Dubai Annex E transactions.

206.    Having completed this reconciliation we can now also see how the shares actually acquired and then reused add up to the figures on the dividend reconciliation worksheet which shows that the 24.845m shares acquired for Cum-Cum transactions were used to support Tax Vouchers on 99.145m share "long holdings"[269] and the claimed total "long holdings" of 163.445m.[270]

**Table 2: Long holdings listed on TDC March 2014 Dividend Reconciliation Sheet**

| "Long Holdings" | Number of shares (millions) |
| --- | --- |
| Cum-Cum positions (actually held on Record Date) | 24.845 |
| Non-Annex E Cum-Ex positions | 10 |
| Annex E Cum-Ex positions (including the 22.3 million MPT Dubai loop discussed above) | 64.3 |
| **Subtotal** "Long Holdings" for which Tax Vouchers were issued | 99.145 |
| Volcafe back-to-back trades re Annex E Cum-Ex | 64.3 |
| **Total** "Long Holdings" | 163.445 |

---

[268] Principally the pricing of the Cum-Ex sales and Futures plus the fact that both of these Cum-Ex purchase are individually over 1.5 and 2.5 times respectively of the 30-day ADTV of TDC shares.

[269] This label is used on the reconciliation sheet in ED&F-00040919, at 83-84.

[270] ED&F-00040919 at 83-84.

**2.    Mr. Hayden's Criticism on the Detail of the ADTV Calculations Ignores the Substantive Point That It Is Implausible That ED&F Man Really Acquired Such Large Positions and Would Have Been Unable to Risk Manage Them if It Could.  In Any Event, ED&F Man Has Now Admitted That It Did Not Really Acquire the Shares It Claimed.**

207.    Mr. Hayden criticizes the measure of average daily trading volume I use in my initial report, which is the 30-day ADTV as reported by Bloomberg.[271]  He appears to have two main complaints: first, that this measure, which does not include OTC trades, is therefore biased downwards, and second, that by including 30 days it dilutes the effect of increased trading around the ex-dividend dates.  Mr. Hayden's critique is misplaced, as I explain below.  It also ignores the main thrust of my opinion, which is that given the market realities of trading in Danish shares, of which the Bloomberg 30-day ADTV is a commonly used measure, it is implausible that ED&F Man could have actually acquired such large positions in Danish equities.[272]

208.    Mr. Hayden opines that, by not including OTC trades, the Bloomberg ADTV measure undercounts the actual traded volume of Danish shares.[273]  He is incorrect, on several grounds.

209.    First, in my experience, banks and traders use this Bloomberg field on a regular basis, due to its ease of use and objectivity.  Bloomberg's ADTV is used to consider what would happen if a counterparty failed and in that circumstance the bank or trader may be limited to trying to liquidate via the exchange (or through brokers who do not have a matching client wanting to take the opposite position and so have to use the exchange).  Access to reliable OTC transaction data in the relevant period was a non-trivial matter and not conducive to desk-level monitoring.  Further, Mr. Hayden ignores the fact that I suggested that 200% of ADTV as a suitable metric.  Any risk measure of this nature is inevitably arbitrary, so it is equally valid to define a risk limit based on an arbitrary percentage

---

[271] Hayden Report, ¶49b.

[272] An opinion which has even more force following the admission by Mr. Wall of ED&F Man that ED&F Man used recycling techniques to settle Cum-Ex trades.  Wall Deposition, pp. 237-239.

[273] Hayden Report, ¶49b.

96

of the exchange volume calculated ADTV as it is to use a different arbitrary percentage on a more comprehensive measure.

210.    In any event, Mr. Hayden ignores the inconvenient fact that ED&F Man's own policy was to use ADTV as one of the measures used to cap the risk taken by their equity finance desk: "Max Position per single stock Min of: … ii. 20% of 20 Day Average Trading volume, based on comparable dividend period."[274]  I note in this context that the policy limit was **20% of ADTV,** compared to the metric of 200% used in my Appendix D whereas the positions ED&F supposedly held were many multiples of this limit.  One would need to multiply the Bloomberg ADTV figures by 10 times to generate an ADTV figure where the ED&F Man risk limit would have exceeded the metric used in the Wade Initial Report.

211.    Further, even if there was a reason to include OTC trading volume in the measure (which I disagree with), it would have not changed the basic arithmetic in any material way. According to the ESMA's 2021 Annual Statistical Report, only 10% of traded volume in European equities outside of the UK occurs over the counter.[275]  To use the TDC March 2014 example,[276] accounting for the missing OTC trades would increase the ADTV from 2.4 million shares per day to 2.69 million shares per day.[277] ED&F Man's claimed position of 99.145 million shares[278] is gigantic even relative to this "augmented" ADTV, coming in at over 35 times ADTV.

---

[274] ED&F-00444677, at 84-85.

[275] EU Securities Markets – ESMA Annual Statistical Report 2021, p. 7. Available at https://www.esma.europa.eu/sites/default/files/library/esma50-165-2004_eu_securities_markets_asr_2021.pdf, last accessed February 25, 2022.  83% of shares are traded on-exchange, and the other 7% are traded via systematic internalisers (SIs).

[276] Wade Initial Report, Appendix D.

[277] 2.4 million shares traded on-exchange * (83% on-exchange + 10% OTC) / (83% on-exchange) = 2.69 million shares traded either on-exchange or OTC.

[278]  From the TDC dividend reconciliation sheet excluding the positions shown as 'held' by Volcafe. ED&F-00040919, at 84.

212.     Mr. Hayden's critique that the use of 30 days around the Record Date is somehow misleading also does not hold water.  First, as already discussed, ED&F Man itself uses a 20-day average, whereas Mr. Hayden appears to advocate for a 7-day average.  Second, his example using the shares of TotalEnergies SE[279] is completely irrelevant because it is a much more liquid French stock, and TotalEnergies in particular is a popular dividend arbitrage event due to its high dividend yield.[280]  The Danish securities involved in this matter do not exhibit a uniform pattern of higher volume on the Ex-Dividend Date.[281]  Mr. Hayden's own Appendix C shows no such jump for Danske.

213.     Mr. Hayden also remarks that "the ratio of holdings to ADTV is not generally used in the market to evaluate whether a party could reasonably have the right to a dividend in the shares it acquires."[282]  I never suggested it was.  My opinion is that an implausible ratio of holdings to ADTV is evidence that the purported holdings were not real.

## IV.     BASES FOR OPINIONS RELATED TO DR. CARR'S REPORT

### A.     Opinion 6: Dr. Carr Ignores the Comprehensive Evidentiary Record That No Shares Were Ever Held by the Parties in Connection with Tax Reclaims and That the Solo Trades Were Conducted with Contrived Circularity and No Economic Risk.  Dr. Carr's Claim That the Solo Transactions Carried Normal Market Risk Ignores All Available Evidence and Is Incorrect.

214.     Dr. Carr asserts that "the pension plan strategy was a structured transaction that required successful execution of all of the stock, stock loan, and hedging transactions."[283]  He explains that "to

---

[279] Hayden Report, ¶49 b iv.

[280] Its historic dividend yield at the time of writing has been above 5% for the last 10 years.  Source: Refinitiv Eikon.

[281]  For example, Bloomberg lists COLOB DC's volume on the ex-dividend date of December 6, 2013, as 411,105 shares.  On December 13, only one week later and after the Record Date of December 10, volume was 523,557 shares, and on December 14 it was 435,029 shares.

Similarly, on Novozymes' ex-dividend date of February 27, 2014, volume was 493,776 shares, lower than the volume on the next day (591,505 shares) and much lower than the volume on February 25 (1,655,208 shares).

[282] Hayden Report, ¶49 b.

[283] Carr Rebuttal Report, Section II heading, p. 9.

pursue the Pension Plan Strategy, pension plans faced several risks, including price risk, liquidity risk and financing risk",[284] and that to mitigate those risks the plans used the services of registered and regulated custodians and IDBs.[285]   This argument is premised on Dr. Carr's demonstrably false assumption that the Pension Plans had faced actual financial risk.  In fact, as I explained in my previous reports, the Pension Plans did not actually hold any shares and faced no economic risk at all.[286]  Two of the principals of the plans, Mr. Markowitz, and Mr. Klugman, confirmed their understanding that their plans faced no market risk,[287] a fact that was apparent from my review and which I have outlined in detail in my prior reports. Dr. Carr cites no new evidence showing that the plans faced real risks or engaged in anything other than circular non-market facing transactions designed to generate tax withholding claims.

215.    Dr. Carr cites the 2007 Interagency Statement on Sound Practices Concerning Elevated Risk Complex Structured Finance Activities in support of his opinion.[288]   He suggests that by simply redefining the Solo transactions as a type of structured finance that carries real risks, a measure of market reality would be attributable to the transactions.  In fact, the Solo transactions, on their face, would have so clearly breached the principles behind the Interagency Statement that prudent investors and financial institutions would surely have avoided them.  The Interagency Statement was issued in order "to describe the types of risk management principles that… may help a financial institution to identify CFSTs [Complex Structured Finance Transactions] that may pose heightened legal or reputational risks to the institution ('elevated risk CSFTs')."[289]   Examples of structured financial

---

[284] Carr Rebuttal Report, ¶13.

[285] Carr Rebuttal Report, ¶¶14-16.

[286] Wade Initial Report, ¶¶234 – 237.

[287] Wade Rebuttal Report, ¶¶45 – 46; ¶¶51 – 52.

[288] Carr Rebuttal Report, ¶9.

[289] Interagency Statement, p. 1.

transactions which may pose elevated legal or reputational risk include, according to the Statement, transactions that "[l]ack economic substance or business purpose," that "[i]nvolve circular transfers of risk (either between the financial institution and the customer or between the customer and other related parties) that lack economic substance or business purpose," or that "[h]ave material economic terms that are inconsistent with market norms."[290]  In my previous reports I discuss in detail the evidence that the Solo transactions, in fact, appeared to be perfect examples of elevated risk financial transactions and include the very factors described in the Interagency Statement cited by Dr. Carr.  They had no clear business rationale, were entirely circular, and had terms that were inconsistent with market norms.[291]  Given these features, in my experience, the Solo transactions would have raised multiple red flags for any finance industry practitioner; red flags which should have been apparent to any knowledgeable market investor, like Mr. Markowitz and Mr. Klugman.

### 1.    Dr. Carr's Claim That the Pension Plans Could Have Reasonably Assumed That the Solo Transactions Were Real Ignores All Available Evidence and Is Incorrect

216.    Dr. Carr opines that, given the complexity of their strategy, it is not surprising that "pension plans like the RJM Plan and the Proper Pacific Plan used their custodians, Solo and Old Park Lane, to successfully implement the Pension Plan Strategy."[292]  In fact, it is highly surprising for a custodian to propose trades and source counterparties, as Solo and Old Park Lane did.[293]   There is an inherent conflict of interest when a financial institution offers customers both custody services and trading services.  As a custodian, the institution is supposed to keep the customers' assets safe, whereas all

---

[290] Interagency Statement, p. 4.

[291] Wade Initial Report, Section VII. E; Wade Rebuttal Report, ¶¶12 – 51.

[292] Carr Rebuttal Report, ¶ 14.

[293] Wade Initial Report, ¶¶ 241-2.

trades include risk. It is not at all customary for a custodian to propose a trading structure, individual trades, and the counterparties with which to execute those trades as Solo clearly did.[294]

217. Dr. Carr is further incorrect when he opines that "[g]iven numerous structured transactions by the pension plans and potentially by its other customers, it seems reasonable that Solo took steps to automate the process."[295] However, instituting an automated system like Brokermesh could have created an enormous risk for its clients had the trades been real, since a default or trading error by any one of the dozens of counterparties would immediately cascade through the entire network. The Pension Plans could not reasonably have ignored this risk, yet, according to the deposition testimony of Klugman and Markowitz, they did exactly that.[296] It is clear to me from the totality of the deposition

---

[294] Klugman Tr. at 110:14-21 ("Q. So, the -- Solo would provide you with the identification of the counterparties and the allocation of the shares for each plan. And Matt and Ira would then use that information to populate the template they were using to process the transaction? A Yes, that sounds right.") See also Markowitz Tr. at 274:22-275:11 ("Q Okay. Whose job was it on behalf of the plans to decide which broker to go to to seek liquidity for any particular trade? A It's part of the allocation process that we received from Solo in terms of the liquidity and shares. We'd also be given information as to which of those brokers would source that liquidity or had access to that liquidity. So Solo would provide us a number of shares that they saw in the marketplace or could arrange in the marketplace, and also the identity of the brokers who would be able to handle the trades on behalf of the pension plans.") See also: In the High Court of Justice, Business and Property Courts of England & Wales, Commercial Court, SKAT v. Solo Capital Partners (in Special Administration) & Others, Sanjay Shah Defendants' Response to Claimant's Request Dated June 4, 2019, for Further Information Under CPR 18 ("Shah Response"), p. 13, Response 16. ("REQUEST: Please clarify who is alleged to have developed the Futures Trades and the Forwards Trades. RESPONSE: [1] Futures Trade: principally Rajen Shah and Graham Horn. [2] Forward Trades: principally Priyan Shah and Gerry O'Callaghan.") See also JVHM_0004863 (detailing instructions concerning conducting the trades with vis-à-vis Old Park Lane and Pogo (i.e., Mr. Patterson)).

[295] Carr Rebuttal Report, ¶22.

[296] "Q And are you aware of any due diligence that anyone performed on any forward counterparty? A Specific due diligence? No. Q Are you aware of any due diligence that any forward counterparty performed on any plan or any other participant in the Danish trading transactions? MR. ALLISON: Object to form. A No, I'm not familiar with that, no. Q Are you aware of any due diligence that any party to the Danish trading transactions performed on any other party? MR. ALLISON: Object to form. A Well, I do know there was a lot of due diligence done originally on Solo Capital by the Argre team. There [was] various successful transactions done over the years and I don't know specifically what was done in 2012, 2013, and in the first part of 2014, before I got involved. But I know they were -- all the transactions were successful and there were no failures involved. Q Is there any due diligence that you're aware of, by any party, that was done by any other party to the Danish trading transactions, other than what the Argre team did with Solo and the earlier successful transaction? A Well, I also know that Kaye Scholer was involved in those earlier transactions as well, as well as other law firms involved in -- in the -- you know, reviewing all the documents on other transactions. Specifically, what exactly they did, I can't speak to. Q Okay. So other than what the Kaye Scholer people may have done, and the Kaye Scholer law firm may have done, are you aware of any due diligence by any party, on any other party to the Danish

testimony and the obviously perfectly matching transactions that, contrary to Dr. Carr's assertions, the participants proceeded on the basis that the only material risk in the scheme was the tax reclaim risk.

218.   Dr. Carr opines that I "ignore the account statements listed by the Solo Custodians that show the pension plans' transactions and holdings."[297]   I refer Dr. Carr to my extensive discussion of these statements in previous reports.   For example, the Solo statements appear to have been manipulated so as to have all transactions net off to zero.   Also, the statements do not show any margin requirements, or if they do, do not show that cash or other assets were actually provided to satisfy margin requirements.   In other words, the statements fundamentally show shares and positions which are not real, a fact that could not have been lost on the knowledgeable market participants, such as Mr. Markowitz and Mr. Klugman, who received these statements.[298]

219.   Dr. Carr misstates several aspects of my previous reports asserting that I "consider information not available to the pension plans,"[299] that I "fail to demonstrate that the pension plans knew that 'Solo never held any actual Danish shares'"[300] and that I "do not provide any evidence demonstrating that the pension plans knew of all transactions (and identities of parties in these transactions), including transactions that did not involve the pension plans."[301]   In fact, I did not opine on the state of knowledge of the Pension Plans or anyone else's, as it is my understand that opining on that state of knowledge is not an area for expert opinion.   I do opine, however, on what informed investors, which is how the

---

trading transaction? A Other than what the Argre team did and Kaye Scholer, no, I'm not aware of anything other than those parties. Q And what can you tell us about the due diligence on Solo that the Argre team did? A Well, when they were initially contemplating transactions with them, I know they did a crawl search, both on Sanjay Shah and on Solo Capital. Q Anything else? A I don't know other -- I mean, before entering into any transactions, like before even contemplating transactions, looking at transaction documents, et cetera, no, I don't know of anything else." Deposition Transcript of Robert Klugman, January 28, 2021, 133:25 – 136:7.

[297] Carr Rebuttal Report, ¶7.

[298] Wade Initial Report, Section VII. E, Wade Rebuttal Report, Section III. A.

[299] Carr Rebuttal Report, Section V heading, p. 34.

[300] Carr Rebuttal Report, ¶83.

[301] Carr Rebuttal Report, ¶84.

Pension Plans are described by Solo,[302] would have made it their business to know had they faced similar circumstances. Accepting at face value a riskless transaction, involving almost infinite leverage and generating large profits is simply not something that any informed investor would do. Considering that the Solo transactions were loss-making transactions but-for the tax refund; the Solo custodians were highly involved in the trades and eventually employed an automated process; the Pension Plans were not required to post margin or to put any cash at risk; the large sizes of the purported transactions;  and that the Pension Plans were matched to trade with counterparties about whom they knew nothing or nearly nothing, I conclude that no reasonably informed investor would have considered the Solo transactions as anything other than a scheme to generate and receive tax refunds.

## 2. Dr. Carr's Claim That IDBs' Participation in the Solo Transactions Is Evidence That They Were Not Fictitious Ignores All Available Evidence and Is Incorrect

220.    Dr. Carr cites selectively from the FCA's Final Notice to Sunrise Brokers in an attempt to support his view that the executing brokers in the Solo transactions did not have instant access to liquidity and were not always able to find any.[303]  Presumably, these quotes purport to show that the executing brokers executed the Solo transaction in the ordinary course of business, as they would execute any other transaction.  Dr. Carr ignores the evidence that, on the whole, brokers working on the Solo trades had an extraordinarily easy time finding the necessary liquidity to execute the massive transactions, and that this was contrary to actual market conditions.  The FCA's report is clear on this topic.  Although Dr. Carr does not cite the relevant passages in the same report, the report finds that the liquidity that Sunrise was able to find was much too large to be realistic in a market context.  For

---

[302]  See, for example, ELYSIUM-01586731, where Gary Pitts, Solo's chief compliance officer, explains: "In general we are relying on the net wealth and holding a professional role for at least 12 months…. A number of these clients do not trade with the frequency required… but their trades are complex, structured dividend arbitrage trades in considerable size, often for seven figure sums subject to significant leverage. The size and complexity of these trades means they cannot be conducted on a frequent basis. A schematic of a standard type of one of these trades would show the professional skill and nature of the investors concerned…. You will also find that there is a short 'season' of around 4-5 months each year when dividend arbitrage trades can take place which renders the FCA test one that the investors are unlikely to meet. These are high leverage, high return trades."

[303]  Carr Rebuttal Report, ¶¶23-24.

example, the FCA calculates that "Sunrise would have had to execute trades on behalf of the Solo Clients to the approximate value of £15.5 billion in order to generate gross commission of DKK 996,355 (which equates to approximately £97,000) within almost a month."[304]  In the face of this incredible success in executing trades, the claim that, occasionally Sunrise had trouble finding liquidity does not carry any weight.

221.    Sunrise's success in finding liquidity was so great, in fact, that the FCA concluded that this should have raised red flags within the organization: "Sunrise never queried how it was possible to source sufficient liquidity, cash or financing for trades that had a nominal value of billions of pounds within a single day. Nor did Sunrise enquire how such liquidity, cash or financing could be found within a closed network of clients (most of whom were individual 401(k) Pension Plans) without access to liquidity from public exchanges.  All of this was possible despite the fact that the purported Solo Trading on Brokermesh represented multiple times the entire daily volume of trading across virtually all European exchanges."[305]  In part for these reasons, the FCA found that the records surrounding the "purported" trades were "highly suggestive of a sophisticated financial crime."[306]  Dr. Carr, with access to the FCA's report, does not ask any of these questions either.

222.    Dr. Carr cites an example where liquidity could not be found for a pension plan trade.[307]  This, if anything, is an exception that proves the rule.  Out of thousands of transactions, involving dozens of Pension Plans over two years, Dr. Carr identifies only one instance where a transaction did not execute. A more careful review of this particular event shows that, far from being a failure to find liquidity, it

---

[304] FCA Sunrise Final Notice, ¶4.135.

[305] FCA Sunrise Final Notice, ¶4.136.

[306] FCA Sunrise Final Notice, ¶2.10.

[307] Carr Rebuttal Report, ¶25.

was in fact the result of a series of errors by the participants in the fictitious trading where they failed to follow the script correctly, and Solo making mistakes coordinating the action.

223.     The relevant example relates to the intended unwind of a transaction which was purported to be put on in December 2012.  In order to unwind the transaction Adam La Rosa should have asked to sell the shares and buy a future.  Instead, in the email cited by Dr. Carr, which is dated March 8, 2013, Mr.  La Rosa asks FGC Securities for liquidity to buy equity and sell futures on behalf of Mill River Capital Management Pension Plan.[308]  However he had made a mistake—he had the direction of the trade wrong—and sent a corrected request to FGC Securities, which also appears to have been aware that the trade request they received was an error and prompt  Mr. La Rosa to cancel the trade.[309]   Mr. La Rosa then sent the request for liquidity to Novus Capital. In his initial request to Novus, Mr. La Rosa had the direction of the trade wrong again.[310]  When approached by Mr. La Rosa with the corrected direction of the trade, Novus had no trouble finding liquidity for the trade.[311]  However, since the hour was late, the trade was executed on the following business day.[312]

224.     It is also clear that the events of March 8 were the subject of significant follow up debate.  For example, on Sunday March 10, Mr. La Rosa says the following in an email to Mark Patterson of Solo: "I sure you guys got all those kinks out of the system now right?  Stepping away from it and thinking about it yesterday I'm actually happy it happened. Rather it happen on an unwind day and get

---

[308]MPSKAT00072487.

[309] See correction from Mr. La Rosa in MPSKAT00072353. FGC Securities send an email which states "Adam — we have NOT been able to find liquidity so far for this. Let me know if you want us to cancel". MPSKAT00072484.  Mr. La Rosa replies a few minutes later with "Ok understand – please cancel the entire trade."  MPSKAT00072495.

[310] MPSKAT00072570.

[311] MPSKAT00072729.

[312] MPSKAT00072775.

everyone's attention now then have it happen on March 20 or 21!!!"[313]  Separately, Sanjay Shah passes on feedback from "Oakley" who had said "Your reports are shit and need fine tuning to show these cash flows.  We should chat on Monday and come up with a solution."  Later in the same email chain he says to Anupe Dwala of Solo, "today's trades/activity is in meltdown for about a dozen different reasons.  Pogo [Mark Patterson], Nirav and me are in the office trying to sort. I have said a million times before that we need a system. I still don't have access to access.  We need a developer hired asap."[314]

225.    Therefore, far from being evidence of the fact that the brokers had problems finding liquidity, the instance cited by Dr. Carr is in fact further evidence of the centralized coordination of the whole scheme and the active and knowing participation of the Pension Plan trustees.

### 3.    Dr. Carr's Claim That the Solo Transactions Were "Bespoke" and Therefore Legitimate Ignores All Available Evidence and Is Incorrect

226.    Dr. Carr asserts that "the analyzed transactions followed numerous accepted market practices and are not fake simply because of the use of any non-standard terms."[315]  My opinion that the Solo transactions were not real transactions is based on the entirety of the evidence I reviewed and my own experience.  It does not hinge on any single piece of evidence.

227.    Having said that, the so-called "non-standard terms" were not part of any trading strategy I can recognize.  First and foremost, as shown in my previous reports, the trades were circular loops in which no shares or cash existed.  Second, Dr. Carr wrongly takes issue with my analysis of Solo's account with JPMorgan.[316]  Dr. Carr ignores the fact that an accurate statement from a third party can nevertheless show transactions that are not market-facing and therefore not real.  JPMorgan's account

---

[313] ELYSIUM-01396410.

[314] ELYSIUM-01389516.

[315] Carr Rebuttal Report, Section IV heading, p. 16.

[316] Carr Rebuttal Report, ¶¶45-47.

statements reflected the information given to it by Solo.  The statements always showed futures trades that netted off precisely to zero, so that the net aggregate position of all the Solo entities—Pension Plans, counterparties, and custodians—was zero at all times.  This was imperative since neither the Pension Plans nor Solo had or could post the proper margin that would have been required had the position not been exactly zero.

228.    JPMorgan, in its correspondence with Solo that is cited by Dr. Carr, appears to be concerned that the trades reflected in its statements were wash trades:  they ask Solo to provide "the rationale behind the April matched business [the trades in question]" and to "confirm that each trade had different buyers and sellers."[317]  Dr. Carr claims that I have "not provided any evidence that they were not."[318]  I refer Dr. Carr to my detailed analysis of the Solo transactions in both my initial report and my rebuttal report, where I show, and provide supporting evidence, that the Solo transactions were complete circles, and that as part of that circle, the futures trades shown in the JPMorgan statements were non-market facing.  This has nothing to do with the trades being "bespoke" or over the counter, neither of which is mutually exclusive to the trades being non-market facing, circular or fictitious.[319]

229.    Dr. Carr dismisses my opinion that the pricing of the futures in the analyzed Solo transactions was not market-based.[320]  His argument appears to be that, since the futures were traded on an OTC basis, it follows that market-based pricing factors are irrelevant.  This argument is incorrect and shows a lack of understanding of the way futures markets work.  A futures contract that is negotiated over the counter can be then given up to a clearing firm and put onto the exchange to be traded like any other future.  Its price then should align to the market price for the other futures on that exchange because the

---

[317] ELYSIUM-01746161.

[318] Carr Rebuttal Report, ¶46.

[319] The concerns raised by JPMorgan were not an isolated instance. In November 2013, SEB raised similar concerns of possible wash trades, and sought confirmation from Solo that the trades were conducted independently of each other. See ELYSIUM-02521413.

[320] Carr Rebuttal Report, ¶52.

only differentiating factor between all the futures of a given maturity is the opening price at which they were first created – all other features are identical.

230.     Dr. Carr claims that I "misleadingly state that the structured nature of pension plans trades is evidence that they are fictitious."[321]  I did not make such a claim.  Instead, in my report I followed the purported structure of the transactions based on the documentation provided, and described in detail how the trades, as reported in the documentation, could not have been real trades.[322]  Structured transactions are common; the structure of the Solo transactions was not.  Not only would no reputable financial institution ever execute such transactions, but there would also be serious disciplinary processes or education programs for anyone who even suggested that they should.

231.     Dr. Carr claims that "[t]here is nothing wrong with trading OTC."[323]  I agree, but equally Dr. Carr cannot ignore all of the regulatory red flags which were raised by these "trades" such as the rules of market abuse, large holding reporting, money laundering, and wash sales which have nothing to do with whether those "trades" are done on an OTC basis or not.  Furthermore, there are a wide range of conventions and market practices in the OTC markets which, as I explain in my earlier reports, are completely ignored, or violated by the Solo transactions.  For example, the parties' use of the GMSLA documents and ISDA documents which are used to execute the stock loans and forwards were highly unusual and not at all consistent with market norms as I have discussed at length in my previous reports.

232.     Dr. Carr asserts that the profitability calculations I include in my report are "irrelevant because they are effectively the gross profits… for an investor paying taxes at the same rate as the withholding tax".[324]  I agree that my calculations show the profit ignoring transaction costs and disputed tax reclaims

---

[321] Carr Rebuttal Report, Section III heading, p. 12.

[322] Wade Initial Report, Opinion 5.

[323] Carr Rebuttal Report, ¶39.

[324] Carr Rebuttal Report, ¶59.

(which I defined as Trade Profit in Table 1 of the Wade Rebuttal Report), but that does not make my calculations irrelevant.  Notwithstanding my explanation, Dr. Carr still does not explain why the Trade Profits for the Proper Pacific transaction he analyzes were exactly zero.[325]  I also refer Dr. Carr back to my analysis of the Roadcraft and Basalt Ventures transactions, where the Trade Profits were also exactly zero.[326]  For real trades, it is implausible that the Trade Profits would be zero.  My calculations of the Trade Profits are relevant because they clearly show that these transactions were artificial and contrived, and could not have been real, market-facing transactions.

### 4.     Dr. Carr's Claim That the Securities Lending Transactions Were Real and Legitimate Ignores All Available Evidence and Is Incorrect

233.    Dr. Carr critiques my opinion as follows: "Mr. Wade's assertion that Aquila would have demanded a haircut… is inconsistent with the fact that Delvian had executed the transaction as a stock lending transaction, in which the stock lender generally charges margin, not a repurchase agreement (repo) in which the cash lender requires a haircut typically."[327]  Dr. Carr is mistaken, and his critique shows a lack of understanding of the operations of the market for securities lending.  The collateral terms in a stock loan reflect the relative negotiating strength of the parties and would also customarily reflect which party is the initiator of the transaction.  As I explained in my report,[328] the party which has the greater need for the transaction would provide margin or haircut to the other party.  According to Dr. Carr's own analysis, "Delvian did obtain the financing [from Aquila] and used that to pay for the shares."[329]  One would expect that Aquila would demand a haircut in return for the financing it provided. The fact that there was no haircut, as Dr. Carr appears to concede, completely undermines his analysis.

---

[325] Wade Rebuttal Report, Table 3.

[326] Wade Rebuttal Report, Table 1, and Table 4.

[327] Carr Rebuttal Report, ¶68.

[328] Wade Initial Report, ¶248.

[329] Carr Rebuttal Report, ¶71.

Additionally, as explained at some length in the Wade Rebuttal Report, the terms of the stock loan margin were in fact based on back-dated prices and so the margin level was in effect random.[330]  In other words, Aquila did not demand margin *and* Delvian did not demand a haircut: both accepted an outdated price, which was convenient because it meant that no net cash was needed by the parties on the settlement date.

234.    Dr. Carr asserts that I "seem to assume that the parties to the stock trade knew each other and had visibility into each other's finances."[331]  In fact, I assumed the opposite, i.e., that the parties to the stock lending transaction initially had no information about each other's financial situation, and therefore would have been extremely hesitant to execute the trade had it been a real, market-facing transaction.  Having no information on a counterparty's finances would lead a reasonable trader to operate on the prudent assumption that the counterparty has very little capital and therefore poses a high risk.  Under regular conditions, the stock trade would not have occurred absent due diligence by each party to gain comfort with the counterparty risk presented.  Here, however, neither party, had it done such due diligence, could have gained the necessary comfort with the counterparty's risk profile.  Indeed, **both** counterparties would have been justified in considering the other as unacceptably high risk. As I show in my report,[332] both counterparties were very thinly capitalized and could not have survived even a small deterioration in market conditions. This stock trade would simply not have occurred had it been a real arm's-length transaction between independent counterparties.

235.    Dr. Carr also misunderstands my opinion regarding the consequences of a potential special dividend during the life of the stock loan.[333]  My point is that should a special dividend be announced

---

[330] Wade Rebuttal Report ¶34.

[331] Carr Rebuttal Report, ¶73.

[332] Wade Rebuttal Report, ¶¶51, 54, and 62.

[333] Carr Rebuttal Report, ¶¶74-75.

while Aquila, Delvian's counterparty, was the stock borrower, then Aquila would have to deliver 100% of the dividend to Delvian, while itself receiving only 73% of the dividend. This is not standard market practice, and that the risk was ignored by the parties to the stock loan is further evidence that the transactions were not real.

### 5. Dr. Carr's Claim That the Pension Plans Had Economic Exposure to the Shares and Therefore a Claim to Dividends Ignores All Available Evidence and Is Incorrect

236.    Dr. Carr asserts that "[b]oth in a Cum-Cum and a Cum-Ex trade, an investor buys a stock at the cum-dividend date, and thereby obtains immediate economic exposure to changes in the stock price and a claim to an amount equal to the forthcoming dividend."[334] As a general matter, I completely disagree with this statement, for the reasons that I have detailed in my reports. However, Dr. Carr's error here is also on a more basic level: the Solo pension plans were not exposed to economic risk, because they never bought any shares, nor did they ever lend shares, recall shares, or sell shares at any point in the Solo transactions, for the simple reason **that there were no shares in Solo's accounts**. Dr. Carr ignores this basic fact and proceeds to make his assertions as if it wasn't true, where, in fact, the lack of any shares renders the entire point meaningless. Further, as discussed above, due to the highly irregular pricing of the stock loans and futures and/or forwards, even if the shares had existed the plans would have faced no price risk on the transactions, as admitted by both Mr. Markowitz and Mr. Klugman. That and the fact that the plans seemed to ignore counterparty and settlement risk is further proof that the trades were fake.

237.    Finally, in relation to the question of the nature of the dividends received by the Pension Plans Dr. Carr takes issue with the citation in the Wade Initial Report of the U.K. Manufactured Overseas Dividend rules, and claims these rules are irrelevant.[335] Even ignoring the absence of any shares and

---

[334] Carr Rebuttal Report, ¶89.

[335] Carr Rebuttal Report, ¶97.

therefore the absence of any dividends he is still mistaken. These rules, in fact, applied to dividends paid to holders of "Overseas Securities", defined as "shares, stock, or other securities issued by a government or public or local authority of a territory outside the UK or by any other body of persons not resident in the UK. This includes both overseas shares and overseas debt securities."[336] This definition includes, of course, the Danish shares at issue in this matter. Solo, which was at the time a U.K. registered and regulated entity, was subject to these rules. The "significant difference" Dr. Carr mentions is not a different tax treatment, rather, it is the difference between a manufactured dividend and a real one. I have covered this point in more detail earlier in this report in response to the comments made by Mr. Hayden.

### 6. Dr. Carr's Claim That the Circularity of the Solo Transactions Does Not Imply They Are Fictitious Ignores All Available Evidence and Is Incorrect

238.     Dr. Carr asserts that I "fail to explain what exactly is circular in the figures present and why the purportedly circular nature of the transactions establishes that the trades were fake."[337] He suggests that, because Danish shares are fungible, the circularity of the transactions is immaterial in and of itself. Dr. Carr's analysis fails because he ignores the very substantial additional evidence that I and others have brought to bear on this issue: first, there were no shares to be traded, and second, even according to Solo's account statements, the counterparties had no other source for the shares they sold short to the Pension Plans other than the shares they borrowed, through an intermediary, **from the very same plans**.[338] If we look through the various thinly capitalized entities doing back-to-back transactions, none of which settled (or even could be settled by the parties to those trades), then we are left with the proposition that a Pension Plan can buy shares for its left pocket from its right pocket and then use those

---

[336] Her Majesty's Revenue & Customs, Corporate Finance Manual, CFM74360 – Manufactured payments: manufactured overseas dividends. Available at https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74360.

[337] Carr Rebuttal Report, ¶101.

[338] See, e.g., Solo's account statement to D.D.C Cayman (ELYSIUM-08526869), and Solo's account statement to Colbrook, Ltd. (ELYSIUM-01744940).

same shares to lend to its right pocket to complete the original purchase and that the "long" position in its left pocket can be used to justify a withholding tax reclaim. This is clearly absurd.

239.    Finally, I would add that, as discussed in the Wade Rebuttal Report, Solo Capital's records themselves show that the trades were structured as a closed loop. For the avoidance of doubt, this is Solo Capital's own diagram of the structure of the trades:

**Figure 10**



ELYSIUM-06020028

**7.    Dr. Carr's Claim That Offsetting Trades in Solo's Accounts Could Somehow Legitimize the Solo Transactions Ignores All Available Evidence and Is Incorrect**

240.    Dr. Carr asserts that "examining the Danish holdings on behalf of the Solo Custodians at the sub-custodians is irrelevant for assessing the validity of purchases that the pension plans made. This is because if [sic] the Solo Custodians' settlement of the trades involved the settlement of offsetting trades

113

on the same date then it would not require sourcing shares externally as the trades netted to zero." [339]
Again, Dr. Carr is incorrect for three reasons:

1.  It ignores the points made in the Wade Rebuttal Report about the fact that one cannot simply assert that a trade has been settled. [340] Book entry settlement of stock does not mean that a custodian can create positions in a share if it never owns any of the shares itself at any point in time. Account positions are created through settled transactions and Solo could not settle any transactions because it never custodied the necessary cash or shares.

2.  While it may be true that, if a prime broker represents to its Pension Plan client that the Pension Plan has purchased securities, then the Pension Plan may have a claim against the prime broker for an amount which is calculated by reference to the value of the shares, it does not mean that there actually are any shares. In particular, there is no basis to claim receipt of a dividend (or any tax reclaim rights which derive from such dividends) on what is, in effect, a derivative position.

3.  Net settlements are only possible on bilateral obligations. Taking the example of the Delvian Carlsberg 2013 transaction from my Initial Report, if Delvian's Cum-Ex purchase of shares from Gulf Management Group had been matched with a same day delivery of shares from Delvian to Gulf Management Group then it would potentially have been possible to net these transactions. However, Delvian had an obligation to deliver shares to Aquila under the stock loan and Acquila had to deliver shares to Gulf Management Group under its back-to-back stock loan. The Solo Custodians had to settle six independent obligations (three share deliveries each with a matching cash delivery obligation) between

---

[339] Carr Rebuttal Report, ¶111.

[340] Wade Rebuttal Report III. A. 2.

three supposedly legally distinct and independent entities **at the same time**, and there is no

legal mechanism which would allow it to do this.

241. Dr. Carr opines that the Solo transactions would result in the same economic exposure to the

Pension Plans whether or not they were structured as a closed loop.[341] In support of this assertion, Dr.

Carr presents diagrams of an actual transaction (Figure 7) and two hypothetical variations on that

transaction (Figures 8 and 9).[342] The transaction shown in Figure 7 is a standard Solo loop: the Bernina

Pension Plan buys 600,000 Carlsberg B shares from D.D.C. Cayman, via FGC Securities the day before

the Ex-Date, with a T+4 settlement date. On the Record Date, Bernina lends the shares to Colbrook,

Ltd., effective on the Payment Date. Colbrook, Ltd. lends the shares on the same terms to D.D.C.

Cayman. On the Payment Date, all three legs of the loop settle, with no shares or cash actually changing

hands.[343] The variation shown in Figure 8 "depicts a transaction where D.D.C. Cayman owned, as of

trade date, the shares it sold and Colbrook, Ltd. lent shares to a different party."[344] Dr. Carr opines that

the two transactions "would result in the same economic exposure for the Bernina Pension Plan."[345] I

strongly disagree, on two grounds. First, as already explained, Dr. Carr assumes away the problem with

the Solo loop that no party ever owned the shares purportedly being sold or lent. By contrast, the

hypothetical transaction described by Dr. Carr can be settled, either internally or externally, exactly

because it is a series of bilateral trades which started with a seller who had acquired the shares as of the

date it sold them: D.D.C. Cayman sells the shares it already owned to Bernina; Bernina lends them to

Colbrook; Colbrook lends them to a third party. Second, Dr. Carr again ignores the evidence. Solo's

---

[341] Carr II, ¶¶102-108.

[342] Carr II, pp. 44-46.

[343] The transaction is essentially identical to the Delvian 2013 Carlsberg transaction analyzed in my initial report (Wade Initial Report, ¶¶227-231.) For details of the Bernina 2013 Carlsberg transaction described here, see ELYSIUM-01463894, ELYSIUM-01463929, ELYSIUM- 01487958, and ELYSIUM- 01487961.

[344] Carr II, ¶104.

[345] Ibid.

statements to D.D.C. Cayman and Colbrook, Ltd. show clearly that (1) D.D.C. Cayman sold Carlsberg shares short in March 2013 that it did not own, nor did it borrow them from a third party;[346] and (2) Colbrook, Ltd. borrowed Carlsberg shares in March 2013 from Bernina and lent them to D.D.C. Cayman.[347]  In other words, there were no shares.

Based on my review of the facts and circumstances in this litigation, various documents produced in this litigation, and the analyses presented in this expert report, I submit that the opinions contained herein are an accurate representation of my views on this matter.

Submitted by:

Graham Wade
February 28, 2022

---

[346] ELYSIUM-08526869.

[347] ELYSIUM-01744940.

**Appendix A: Materials Considered**

**I.  Expert Reports**

- Expert Report of Adam L. Warren In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.
- Expert Report of Emre Carr In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.
- Expert Report of Graham Wade In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.
- Expert Report of Max Hayden In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, February 1, 2022.
- Rebuttal Expert Report of Emre Carr In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, February 1, 2022.
- Rebuttal Expert Report of Graham Wade in re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, February 1, 2022.

**II.  Specific Bates Stamped Documents**

| | | |
|---|---|---|
| ACER_00010838 | ACER_00003910 | |
| AIGKAMCO_00000553 | ED&F-00210760 | ELYSIUM-00430068 |
| ED&-00445297 | ED&F-00210954 | ELYSIUM-00430094 |
| ED&F-00026581 | ED&F-00211956 | ELYSIUM-00430126 |
| ED&F-00040919 | ED&F-00211963 | ELYSIUM-00430146 |
| ED&F-00040984 | ED&F-00211965 | ELYSIUM-00433347 |
| ED&F-00040988 | ED&F-00211966 | ELYSIUM-00433403 |
| ED&F-00041059 | ED&F-00212194 | ELYSIUM-00433420 |
| ED&F-00041067 | ED&F-00212243 | ELYSIUM-00433424 |
| ED&F-00041236 | ED&F-00212275 | ELYSIUM-00435823 |
| ED&F-00041857 | ED&F-00212278 | ELYSIUM-00435876 |
| ED&F-00042680 | ED&F-00212280 | ELYSIUM-00435965 |
| ED&F-00042905 | ED&F-00212281 | ELYSIUM-00435983 |
| ED&F-00044265 | ED&F-00212309 | ELYSIUM-00438461 |
| ED&F-00045042 | ED&F-00212311 | ELYSIUM-00438485 |
| ED&F-00045804 | ED&F-00212312 | ELYSIUM-00438552 |
| ED&F-00047364 | ED&F-00212313 | ELYSIUM-00438570 |
| ED&F-00047428 | ED&F-00212314 | ELYSIUM-00441387 |
| ED&F-00047516 | ED&F-00212315 | ELYSIUM-00441411 |
| ED&F-00049309 | ED&F-00212316 | ELYSIUM-00441435 |
| ED&F-00049371 | ED&F-00212320 | ELYSIUM-00441444 |
| ED&F-00053123 | ED&F-00212376 | ELYSIUM-00443223 |
| ED&F-00053124 | ED&F-00212385 | ELYSIUM-00443237 |
| ED&F-00060888 | ED&F-00212401 | ELYSIUM-00443288 |
| ED&F-00063165 | ED&F-00212560 | ELYSIUM-00443294 |
| ED&F-00063183 | ED&F-00212682 | ELYSIUM-00443837 |
| ED&F-00076369 | ED&F-00212685 | ELYSIUM-00443958 |
| ED&F-00076918 | ED&F-00212686 | ELYSIUM-00444955 |

| | | |
|---|---|---|
| ED&F-00077325 | ED&F-00213509 | ELYSIUM-00444997 |
| ED&F-00080581 | ED&F-00214828 | ELYSIUM-00444999 |
| ED&F-00081078 | ED&F-00214830 | ELYSIUM-00446617 |
| ED&F-00081101 | ED&F-00215334 | ELYSIUM-00446621 |
| ED&F-00081143 | ED&F-00215686 | ELYSIUM-00446999 |
| ED&F-00081178 | ED&F-00215700 | ELYSIUM-00447388 |
| ED&F-00081245 | ED&F-00215701 | ELYSIUM-00448227 |
| ED&F-00081248 | ED&F-00215703 | ELYSIUM-00449362 |
| ED&F-00081249 | ED&F-00215719 | ELYSIUM-00450322 |
| ED&F-00081250 | ED&F-00215900 | ELYSIUM-00450415 |
| ED&F-00081251 | ED&F-00215905 | ELYSIUM-00451311 |
| ED&F-00081252 | ED&F-00216199 | ELYSIUM-00454586 |
| ED&F-00081253 | ED&F-00221866 | ELYSIUM-00454587 |
| ED&F-00081254 | ED&F-00222213 | ELYSIUM-00454689 |
| ED&F-00081255 | ED&F-00222454 | ELYSIUM-00454696 |
| ED&F-00081256 | ED&F-00222877 | ELYSIUM-00454774 |
| ED&F-00081257 | ED&F-00251315 | ELYSIUM-00454819 |
| ED&F-00102675 | ED&F-00251535 | ELYSIUM-00467567 |
| ED&F-00108552 | ED&F-00251662 | ELYSIUM-00467846 |
| ED&F-00108588 | ED&F-00251678 | ELYSIUM-00467991 |
| ED&F-00108599 | ED&F-00251833 | ELYSIUM-00467998 |
| ED&F-00108611 | ED&F-00251859 | ELYSIUM-00468446 |
| ED&F-00108634 | ED&F-00251862 | ELYSIUM-00470169 |
| ED&F-00108661 | ED&F-00251995 | ELYSIUM-00470444 |
| ED&F-00108683 | ED&F-00251997 | ELYSIUM-00470477 |
| ED&F-00108723 | ED&F-00251998 | ELYSIUM-00470981 |
| ED&F-00108778 | ED&F-00251999 | ELYSIUM-00471936 |
| ED&F-00108909 | ED&F-00252017 | ELYSIUM-00472815 |
| ED&F-00108912 | ED&F-00252019 | ELYSIUM-00474421 |
| ED&F-00110000 | ED&F-00252020 | ELYSIUM-00474948 |
| ED&F-00111959 | ED&F-00252021 | ELYSIUM-00475143 |
| ED&F-00112387 | ED&F-00252023 | ELYSIUM-00475399 |
| ED&F-00112481 | ED&F-00252024 | ELYSIUM-00475526 |
| ED&F-00113785 | ED&F-00252025 | ELYSIUM-00478338 |
| ED&F-00113786 | ED&F-00252086 | ELYSIUM-00478369 |
| ED&F-00113787 | ED&F-00252584 | ELYSIUM-00478497 |
| ED&F-00113788 | ED&F-00252586 | ELYSIUM-00478942 |
| ED&F-00113789 | ED&F-00252743 | ELYSIUM-00478950 |
| ED&F-00113798 | ED&F-00252745 | ELYSIUM-00478951 |
| ED&F-00113799 | ED&F-00252747 | ELYSIUM-00478954 |
| ED&F-00137236 | ED&F-00252748 | ELYSIUM-00479189 |
| ED&F-00137989 | ED&F-00252913 | ELYSIUM-00484231 |
| ED&F-00137992 | ED&F-00253726 | ELYSIUM-00484248 |
| ED&F-00137993 | ED&F-00255116 | ELYSIUM-00484321 |
| ED&F-00137994 | ED&F-00255223 | ELYSIUM-00484367 |

| ED&F-00137996 | ED&F-00255639 | ELYSIUM-00486575 |
| ED&F-00138058 | ED&F-00257138 | ELYSIUM-00486598 |
| ED&F-00138060 | ED&F-00257143 | ELYSIUM-00486695 |
| ED&F-00138062 | ED&F-00257556 | ELYSIUM-00486756 |
| ED&F-00138063 | ED&F-00258416 | ELYSIUM-00489015 |
| ED&F-00138065 | ED&F-00261210 | ELYSIUM-00489124 |
| ED&F-00138068 | ED&F-00261215 | ELYSIUM-00489138 |
| ED&F-00138076 | ED&F-00261241 | ELYSIUM-00489164 |
| ED&F-00138079 | ED&F-00261260 | ELYSIUM-00490370 |
| ED&F-00138080 | ED&F-00261264 | ELYSIUM-00490502 |
| ED&F-00138081 | ED&F-00261347 | ELYSIUM-00490980 |
| ED&F-00138083 | ED&F-00261467 | ELYSIUM-00490997 |
| ED&F-00138084 | ED&F-00261589 | ELYSIUM-00493580 |
| ED&F-00138086 | ED&F-00264427 | ELYSIUM-00493589 |
| ED&F-00138087 | ED&F-00264430 | ELYSIUM-00493674 |
| ED&F-00138091 | ED&F-00265400 | ELYSIUM-00493684 |
| ED&F-00138092 | ED&F-00265408 | ELYSIUM-00494892 |
| ED&F-00138093 | ED&F-00265863 | ELYSIUM-00494993 |
| ED&F-00138094 | ED&F-00265884 | ELYSIUM-00495232 |
| ED&F-00138095 | ED&F-00265891 | ELYSIUM-00495279 |
| ED&F-00138096 | ED&F-00266112 | ELYSIUM-00498490 |
| ED&F-00138097 | ED&F-00266481 | ELYSIUM-00498872 |
| ED&F-00138098 | ED&F-00269892 | ELYSIUM-00499037 |
| ED&F-00138099 | ED&F-00269893 | ELYSIUM-00499220 |
| ED&F-00138100 | ED&F-00269895 | ELYSIUM-00500171 |
| ED&F-00138101 | ED&F-00269897 | ELYSIUM-00500179 |
| ED&F-00138102 | ED&F-00269899 | ELYSIUM-00500203 |
| ED&F-00138104 | ED&F-00269901 | ELYSIUM-00500309 |
| ED&F-00138107 | ED&F-00269903 | ELYSIUM-00502427 |
| ED&F-00138110 | ED&F-00269905 | ELYSIUM-00502990 |
| ED&F-00138111 | ED&F-00269907 | ELYSIUM-00503371 |
| ED&F-00138122 | ED&F-00269909 | ELYSIUM-00503446 |
| ED&F-00138123 | ED&F-00269911 | ELYSIUM-00505135 |
| ED&F-00138124 | ED&F-00272712 | ELYSIUM-00505684 |
| ED&F-00138127 | ED&F-00273945 | ELYSIUM-00505721 |
| ED&F-00138128 | ED&F-00279157 | ELYSIUM-00590156 |
| ED&F-00138131 | ED&F-00281405 | ELYSIUM-00612553 |
| ED&F-00138133 | ED&F-00301242 | ELYSIUM-00612555 |
| ED&F-00138134 | ED&F-00312726 | ELYSIUM-00612638 |
| ED&F-00138135 | ED&F-00315769 | ELYSIUM-00612794 |
| ED&F-00138136 | ED&F-00315774 | ELYSIUM-00670195 |
| ED&F-00138137 | ED&F-00317370 | ELYSIUM-00670279 |
| ED&F-00138138 | ED&F-00317380 | ELYSIUM-00670463 |
| ED&F-00138139 | ED&F-00331943 | ELYSIUM-00670488 |
| ED&F-00138140 | ED&F-00336761 | ELYSIUM-00740172 |

| | | |
|---|---|---|
| ED&F-00138141 | ED&F-00404046 | ELYSIUM-00762308 |
| ED&F-00138147 | ED&F-00408039 | ELYSIUM-00762509 |
| ED&F-00138149 | ED&F-00408040 | ELYSIUM-00837359 |
| ED&F-00138152 | ED&F-00408042 | ELYSIUM-00873815 |
| ED&F-00138153 | ED&F-00408045 | ELYSIUM-00873873 |
| ED&F-00138160 | ED&F-00408047 | ELYSIUM-00921091 |
| ED&F-00138163 | ED&F-00408051 | ELYSIUM-00921096 |
| ED&F-00138164 | ED&F-00408905 | ELYSIUM-00921141 |
| ED&F-00138165 | ED&F-00408907 | ELYSIUM-00921148 |
| ED&F-00142388 | ED&F-00408910 | ELYSIUM-00935381 |
| ED&F-00145451 | ED&F-00408912 | ELYSIUM-00935828 |
| ED&F-00146110 | ED&F-00408913 | ELYSIUM-01001188 |
| ED&F-00146310 | ED&F-00408916 | ELYSIUM-01001763 |
| ED&F-00146493 | ED&F-00408922 | ELYSIUM-01002177 |
| ED&F-00146549 | ED&F-00408923 | ELYSIUM-01231903 |
| ED&F-00146608 | ED&F-00408934 | ELYSIUM-01238903 |
| ED&F-00146973 | ED&F-00408936 | ELYSIUM-01266554 |
| ED&F-00150203 | ED&F-00408937 | ELYSIUM-01282981 |
| ED&F-00150908 | ED&F-00408944 | ELYSIUM-01324093 |
| ED&F-00152687 | ED&F-00408946 | ELYSIUM-01324467 |
| ED&F-00160290 | ED&F-00408948 | ELYSIUM-01324750 |
| ED&F-00160339 | ED&F-00412410 | ELYSIUM-01324986 |
| ED&F-00189961 | ED&F-00414021 | ELYSIUM-01378046 |
| ED&F-00189967 | ED&F-00414071 | ELYSIUM-01385550 |
| ED&F-00190349 | ED&F-00414179 | ELYSIUM-01389516 |
| ED&F-00190422 | ED&F-00436904 | ELYSIUM-01396410 |
| ED&F-00190431 | ED&F-00437631 | ELYSIUM-01398148 |
| ED&F-00190435 | ED&F-00443853 | ELYSIUM-01399895 |
| ED&F-00190437 | ED&F-00444175 | ELYSIUM-01445627 |
| ED&F-00190438 | ED&F-00444262 | ELYSIUM-01460207 |
| ED&F-00190439 | ED&F-00444356 | ELYSIUM-01463894 |
| ED&F-00190440 | ED&F-00444407 | ELYSIUM-01463929 |
| ED&F-00190441 | ED&F-00444677 | ELYSIUM-01479796 |
| ED&F-00190456 | ED&F-00477507 | ELYSIUM-01581819 |
| ED&F-00190459 | ED&F-00477508 | ELYSIUM-01582338 |
| ED&F-00190460 | ED&F-00495365 | ELYSIUM-01582662 |
| ED&F-00190461 | ED&F-00503765 | ELYSIUM-01585575 |
| ED&F-00190462 | ED&F-00503861 | ELYSIUM-01586731 |
| ED&F-00190463 | ED&F-00503864 | ELYSIUM-01744706 |
| ED&F-00190464 | ED&F-00504633 | ELYSIUM-01744784 |
| ED&F-00190465 | ED&F-00505663 | ELYSIUM-01744905 |
| ED&F-00190466 | ED&F-00505694 | ELYSIUM-01744925 |
| ED&F-00190467 | ED&F-00505695 | ELYSIUM-01744940 |
| ED&F-00190786 | ED&F-00505707 | ELYSIUM-01745187 |
| ED&F-00190788 | ED&F-00505786 | ELYSIUM-01745381 |

| | | |
|---|---|---|
| ED&F-00190789 | ED&F-00529777 | ELYSIUM-01746161 |
| ED&F-00190794 | ED&F-00529780 | ELYSIUM-01850776 |
| ED&F-00190796 | ED&F-00604196 | ELYSIUM-01850971 |
| ED&F-00190797 | ELYSIUM-01487958 | ELYSIUM-01851041 |
| ED&F-00190891 | ELYSIUM-01487961 | ELYSIUM-01968214 |
| ED&F-00190894 | ELYSIUM-00364326 | ELYSIUM-01968250 |
| ED&F-00190895 | ELYSIUM-00366341 | ELYSIUM-01968263 |
| ED&F-00190896 | ELYSIUM-00368221 | ELYSIUM-01999826 |
| ED&F-00190899 | ELYSIUM-00369259 | ELYSIUM-02002133 |
| ED&F-00190900 | ELYSIUM-00370448 | ELYSIUM-02002150 |
| ED&F-00190903 | ELYSIUM-00372069 | ELYSIUM-02038702 |
| ED&F-00190905 | ELYSIUM-00373671 | ELYSIUM-02050021 |
| ED&F-00190906 | ELYSIUM-00376734 | ELYSIUM-02079174 |
| ED&F-00191809 | ELYSIUM-00376735 | ELYSIUM-02104733 |
| ED&F-00191813 | ELYSIUM-00378412 | ELYSIUM-02109666 |
| ED&F-00191814 | ELYSIUM-00379382 | ELYSIUM-02455073 |
| ED&F-00192604 | ELYSIUM-00380900 | ELYSIUM-02464519 |
| ED&F-00192715 | ELYSIUM-00381939 | ELYSIUM-02512584 |
| ED&F-00192871 | ELYSIUM-00383581 | ELYSIUM-02516994 |
| ED&F-00192954 | ELYSIUM-00385078 | ELYSIUM-02518330 |
| ED&F-00192963 | ELYSIUM-00386566 | ELYSIUM-02521413 |
| ED&F-00193695 | ELYSIUM-00387203 | ELYSIUM-02530665 |
| ED&F-00193696 | ELYSIUM-00390731 | ELYSIUM-02538964 |
| ED&F-00193697 | ELYSIUM-00392787 | ELYSIUM-02545160 |
| ED&F-00193698 | ELYSIUM-00394976 | ELYSIUM-02552980 |
| ED&F-00193779 | ELYSIUM-00397631 | ELYSIUM-02570519 |
| ED&F-00193783 | ELYSIUM-00405169 | ELYSIUM-02576574 |
| ED&F-00193873 | ELYSIUM-00405188 | ELYSIUM-02581645 |
| ED&F-00193874 | ELYSIUM-00405196 | ELYSIUM-02589117 |
| ED&F-00193949 | ELYSIUM-00407440 | ELYSIUM-02594982 |
| ED&F-00193974 | ELYSIUM-00407451 | ELYSIUM-02601352 |
| ED&F-00195986 | ELYSIUM-00407501 | ELYSIUM-02606297 |
| ED&F-00195988 | ELYSIUM-00407519 | ELYSIUM-02610747 |
| ED&F-00195989 | ELYSIUM-00409351 | ELYSIUM-02694967 |
| ED&F-00196463 | ELYSIUM-00409363 | ELYSIUM-03470328 |
| ED&F-00201236 | ELYSIUM-00409373 | ELYSIUM-03478220 |
| ED&F-00201239 | ELYSIUM-00409374 | ELYSIUM-03478277 |
| ED&F-00201291 | ELYSIUM-00411046 | ELYSIUM-06081537 |
| ED&F-00201296 | ELYSIUM-00411048 | ELYSIUM-06332466 |
| ED&F-00201302 | ELYSIUM-00411052 | ELYSIUM-06561052 |
| ED&F-00201306 | ELYSIUM-00412534 | ELYSIUM-06755671 |
| ED&F-00201311 | ELYSIUM-00414234 | ELYSIUM-08421068 |
| ED&F-00201315 | ELYSIUM-00414236 | ELYSIUM-08433971 |
| ED&F-00201321 | ELYSIUM-00414525 | ELYSIUM-08445764 |
| ED&F-00201322 | ELYSIUM-00415210 | ELYSIUM-08526869 |

| | | |
|---|---|---|
| ED&F-00201328 | ELYSIUM-00416456 | ELYSIUM-08656676 |
| ED&F-00201334 | ELYSIUM-00416467 | ELYSIUM-08770653 |
| ED&F-00201341 | ELYSIUM-00416483 | MPSKAT00072347 |
| ED&F-00202057 | ELYSIUM-00419905 | MPSKAT00072353 |
| ED&F-00202339 | ELYSIUM-00420104 | MPSKAT00072484 |
| ED&F-00202588 | ELYSIUM-00420152 | MPSKAT00072495 |
| ED&F-00205028 | ELYSIUM-00421748 | MPSKAT00072497 |
| ED&F-00205304 | ELYSIUM-00425005 | MPSKAT00072570 |
| ED&F-00205422 | ELYSIUM-00425007 | MPSKAT00072729 |
| ED&F-00206575 | ELYSIUM-00425077 | MPSKAT00072775 |
| ED&F-00206708 | ELYSIUM-00425111 | MPSKAT00072800 |
| ED&F-00206754 | ELYSIUM-00428406 | MPSKAT00072925 |
| ED&F-00210336 | ELYSIUM-00428438 | MPSKAT00072970 |
| | | MPSKAT00082940 |
| | | SCPADMINISTRATORS_00013560 |

## III.   Specific Bates Stamped Documents Related to Table 1

| | | |
|---|---|---|
| ED&F-00040919-ED&F-00040990 | ED&F-00041756-ED&F-00041856 | ED&F-00206575 |
| ED&F-00040991-ED&F-00041008 | ED&F-00041857-ED&F-00041957 | ED&F-00211966 |
| ED&F-00041009-ED&F-00041033 | ED&F-00041958-ED&F-00042058 | ED&F-00212194 |
| ED&F-00041034-ED&F-00041058 | ED&F-00042059-ED&F-00042159 | ED&F-00212682 |
| ED&F-00041059-ED&F-00041082 | ED&F-00042160-ED&F-00042260 | ED&F-00212686 |
| ED&F-00041083-ED&F-00041107 | ED&F-00060888 | ED&F-00215701 |
| ED&F-00041108-ED&F-00041179 | ED&F-00081078 | ED&F-00251859 |
| ED&F-00041180-ED&F-00041210 | ED&F-00113799 | ED&F-00252019 |
| ED&F-00041211-ED&F-00041235 | ED&F-00190439 | ED&F-00252020 |
| ED&F-00041236-ED&F-00041284 | ED&F-00190440 | ED&F-00252021 |
| ED&F-00041285-ED&F-00041309 | ED&F-00190788 | ED&F-00408907 |
| ED&F-00041310-ED&F-00041334 | ED&F-00190797 | ED&F-00408937 |
| ED&F-00041335-ED&F-00041351 | ED&F-00190906 | ED&F-00436904 |
| ED&F-00041352-ED&F-00041452 | ED&F-00193695 | ED&F-00482233 |
| ED&F-00041453-ED&F-00041553 | ED&F-00193696 | ED&F-00604196 |
| ED&F-00041554-ED&F-00041654 | ED&F-00193697 | |
| ED&F-00041655-ED&F-00041755 | ED&F-00193698 | |

## IV.    **Deposition Transcripts**

- Deposition Transcript of Andrew Wall, February 23, 2022.
- Deposition Transcript of Richard Markowitz, April 8, 2021.
- Deposition Transcript of Robert Klugman, January 28, 2021.

## V.    **Legal Documents**

- Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts.

- ED&F Re-Amended Defence and Annex E

## VI.    **Statutes and Rules**

- International Accounting Standard 39 Financial Instruments: Recognition and Measurement

## VII.    **Publicly Available Documents**

- http://issanet.org/content/uploads/2013/04/ISSA_Issuer_Outreach_Final.pdf
- https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/496664/denmark-uk-dta-consol_-_in_force.pdf
- https://docs.londonstockexchange.com/sites/default/files/documents/rules-lse.pdf
- https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:32012R0236
- https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32012R0827
- https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:174:0001:0073:EN:PDF
- https://find-and-update.company-information.service.gov.uk/company/00500777/filing-history?page=4
- https://find-and-update.company-information.service.gov.uk/company/01698498/filing-history/MzE1MjAzODA0MmFkaXF6a2N4/document?format=pdf&download=0
- https://find-and-update.company-information.service.gov.uk/company/01698498/filing-history/MzEyMzgxMzA0MWFkaXF6a2N4/document?format=pdf&download=0
- https://find-and-update.company-information.service.gov.uk/company/05071454/filing-history
- https://listingcenter.nasdaq.com/assets/rulebook/nfx/rules/NFX_Rules.pdf
- https://nyseguide.srorules.com/rules/document?searchId=867829828&treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B4A07B716-0F73-46CC-BAC2-43EB20902159%7D--WKUS_TAL_19401%23teid-227
- https://register.fca.org.uk/s/
- https://register.fca.org.uk/s/firm?id=001b000000MfISLAA3
- https://register.fca.org.uk/s/firm?id=001b000000MfJVVAA3
- https://register.fca.org.uk/s/firm?id=001b000000NMblRAAT
- https://www.bgcpartners.com/bgc-partners-acquires-mint-partners-key-businesses
- https://www.clearstream.com/resource/blob/1316782/43a60afa470c37ba74f7cb2d6949e71c/compensation-handbook-cata-en-data.pdf
- https://www.ecb.europa.eu/paym/target/t2s/governance/html/casg.en.html

- https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg120606_M arketStandardsForCorporateActionsProcessingCAJWGStandardsRevised2012Updated2015.e n.pdf?5a5c8308c24a6618ed600daf627df86c
- https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2 SMarketClaimStandards.en.pdf?bf450b0be5b3dabe36b05487e03be4e0
- https://www.ecb.europa.eu/paym/target/t2s/html/index.en.html
- https://www.esma.europa.eu/databases-library/interactive-single-rulebook/clone-mifid-ii/article-16-0
- https://www.esma.europa.eu/sites/default/files/library/2015-1858_-_final_report_-_draft_implementing_technical_standards_under_mifid_ii.pdf
- https://www.esma.europa.eu/sites/default/files/library/esma50-165-2004_eu_securities_markets_asr_2021.pdf
- https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf
- https://www.esma.europa.eu/sites/default/files/library/esma70-156-3914_consultation_paper_on_the_review_of_certain_aspects_of_the_short_selling_regulatio n.pdf
- https://www.fca.org.uk/news/press-releases/sunrise-brokers-llp-fine-serious-financial-crime-control-failings
- https://www.fca.org.uk/publication/documents/market-makers-authorised-primary-dealers.pdf
- https://www.federalreserve.gov/boarddocs/srletters/2007/SR0705a1.pdf
- https://www.gov.uk/hmrc-internal-manuals/corporate-finance-anual/cfm74430
- https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74300
- https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74360
- https://www.handbook.fca.org.uk/handbook/glossary/G2811.html
- https://www.investor.gov/introduction-investing/investing-basics/glossary/ex-dividend-dates-when-are-you-entitled-stock-and
- https://www.iotafinance.com/en/SWIFT-ISO15022-View-Code-NOMC.html
- https://www.iso20022.org/15022/uhb/mt541-33-field-22f.htm
- https://www.legislation.gov.uk/ukpga/2000/8
- https://www.legislation.gov.uk/ukpga/2000/8/section/19
- https://www.legislation.gov.uk/ukpga/2000/8/section/26
- https://www.legislation.gov.uk/uksi/2001/544/contents/made
- https://www.nasdaq.com/docs/2021/12/01/Nasdaq-Nordic-Market-Model-2021_09.pdf
- https://www.nyse.com/publicdocs/nyse/regulation/nyse/NYSE_Rules.pdf
- https://www.ust2.com/pdfs/NYSE-T2-Announcements.pdf


**VIII.** **Correspondence**

- Letter to Pinsent Masons, January 11, 2021.


**IX.** **Other**

- Bloomberg.

- Refinitiv Eikon.