# Exhibit 49

Norton Rose LLP · Stephanstraße 15 · 60313 Frankfurt am Main

Solo Capital Ltd.
4 Broadgate
London EC2M 2QY
United Kingdom

Norton Rose LLP
Rechtsanwälte
Stephanstraße 15
60313 Frankfurt am Main

Tel   +49 69 505096 0
Fax  +49 69 505096 100
www.nortonrose.com

From   Martin Krause
Tel    +49 69 505096 490
Fax    +49 69 505096 100
Email  martin.krause@nortonrose.com
Our ref FR 2897/ MMKR/SANG
Your ref

[●] April 2010

# DRAFT

# German Tax Opinion

Dear Sirs,

You have asked us for a German tax opinion (the "**Opinion**") on certain aspects of the transaction (the "**Transaction**") as described below.

## 1      Facts and Assumptions

The Transaction is comprised of the following:

1.1     Foreign Investment Fund

An Irish Qualifying Investor Fund (the "**Fund**") will be incorporated as an Irish ~~public limited~~ company. The Fund will fulfil all requirements for a foreign investment fund (*ausländisches Investmentvermögen*) in the meaning of Section 2 para. 8 and 9 German Investment Act (*Investmentgesetz*)~~, i.e.~~ <u>except for the criterion of risk-diversification. This means, in particular,</u> the Fund will be a ~~sufficiently risk-diversified~~ pool of <u>qualifying</u> assets ~~that~~<u>and</u> (i) will redeem its fund units and/or (ii) will be governed by an investment fund supervision in Ireland. <u>With regard to risk-diversification, the fund documentation (terms and conditions (*Vertragsbedingungen*), articles (*Satzung*) or things comparable to this) will provide for risk-diversification in accordance with the legally required criteria as stipulated in the FAQ of the German regulator BaFin published on 21 January 2010 (WA 41-Wp 2136-2008/0001).</u>

2

The Fund's structure will be comparable to that of a German *Investmentaktiengesellschaft* and the shares will be comparable with German *Aktien*. The Fund will not be limited to 100 investors and does not exclude private individuals.

To a large extent, the Fund will be owned by ~~a Maltese SICAV~~external investors.

The Fund will have a minimum of two independent Irish tax resident directors, and all board meetings will take place in Ireland. The Fund will be managed and controlled in Ireland and will not have a German presence and, furthermore, the day-to-day business decisions will be taken in Ireland. The Fund will be administered by a well-established fund management firm in Ireland and will have ~~a business environment~~resources adequate for ~~its~~the business it conducts.

A ~~tax residency~~ certificate of tax residence in respect of the Fund ~~will be~~has been obtained from the Irish tax authorities. The certificate ~~will contain~~contains the following wording:

> "The above named is an investment undertaking, which, under Irish law is regarded as resident in Ireland for tax purposes and thereby subject to Irish tax legislation. ~~Any~~An investment undertaking is required to account for Irish tax in respect of its profits and gains other than those, which relate to shareholders/unit holders who are neither resident nor ordinarily resident in Ireland, where such shareholders make approved declarations to that effect~~"~~.
>
> There is only one corporate tax in Ireland - "Corporation Tax". There is no "Revenue Tax". All companies (including PLCs - public limited companies) are liable to Irish corporation tax if they are incorporated in Ireland or have their central management and control in Ireland. There is however a special tax regime that applies to PLCs that are collective investment funds, which is Investment Undertaking Tax."

We understand ~~from~~that the certificate ~~that the Fund is treated as a taxable unit under the tax laws of Ireland~~is factually correct.

1.2   Investment Strategy

The Fund may pursue all strategies permitted by the Irish Financial Regulator ~~including~~. By way of example, the Fund may hold four different securities each with a value of EUR 10k. The investment policy may include the strategy described below, to which this Opinion is strictly limited.

Component 1 – Long stock position

The Fund intends to take long stock positions in German stocks, in any event with a shareholder quota below 25%. The positions will be entered into by either: (i) directly purchasing the stock ("**Stock**") itself, on or before the dividend record date (*Hauptversammlungstag*); or (ii) purchasing a physically settled single stock future expiring on or before the record date.

The counterparty ("**Counterparty**") may be a central counterparty or a broker.

The global certificate of the Stock will be subject to collective safe custody (*Girosammelverwahrung*) with Clearstream Banking AG ("**Clearstream**"), and expiry time will be before Clearstream's close of business on the record date, at the latest.

The stocks will be held in a segregated account for the Fund. The stocks may be pledged in a manner not transferring beneficial ownership (*wirtschaftliches Eigentum*). In particular, re-hypothecation will not be permitted.

Component 2 – Short futures position

The Fund will also take short futures positions in German stocks. The positions will be entered into by selling ~~either cash- or physically~~ -settled single stock futures. ~~The Counterparty will decide whether the short future will be cash- or physically-settled. In either case, the~~ The expiry date of the short future will be on or after the ex date (record date + one day), and will always be after the trade date (or expiry date, as the case may be) of Component 1. The postponement period for settlement (e.g. two days) will be equal to that of Component 1.

~~As above, the~~The Counterparty may be a central counterparty ~~or a broker~~, and may or may not be the same counterparty as for Component 1.

In case of cash settlement, the short future with the Counterparty will be closed out, and the Stock will be sold in the market. ~~In case~~

Combination of ~~physical settlement, the Stock will be sold to the Counterparty. In any event, the Stock will have physically been held for at least one day.~~ the above

~~Other facts~~

In the case of both Components above, settlement terms will match those of a well-established stock exchange or clearing system.

In the case of both Components, the Fund's instructions to the Counterparty(ies) will specify the number of shares (or futures as the case may be) being bought (or sold as the case may be), together with the target price. If the Counterparty(ies) can find sufficient liquidity at this price, it (they) will enter into the respective contracts. Execution will take place ~~either: (i)~~ via an official stock exchange in case of a central counterparty; or (ii) over-the-counter ("**OTC**") in case of a broker. ~~Either way, settlement will be via a well-established clearing system.~~ in Component 1.

The above set of economics is not designed such that it would fit only short sellers outside the substitutional withholding tax. Moreover, there will be no direct or indirect instructions or any other pre-arranged circumstances by the Fund or the fund manager regarding the involvement of a short seller outside the scope of the substitutional withholding tax. Correspondingly, the Counterparty will not report back any details, in particular, whether or not a short seller not subject to the substitutional withholding tax is involved.

## 2   Scope of Opinion

This Opinion is strictly limited to German tax laws and does not cover any other issues. It is strictly limited to the statements made therein. This Opinion only covers the tax consequences arising from the investment strategy described above. Other or additional strategies are not covered.

This Opinion is based on our professional interpretation of German tax laws in force as of 1 January 2010. It is not coordinated or otherwise discussed with German regulatory or tax authorities or with audit firms and shall, therefore, not be construed as a guarantee for certain results.

For the purpose of this Opinion, we have solely relied upon the facts and assumptions in 1 above and have made no further enquiries. With regard to risk-diversification, this Opinion only covers the fulfilment of this criterion with regard to the documentation aspect but not with regard to the portfolio test.

## 3   Opinion

Based on the facts and assumptions in 1 above and subject to the qualifications in 4 below, we are of the opinion (*sind der Auffassung*) that:

3.1   The Fund should qualify as an investment fund within the meaning of the Investment Act;

CONFIDENTIAL                                                                                                                    WH_MDL_00453982

| | | |
|---|---|---|
| 3.2 | ~~3.1~~ upon purchase of Stock by the Fund from a holder of such Stock via a stock exchange or a broker, the Fund should acquire the true/beneficial/economic ownership (*wirtschaftliches Eigentum*) of the Stock at the time of the purchase; |
| 3.3 | ~~3.2~~ the decree of the Federal Ministry of Finance dated 5 May requiring a special tax certificate as a condition for the withholding tax refund should not affect the Fund; |
| 3.4 | ~~3.3~~ the Fund should be entitled to a partial refund of German withholding tax such that the withholding tax originally withheld and the refund thereon total to a withholding tax burden of 10 per cent.; |
| <u>3.5</u> | ~~3.4~~ the Fund should not be disregarded by application of the anti-avoidance-rule. |

## 4     Qualifications

<u>4.1</u>     <u>Application of the Investment Act</u>

<u>The Fund should qualify as an investment fund within the meaning of the InvG. As per the assumptions under 1 above, all criteria set out in the Investment Act except for risk-diversification are fulfilled. The risk-diversification test should be passed as well.</u>

<u>The German regulator BaFin has issued a list of frequently asked questions (FAQ) on 21 January 2010 on its website www.bafin.de. The FAQ states in its number 6 that the risk-diversification test is to be applied on the basis of the fund documentation. Conversely, in our view the test is not applied on the basis of the portfolio actually held. On the assumption that the documentation contains regulations satisfactory under the Investment Act with regard to risk-diversification, the Fund should pass the risk-diversification test and, consequently, qualify as an investment fund.</u>

4.2     ~~4.1~~ True/Beneficial/Economic Ownership

Upon purchase of Stock by the Fund from a holder of such Stock via a stock exchange or a broker, the Fund should acquire the true/beneficial/economic ownership (*wirtschaftliches Eigentum*) of the Stock (cf. below under 4.1.1) at the time of the purchase (cf. below under ~~4.1.2~~<u>4.2.2</u>) and the dividend income should be allocated to him at the end of the dividend record date (cf. below under ~~4.1.3~~<u>4.2.3</u>).

4.2.1     ~~4.1.1~~ Transfer of True/Beneficial/Economic Ownership to the Fund

The true/beneficial/economic ownership of the Stock should be transferred to the Fund upon purchase[1] of the Stock within Component 1.

The tax provisions for true/beneficial/economic ownership are laid down in Section 39 of the General Tax Code (*Abgabenordnung – AO*). Under Section 39 para. 1 AO, the true/beneficial/economic ownership generally follows the civil-law ownership. As an exception, however, pursuant to Section 39 para. 2 no. 1 sentence 1 AO, true/beneficial/economic ownership is assigned to a person other than the legal owner if this person is in a position to effectively exclude the legal owner from accessing the asset. There are no explicit criteria on such exclusion. Rather, an assessment has to be made looking at and evaluating all aspects relevant for the individual case. With regard to shares, the risk and reward for a certain period of time is particularly important. Furthermore, the dividend entitlement as well as voting, pre-emption and other rights are essential.

In our opinion, the criteria for true/beneficial/economic ownership should be satisfied in the case at issue~~:~~<u>.</u>

(a)     Cash Settled Future

---

[1]     For the exact point of time of transfer of the true/beneficial/economic ownership see 4.1.2

5

~~In case of~~ <ins>By entering in</ins> a cash settled future in Component 2, the Fund purchases the Stock (within Component 1) without a corresponding sale of the Stock. ~~In this case~~ <ins>Under these circumstances</ins>, the Fund acquires the Stock and is (legally and contractually) free to hold or sell the Stock at its sole discretion. Consequently, the sale of the Stock on the market should not retroactively jeopardise the true/beneficial/economic ownership since the disposal is at the sole discretion of the Fund. Furthermore, the acquisition of true/beneficial/economic ownership should not be affected by the cash settled future since under this future the Stock will not be delivered at all.

(b) ~~Physically Settled Future~~

~~We take the view that even in case of a physically settled future in Component 2, the Fund should become true/beneficial/economic owner of the Stock. However, it cannot be entirely ruled out that the tax authorities might take a different view in case the Counterparty in Component 2 is the same one as in Component 1.~~

~~The tax authorities might argue that the Transaction is comparable to a so-called true repo (*echtes Wertpapierpensionsgeschäft*). Under a true repo, one party sells a security to the other party and repurchases it from the other party, both at pre-agreed prices and pre-agreed dates. Economically, the situation is the same as in the event of secured lending. The tax consequences from a true repo are not entirely clear but it is one view that true/beneficial/economic ownership is not transferred but, rather remains with the party selling the security and repurchasing it. In the case at issue, the Fund purchases the Stock from the Counterparty and, simultaneously, sells the Stock back to it at a pre-determined date and a pre-determined price. Therefore, the tax authorities might argue that the Fund does not acquire true/beneficial/economic ownership.~~

~~We would not subscribe to such an argumentation for the following two reasons:~~

- ~~In our view, the Transaction is not comparable to a true repo. The fact that the Counterparty is a party to both, the sale and the purchase agreement is only a technical aspect to avoid counterparty risk in case of futures transactions. The use of either a central counterparty or a broker does not mean from an economical point of view that the central counterparty or the broker act on its own account. Neither the central counterparty nor the broker intend to impact on the security or take any price risk or chance. Both, the central counterparty and the broker only intermediate to a counterpart who is not disclosed.~~

- ~~As a further argument, one characteristic of a true repo is that the seller of the asset gets back the asset at a pre-determined time for a pre-determined price. In the case at hand, there is no such link between the futures entered into with the Counterparty. A physical delivery of the Stock back to the Counterparty is not ensured. Rather, the Fund may acquire the opposite future, close-out the trade and sell the Stock otherwise.~~

~~Therefore, even if the Counterparty becomes legal owner of the Stock for a logical second, we take the view that it should not become true/beneficial/economic owner of the Stock.~~

(c) ~~Preliminary Conclusion~~

For the foregoing reasons, we take the view that the Fund should become true/beneficial/economic owner of the Stock ~~irrespective of whether the future in Component 2 is cash settled or physically settled. However, it has to be noted that the remaining risk is slightly larger in the case of a physically settled future~~.

<ins>(b)</ins> ~~(d)~~ Short Sale

The above statements pertain to the scenario in which the seller actually is a holder of the shares. The question arises whether this also applies where the seller is a short seller and acquires the shares only on the ex date and delivers those shares subsequently to the Fund. In this scenario, there are no shares at the level of the seller on the dividend record date and, consequently, one might argue that the purchaser cannot acquire true/beneficial/economic ownership in shares from the seller because there are none in its hands.

Nevertheless, it is the view of the German legislator that true/beneficial/economic ownership in shares is also acquired if the seller is a short seller. This view has been laid down in the notes of the legislator to the Annual Tax Act 2007 (*Jahressteuergesetz 2007*)[2] introducing a new provision Section 20 para. 1 no. 1 sentence 4 EStG which aims at closing the existing loophole for short sales over the dividend date. The following example is given in the notes (in German language):

Die steuerrechtliche Lage im Fall von sog. Leerverkäufen, bei denen der Leerverkäufer die Aktien, die er veräußert, selbst erst am Markt beschaffen muss, stellt sich nach geltendem Recht wie folgt dar:

| 28. 06. | 29. 06. | 30. 06. |
|---|---|---|
| Aktien im Marktbesitz | Gewinnverteilungsbeschluss der Hauptversammlung | |
| Leerverkäufer gibt Verkaufs-Order | | Leerverkäufer gibt Kauf-Order als Ausgleich für Verkaufs-Order |
| Kunde Y gibt Kauf-Order | | Erfüllungsgeschäft. |

Am 29. Juni sind die Aktien steuerlich den Marktteilnehmern zuzurechnen, in deren Eigentum und Besitz sich die Aktien an diesem Tag befinden, mit der Folge, dass diese die Nettodividende und den Kapitalertragsteuer-Anrechnungsanspruch erhalten.

Der Leerverkäufer wird nur in Höhe der Nettodividende belastet, damit die Bank in gleicher Höhe eine Verrechnung mit Kunde Y vornehmen kann.

Am 29. Juni sind aber auch Kunde Y die erworbenen Aktien steuerlich zuzurechnen, d. h., er erhält ebenfalls eine Nettodividende und den Kapitalertragsteuer-Anrechnungsanspruch. Um sicherzustellen, dass dem Leerverkäufer weder eine Dividende noch ein Kapitalertragsteuer-Anrechnungsanspruch vermittelt wird und sämtliche Ansprüche des Kunden Y abgedeckt werden, ist es erforderlich, dass die Bank den Leerverkäufer zusätzlich mit einem Ausgleichsanspruch in Höhe der Kapitalertragsteuer belastet. Darauf zielt die Neuregelung ab.

The free translation of this note of the legislator reads:

*Under existing law, the tax situation for a short seller who has to acquire the shares himself is the following:*

*28 June                29 June                                30 June*
*Shares held by a third party   Shareholder dividend resolution*
*Short seller trades                                           Short seller purchases to hedge*
*Purchaser Y trades                                            Settlement*

*On 29 June, the true/beneficial/economic ownership in the shares is attributed to those market participants who are legal owners and in possession of the shares at this time and, consequently, these participants receive the net dividend plus the withholding tax credit.*

---

[2]  Federal German Parliament, Document no. 16/2712, dated 25 September 2006, 48

*The short seller will only be debited with the net dividend so that the bank can settle against the purchaser Y.*

*On 29 June, the true/beneficial/economic ownership in the shares is also attributed to purchaser Y and, therefore, from a tax perspective, purchaser Y generates the net dividend and is entitled to the withholding tax credit. To ensure that the short seller neither generates a dividend nor receives a withholding tax credit, the bank has to debit the short seller with a compensation payment for the withholding tax amount. This is the objective of the new provision.*

On the basis of the above, it is obvious that the legislator takes the view that a purchaser from a short seller will become true/beneficial/economic owner. However, one might very well take a different view and deny true/beneficial/economic ownership in the absence of shares. Similar concerns could be raised by a scholar view stating that a double attribution (*Doppelausweis*) of the true/beneficial ownership in securities is incompatible with German tax laws.[3] We would not agree to these views. Although a double attribution of the true/beneficial/economic ownership might be exceptional in German tax laws, the position taken by the legislator is a very important element when it comes to the interpretation of laws. Consequently, following the legislator's view there is no difference for the purchaser whether or not the seller holds the shares. This is a reasonable approach in our view because it will be virtually impossible for the purchaser to track-down whether or not the seller is a short seller.

4.2.2   4.1.2 Date of Transfer of True/Beneficial/Economic Ownership to the Fund

The Fund should become true/beneficial/economic owner of the Stock at the date T which is either (i) the trade date of the Stock or (ii) the expiry date of the future in Component 1.

Generally, true/beneficial/economic ownership is transferred at the same point of time when legal ownership is transferred because, as stated above under 4.1.1., true/beneficial/economic ownership generally follows the civil-law ownership. However, in case of exchange-traded stocks, the Federal Fiscal Court (*Bundesfinanzhof*) holds that the true/beneficial/economic ownership is transferred on trade date even if – according to exchange usages – the settlement date is two days later.[4] The reason is that at trade date the stock is locked in and cannot be sold or otherwise disposed of any longer. The fact that the settlement date is two days later is a mere technical aspect which does not affect the economics of the trade.

In the case at hand, the difference between trade date and settlement date is prescribed by the stock exchange or the clearing system and, furthermore, the Stock might be purchased by way of an OTC transaction. We take the view that even in this case, the mentioned principle should apply that the true/beneficial/economic ownership is transferred at trade date rather than at settlement date. This principle is based on exchange usages and technical aspects of the relevant stock exchange. Regardless of the time difference between trade date and settlement date the stock is locked in in the meantime and cannot be otherwise sold or disposed of. Furthermore, the booking at settlement date is a mere technical aspect which is irrelevant for the economics of the trades.

Our view seems to be supported by a tax decree[5]. Regarding its scope of application, the decree states that it applies to share purchases on the dividend record date or shortly before, where the exact time frame depends on the number of days between trade date and settlement date at the respective stock

---

[3] *Häuselmann*, FR 2010, p. 200, 201.

[4] Cf. Federal Fiscal Court, judgment dated 15 December 1999, I R 29/97, Federal Tax Gazette (*Bundessteuerblatt*) II 2000, 527. The Federal Ministry of Finance issued a tax decree to the contrary on 6 October 2000, IV C 6 – S 2189 – 11/00, Federal Tax Gazette I 2000, 1392 instructing the tax authorities to disregard the judgment. However, the Federal Fiscal Court has confirmed its view again in its judgment dated 20 November 2007, I R 85/05, BFH/NV 2008, 551. The tax authorities have been silent since then.

[5] Federal Ministry of Finance (*Bundesfinanzministerium*), tax decree dated 5 May 2009, IV C 1 S 2252/09/10003, DOK 2009/0288260, Federal Tax Gazette I 2009, 631

CONFIDENTIAL                                                                                                              WH_MDL_00453986

exchange. Thus, we understand that the tax authorities take the view that the trade date is decisive, independent of the stock exchange used and the number of days between trade date and settlement date.

It is our view that the principles for the purchase of stocks on the stock exchange should apply accordingly to stocks cleared through an official clearing system because the same arguments as above can be made. Although, no evidence for our conclusion can be furnished, a tax decree[6] explaining ramifications on the application of the tax decree dated 5 May 2009 with a view to OTC trades gives some indications into this direction:

- With regard to general shareholding (outside an investment fund), the initial decree dated 5 May 2009 requires a tax certificate detailing (i) the dividend amount resulting from shares purchased cum dividend but settled ex dividend and (ii) the withholding tax amount associated with this. This certificate, however, is only required if the shares are purchased on the dividend record date or the day before. Further examples on the relevant timing are given with regard to EUREX options and other exchanges with different usages regarding settlement periods. The decree makes explicit reference to the number of days imposed by the relevant exchange for settlement. It seems, only a purchase cum dividend but a settlement ex dividend due to the settlement period is intended to be covered.

- Following this initial tax decree, the Ministry was asked whether that decree also applies to OTC transactions. The Ministry declined this request in its subsequent tax decree dated 2 September 2009 and stated that the tax certificate must always disclose transactions when shares are purchased cum dividend but are settled ex dividend. The Ministry strengthens that this extends to both, transactions over the stock exchange and to OTC transactions.

- Although, the tax decree dated 2 September is silent on this, this decree only makes sense to us if, with a view to OTC transactions, true/beneficial/economic ownership in shares can – like in a scenario with trading over the stock exchange – be transferred prior to the transfer of legal ownership. The Ministry draws a picture in which the shares are purchased cum dividend but are settled ex dividend and the dividend entitlement of the purchaser is, nevertheless, taxwise accepted. In such a scenario it makes sense to request a tax certificate detailing the dividend amount and the withholding tax amount thereon resulting from such transactions.

Therefore, we take the view that the Fund should become true/beneficial/economic owner of the Stock at trade date T.

4.2.3   4.1.3 Relevant Point of Time for the Allocation of Dividend

The dividend should be allocated to the true/beneficial/economic owner of the Stock at Clearstream's close of business on the dividend record date.

According to Section 20 para. 5 EStG, a dividend is allocated to the person who holds the share at the time the general assembly resolves upon a dividend distribution. If this rule were strictly applied, it would be necessary to determine the exact time of the dividend resolution as well as to determine the true/beneficial/economic owner of the share at this point of time on the dividend record date.

However, especially in case of an exchange-listed stock, it would be hardly possible from a practical point of view to determine the true/beneficial/economic owner at this exact point of time. The legislator took the same view when introducing Section 20 para. 2a EStG (which is now para. 5) and stated in the legislative notes that in case of exchange-listed stocks the allocation of dividends for tax purposes follows the civil law assessment for practical reasons.[7] Although, it is not clear whether the legislator has noted the

---

[6] Federal Ministry of Finance, tax decree dated 2 September 2009, IV C 1 - S 2252/09/10003, DOK 2009/0546554
[7] Cf. *Bundestags-Drucksache* 12/5016, p. 88

9

difference between listing on a stock exchange and clearing through a clearing system, the legislator aims at synchronisation between the legal and the tax treatment.

Therefore, we take the view that the decisive point of time is the detachment of the dividend coupon from the shares. From this time on, the shares are traded "ex dividend" and, thus, from a civil law perspective, the purchaser is not entitled to receive the dividend.

According to No. 33(1) of Clearstream's general terms and conditions, the dividend coupons are detached from the shares at the end of the day when the general assembly resolves upon the dividend (i.e. 12pm on the dividend record date). According to No. 33(6) of Clearstream's general terms and conditions, the shares are traded "ex dividend" from the day after dividend record date (i.e. ex date) onwards.

We take the view that the civil law assessment should be adopted from a tax point of view and, thus, the dividend should be allocated to the true/beneficial/economic owner of the stock in accordance with Clearstream's business practice.

For the foregoing reasons, the dividend paid under the Stock should be allocated to the Fund if the Fund acquires true/beneficial/economic ownership of the Stock before Clearstream's close of business at dividend record date at the latest.

**4.3**     4.2 Inapplicability of the Decree dated 5 May to the Fund

The decree dated 5 May 2009 on dividend withholding tax in connection with short sales should not adversely affect the Fund since the decree is limited to German special funds (*Spezial-Sondervermögen*) but the Fund at hand is established as a foreign fund.

**4.3.1**   4.2.1 Regulations Imposed by the Decree

Under the decree dated 5 May 2009, in general, a German special fund purchasing shares cum dividend but with settlement ex dividend has to provide a certificate to its depot bank certifying the following:

> *"There are no findings (Erkenntnisse) that the KAG has made any arrangement with regard to the acquisition of shares over the dividend date and respective short sales which were not subject to Section 44 para. 1 sentence 3 in connection with Section 20 para. 1 no. 1 sentence 4 Income Tax Act (Einkommensteuergesetz). With regard to outsourcing by the KAG to external portfolio managers or advisors, there are no findings that the KAG instructed them to pre-arrange such transactions and, furthermore, there are no findings that such pre-arrangements have occurred."*

The depot bank of the special fund then has to report under the decree dated 5 May 2009 to the Federal Central Tax Office *(Bundeszentralamt für Steuern)* the purchases of shares cum dividend but settled ex dividend. The depot bank also has to report to the Federal Central Tax Office whether the above certification was filed. If no such certification is filed the Federal Central Tax Office may assume that withholding taxes had been refunded without reason and reclaim them.

However, the above rules under the decree exclusively apply to German special funds. Since the Fund at hand is an Irish fund, the decree should not be applied to the Fund.

Furthermore and only for the sake of completion, the consequences of the decree only kick-in in the event of a pre-arrangement (*Absprache*) between the short seller and the purchaser regarding a short sale outside the substitutional withholding tax pursuant to Section 44 para. 1 sentence 3 in connection with Section 20 para. 1 no. 1 sentence 4 EStG. In the absence of such a pre-arrangement, the decree should not apply.

**4.3.2**   4.2.2 No Re-Qualification of the Fund into a German Special Fund

CONFIDENTIAL                                                                                                    WH_MDL_00453988

The Fund at issue is established as a foreign fund and should not be re-qualified into a German special fund under the general anti-avoidance provision[8] for which reason the above decree should not be applicable under anti-avoidance regulations, either.

A re-qualification of public funds into special funds is considered in certain circumstances by the decree of the Federal Ministry of Finance dated 18 August 2009.[9] The re-qualification is, however, limited to German public funds and there is no extension to the effect that a non-German public fund could be re-qualified into a special fund.

4.4     4.3 Refund of Withholding Tax under the Double Tax Treaty

The Fund should be entitled to a refund of German withholding tax on portfolio dividends since Germany may only levy a reduced withholding tax rate of 10 per cent. on Irish-resident persons pursuant to Article VI para. 1 sentence 2, para. 2 double tax treaty between Germany and Ireland ("**DTT**").

Under these provisions of the DTT the German withholding tax shall be reduced to 10 per cent. on dividends paid by a company resident in Germany to a resident of Ireland, since the tax rate of corporation tax on distributed profits equals that on undistributed profits. Whether or not the profit is distributed, the German corporation tax rate amounts to 15 per cent. on the taxable income of the corporation according to Section 23 para. 1 German corporation tax act (*Körperschaftsteuergesetz - KStG*).

4.4.1   4.3.1 Dividend under the DTT

We take the view that the Fund receives a dividend in the meaning of Article VI para. 1 DTT whether the share is acquired from a seller that physically holds the share or by a short seller.

(a) Acquisition from a seller that holds the share

Where the Fund acquires the shares from a seller that physically holds the shares, there is no doubt that the Fund receives a dividend in the meaning of Article 10 para. 1.

In the absence of a general definition of the term "dividend" in the DTT[10], leading scholar views take the view that the term has to be interpreted under national tax laws.[11] Under German tax laws, the term "dividend" is defined as a share in profits (*Gewinnanteile*) from stocks and certain other equity-style participation rights in certain legal corporations listed in Section 20 para. 1 no. 1 EStG. The Fund at hand as the purchaser of a physical share in a stock corporation should therefore receive a dividend under the treaty.

(b) Acquisition from a short seller

Where the Fund acquires the shares from a short seller, one might argue that the compensation payment, i.e. the manufactured dividend, does not fall under the term "dividend".

Under Section 20 para. 1 no. 1 sentence 4 EStG manufactured dividends are fictitous "other income" (*sonstige Bezüge*) from capital investment. In contrast to dividends in nature the manufactured dividends are not paid by the stock corporation but a third party, i.e. the short seller. The meaning of a dividend "paid by a company resident in a contracting state" pursuant to Article

---

[8]  Section 42 General Tax Code *(Abgabenordnung)*
[9]  Federal Ministry of Finance, tax decree date 18 August 2009, IV C 1 - S 1980-1/08/10019, Federal Tax Gazette I 2009, 931, 972, annotation no. 242
[10] Art. 2 para. 1 lit. h DTT only contains a partial definition pertaining to profits distributed by a German limited liability company (*Gesellschaft mit beschränkter Haftung*), distribution on German investment funds and income derived by a typical silent partner from his participation as such.
[11] *Rosenthal* in Debatin/Wassermeyer, Double Taxation, Commentary, Ireland, May 2007, Article II annotation no. 39.

VI para. 1 DTT, however, should in our view not be interpreted strictly adhering to its wording. We would argue that Art. 6 para. 1 DTT should apply to all payments that are treated as dividends for tax purposes. This interpretation would include manufactured dividends and is supported by Article 10 no. 28 of the Commentary on the OECD Model Tax Convention on Income and on Capital which reads as follows:

*"Payments regarded as dividends may include not only distributions of profits decided by annual general meetings of shareholders, but also other benefits in money or money's worth, such as bonus shares, bonuses, profits on a liquidation and disguised distribution of profits. The reliefs provided in the Article [i.e. the article referring to dividends] apply so long as the State of which the paying company is a resident taxes such benefits as dividends."* In addition, the term "paid" in Article VI para. 1 DTT should be interpreted in a broad meaning under the treaty. The leading scholar view states that the term "payment" applies to the emergence of the dividend claim as well as settlement substitutes (*Erfüllungssurrogate*) and other similar economic transactions.[12] That interpretation corresponds to the wide scope of the term "dividend" as analysed above.

Even where the Fund receives the payment from a short seller, it should receive a dividend in the meaning of Article 10 para. 1 DTT.

4.4.2   ~~4.3.2~~ Residency under the Treaty

The Fund should also fall within the meaning of a "resident of the other Contracting State" (*ansässige Person im anderen Vertragsstaat*) as required by Article VI para. 1 sentence 1 DTT:

- The Fund should qualify as a "person" in the meaning of the DTT that refers, *inter alia*, to companies and all other entities which are treated as taxable units under the tax laws of the respective contracting states (Art. II para. 1 letter (b) DTT). In the case at hand, the Fund is treated as a taxable unit in Ireland.

- Pursuant to Article II para. 1 (d) (iii) DTT, in connection with companies, the term "resident of Ireland" means a company managed and controlled in Ireland which condition should be satisfied.

4.4.3   ~~4.3.3~~ Result and Further Thoughts

As a result, the Fund should benefit from a reduced withholding tax rate under the DTT. This should hold true irrespective of the unit holders in the Fund in the absence of limitation-of-benefits clause with regard to the shareholder situation.

This analysis is supported by the former practice of the German tax authorities. According to an information letter on the procedure for the refund of withholding tax under the double tax treaties that was released by the former Federal Finance Office (*Bundesamt für Finanzen*, the predecessor of the Federal Central Tax Office)[13], Irish public limited companies were listed as entities being generally entitled to a refund of German withholding taxes on dividends, if certain declarations were made by the Irish plc. There are no indications that the Federal Central Tax Office has adopted a different view although, one has to state that the information letter has no binding view and was not about investment funds.

Based on the currently published application form on the claim for refund of German withholding taxes on dividends and/or interest[14] the claimant is required to give the declaration that it does not derive its income

---

[12] *Wassermeyer* in Debtin/Wassermeyer, Double Taxation, Commentary, June 2001, Article 10 annotation no. 39.
[13] Federal Finance Office, Application procedure on the reclaim of withholding tax under the double tax treaties by way of a mechanically usable data medium (*Datenträgerverfahren*), August 2002, St II 3 - S 2411 - 02/02
[14] Published on the website of the Federal Central Tax Office under http://www.bzst.de/003_menue_links/008_kapertragsteuer/084_ausl_antragsteller/843_Formulare/002_E_engl.pdf

through a permanent establishment (*Betriebsstätte*) or a permanent representative (*ständiger Vertreter*) maintained in Germany.

The Fund at hand neither derives its German income through a permanent establishment nor a permanent representative in Germany.

In contrast to other jurisdictions (e.g. UK) no further declaration is needed that the dividends are subject to tax in the country of residence. This supports the view that the entitlement for a refund should not depend on the taxation of the dividends in Ireland.

4.4.4   4.3.4 No Application of the German Treaty Override Provision

Section 50d para. 3 EStG which is to counter abuse of tax treaties by "treaty shopping", i.e. an interposition of foreign companies without function for the purpose of obtaining benefits under a tax treaty, should not be applicable to the Fund at issue. As a first layer analysis, the provision might apply but, as a second layer analysis, an exemption should be granted.

(a) Application of the Treaty Override

Under Section 50d para. 3 EStG a foreign company is not entitled to full or partial relief of German withholding tax, insofar as persons hold shares in it, that would not be entitled to the tax refund or relief if they generated the income directly and, in addition, one of the tests as stipulated below was met:

(i) no commercial or other sound reasons (*wirtschaftliche oder sonst beachtliche Gründe*) for the interposition of the foreign company,

(ii) the foreign company earns no more than 10 per cent. of its total gross income of the relevant fiscal year from a business activity of its own, or

(iii) the foreign company is, judged by its objects, not appropriately equipped for its business conduct.

Regardless of the fulfilment of this test, however, in the case at issue, the Fund should benefit from an exemption from the treaty override provision (see below).

(b) Exemption from the Treaty Override

The restrictions under Section 50d para. 3 sentence 1 to 3 EStG should not apply to the Fund according to Section 50d para. 3 sentence 4 EStG.

Under that provision, the restrictions under Section 50d para. 3 EStG as described above are not applied, *inter alia*, to investment funds which are subject to the German Investment Tax Act. This means that a foreign company that falls in the scope of the German Investment Tax Act is generally entitled to claim a tax refund under the respective double tax treaty, whether or not it fulfils the requirements of the anti-treaty-shopping provision in Section 50d para. 3 sentence 1 to 3 EStG.

A tax decree issued by the Federal Ministry of Finance[15] has confirmed that incorporated foreign investment funds benefit from the exemption set out in Section 50d para. 3 sentence 4 EStG.[16] The decree explicitly states that a foreign investment fund needs to have a comparable structure

---

[15] Federal Ministry of Finance, decree dated 3 April 2007, IV B 1 - S 2411/07/0002, Federal Tax Gazette I 2007, 446
[16] Federal Ministry of Finance, decree dated 3 April 2007, IV B 1 - S 2411/07/0002, Federal Tax Gazette I 2007, 446, no. 10.2

with a German investment corporation (*Investmentaktiengesellschaft*) in the meaning of Section 2 para. 5 Investment Act. Under the assumptions made, the conditions stipulated by the Federal Ministry of Finance should be met.

As a consequence, the exemption for foreign incorporated funds should apply and the restrictions of Section 50d para. 3 sentence 1 to 3 EStG should not kick-in.

4.4.5    ~~4.3.5~~ No Abuse of Law

The interposition of the Fund at issue and its entitlement to reclaim German withholding taxes should not be challenged under the general anti-avoidance provision of Section 42 AO. ~~This~~

The provision can apply even if the conditions of the specific anti-treaty shopping rule are not met~~:~~

(a) ~~No Qualification as a Base Company The Fund should not be regarded as a letter-box or an inoperable base company (funktionslose Basisgesellschaft) falling under Section 42 AO~~. Under Section 42 AO it shall not be possible to circumvent tax legislation by abusing legal options for tax planning schemes. An abuse shall be deemed to exist where an appropriate legal option is selected which, in comparison with an appropriate option, leads to tax advantages unintended by law for the taxpayer or a third party. This shall not apply where the taxpayer provides evidence of non-tax reasons for the selected option which are relevant from an overall perspective.

We take the view that the general anti-avoidance provision should not apply.

(a) No Qualification as a Base Company

The Fund should not be regarded as a letter-box or an inoperable base company (*funktionslose Basisgesellschaft*) falling under Section 42 AO.

According to the jurisdiction of the Federal Fiscal Court[17] so-called base companies are disregarded for German tax purposes by application of Section 42 AO. They are characterised by insufficient personnel or infrastructure in order to achieve their business. The Fund at issue~~, however, should be in a position to prove sufficient personnel and office equipment in Ireland. In particular, the directors of the Fund hold their regular meetings in Ireland and, thus, control the management of the Fund in Ireland. Therefore, the Fund should not be challenged by the jurisdiction on inoperable base companies~~ has adequate resources to conduct its business and, therefore, should not be seen as a letter box.

(b) No Abuse under the Criteria of the Federal Tax Authority

~~The~~ Furthermore, the Fund should not be regarded as abusive when applying the criteria of the Federal tax Authority.

Pursuant to the decree on the General Tax Code (*Anwendungserlass zur Abgabenordnung* – "**AEAO**"), comprised of the decree dated 2 January 2008[18], an abuse is contingent on

(i) a legal structure inappropriate to the economic transaction,

(ii) the chosen structure generating a tax benefit at the level of the taxpayer or a third party,

(iii) such tax advantage not being provided for by the law, and

---

[17]   Federal Fiscal Court, judgment dated 20 March 2002, I R 38/00, Federal Tax Gazette II 2002, 819
[18]   Federal Tax Gazette I 2008, p. 26, modified and amended from time to time, the latest amendment being the tax guideline dated 22 December 2009, IV A 3 - S 0062/08/10007-07

Opinion-Solo-Capital-2010-04-~~12~~.16.doc

CONFIDENTIAL                                                                                                                                         WH_MDL_00453992

(iv) the absence of sound business reasons.

As stated above, the Fund will conduct asset management business and has adequate resources ~~necessary for this~~. It will have the character of a collective investment vehicle since, to a large extent, the Fund will be owned by external investors. In our view, this constitutes a sound business reason although, it cannot be ~~ruled out~~guaranteed that the tax authorities ~~would look-through to the unit holder. If there were other unit holders and/or if the Fund conducted~~subscribe to this view. The sound business reason would be enhanced if there was asset management business in excess of Component 1 and Component ~~2, this would enhance the robustness~~2 or comparable structures.

## 5    Limitation of Liability

This Opinion is solely for the benefit of the addressee. This Opinion may not be (i) relied upon by any other person or for any other purpose or (ii) quoted or referred to in any other document or filed with anyone, in each case, without our written consent. This Opinion is not intended to create third party rights pursuant to Section 328 of the German Civil Code (*Bürgerliches Gesetzbuch*). This Opinion may not be disclosed to any other person except that disclosure shall be permitted: (i) in the event disclosure is required by law or by a regulatory authority, or is made in a court of law, (ii) to any government authority including any tax authority, regulatory or banking authority, and (iii) in other circumstances upon (A) written request by the addressee and (B) our written consent in response to such request (which consent shall not be unreasonably withheld provided no liability results thereof). For the avoidance of doubt, no party to which disclosure is permitted shall be permitted to rely upon this Opinion.

This Opinion is based on German law (including its interpretation by authorities and courts) as it is in effect as of the date of this Opinion. We assume no obligation to advise either you or any other party of changes that could occur after the date of this Opinion, even though the change may affect the analysis or conclusion given in this Opinion, potentially with retroactive effect.

This Opinion is governed by, and shall be construed in accordance with, German law. The exclusive place of jurisdiction is Frankfurt/Main, Germany.

\* \* \* \* \*

Yours sincerely

Frankfurt am Main [●] April 2010

Norton Rose LLP

Opinion-Solo-Capital-2010-04-~~12~~-16.doc

CONFIDENTIAL

WH_MDL_00453993

Document comparison done by DeltaView on 17 April 2010 23:18:37

| Input: | |
|---|---|
| Document 1 | file:////FRAFS01/mmkr$/My Videos/Opinion-Solo-Capital-2010-04-12.doc |
| Document 2 | file:////FRAFS01/mmkr$/My Videos/Opinion-Solo-Capital-2010-04-16.doc |
| Rendering set | NR Standard |

| Legend: |
|---|
| Insertion |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 49 |
| Deletions | 69 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 122 |

CONFIDENTIAL